[ORAL ARGUMENT NOT SCHEDULED]
CASE No. 22-5304

IN THE

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

_____

JASON LEOPOLD,

*Plaintiff-Appellant,*

v.

J. THOMAS MANGER, et al.,

*Defendants-Appellees*

_____

CORRECTED JOINT APPENDIX

_____

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

_____


JEFFREY LIGHT, D.C. BAR #485360
Law Office of Jeffrey L. Light
1629 K Street, N.W.
Suite 300
Washington, DC 20006
(202) 277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

Dated: April 20, 2023      *Counsel for Plaintiff-Appellant*

# TABLE OF CONTENTS

Docket from the U.S. District Court .................................................................JA-1

First Amended Complaint (Dkt. No. 12) ...........................................................JA-6

Answer (Dkt. No. 15)........................................................................................JA-11

Defendant's Motion for Summary Judgment

      Declaration of Michael Bolton (Dkt. No. 19-3) ......................................JA-14

      Capitol Police Board Order 17.16 (Dkt. No. 19-4) ..................................JA-19

      Declaration of James W. Joyce (Dkt. No. 19-5)......................................JA-20

      Plaintiff Jason Leopold's Request for Records (Dkt. No. 19-6) .............JA-26

      List of Capitol Police Directives (Dkt. No. 19-7) ...................................JA-28

Plaintiff's Cross-Motion for Summary Judgment and Opposition
to Defendants' Motion for Summary Judgment

      U.S. Capitol Police Directive 2053.013 (Dkt. No. 21-1) ........................JA-30

      "Publication of MPD Orders on the Internet" (Dkt. No. 21-1) ..............JA-38

      Statement of Inspector General Michael A. Bolton (Dkt. No. 21-1) ......JA-42

      U.S. Capitol Police Office of Inspector General
      Flash Report (Dkt. No. 21-1)...................................................................JA-51

      Hearing Before the U.S. House of Representatives Subcommittee on U.S.
      Capitol Security, "U.S. Capitol Police Budget Concerns
      (July 29, 2010) (Dkt. No. 21-1) ..............................................................JA-55

      U.S. Capitol Police Office of Inspector General,
      "Audit of USCP Budget Formulation Process" (Dkt. No. 21-1) ............JA-58

i

U.S. Election Assistance Commission Office of
Inspector General Audit Peer Review of the United States
Capitol Police Office of Inspector General (Dkt. No. 21-1) ...................JA-62

U.S. Capitol Police Office of Inspector General
Response to U.S. Election Assistance Commission Office of Inspector
General's System Review Report (Dkt. No. 21-1)..................................JA-66

Combined Opposition to Plaintiffs' Cross-Motion for Summary Judgment and
Reply in Support of Defendants' Motion for Summary Judgment

Second Declaration of Michael Bolton (Dkt. No. 25-2) .......................JA-67

Order Dismissing Case (Dkt. No. 28).................................................JA-69

Memorandum Opinion (Dkt. No. 29) ................................................JA-71

Notice of Appeal (Dkt. No. 30) .......................................................JA-95

APPEAL,CLOSED,MANDAMUS,TYPE−C

**U.S. District Court**
**District of Columbia (Washington, DC)**
**CIVIL DOCKET FOR CASE #: 1:21−cv−00465−BAH**

LEOPOLD et al v. PITTMAN et al
Assigned to: Chief Judge Beryl A. Howell
Case in other court:  22−05304
Cause: Petition for Writ of Mandamus

Date Filed: 02/23/2021
Date Terminated: 09/20/2022
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: U.S. Government Defendant

**Petitioner**

**JASON LEOPOLD**                    represented by    **Jeffrey Louis Light**
LAW OFFICES OF JEFFREY L. LIGHT
1629 K Street, NW
Suite 300
Washington, DC 20006
202−277−6213
Email: jeffrey@lawofficeofjeffreylight.com
*ATTORNEY TO BE NOTICED*

**Petitioner**

**BUZZFEED, INC.**                   represented by    **Jeffrey Louis Light**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**YOGANANDA D. PITTMAN**             represented by    **Michael Andrew Zee**
*Acting Chief, United States Capitol*                 U.S. DEPARTMENT OF JUSTICE
*Police*                                              Civil Division, Federal Programs Branch
450 Golden Gate Avenue
San Francisco, CA 94102
(415) 436−6646
Fax: (415) 436−6632
Email: m.andrew.zee@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Justin Robinson**
U.S. DEPARTMENT OF JUSTICE
Civil Division, Federal Programs Branch
450 Golden Gate Ave
Suite 7−5395
San Francisco, CA 94102
(415) 436−6635
Fax: (415) 436−6632
Email: stuart.j.robinson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Respondent**

**MICHAEL BOLTON**                   represented by    **Michael Andrew Zee**
*Inspector General of the United States*              (See above for address)
*Capitol Police*                                      *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart Justin Robinson**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/23/2021 | 1 | PETITION FOR WRIT OF MANDAMUS against MICHAEL BOLTON, YOGANANDA D. PITTMAN ( Filing fee $ 402 receipt number ADCDC−8232136) filed by JASON LEOPOLD, BUZZFEED, INC.. (Attachments: # 1 Exhibit 1−5, # 2 Civil Cover Sheet, # 3 Summons)(Light, Jeffrey) (Entered: 02/23/2021) |
| 02/23/2021 | 2 | LCvR 26.1 CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests by BUZZFEED, INC. (Light, Jeffrey) (Entered: 02/23/2021) |
| 02/23/2021 | | Case Assigned to Chief Judge Beryl A. Howell. (adh, ) (Entered: 02/23/2021) |
| 02/23/2021 | 3 | SUMMONS (4) Issued Electronically as to MICHAEL BOLTON, YOGANANDA D. PITTMAN, U.S. Attorney and U.S. Attorney General (Attachment: # 1 Notice and Consent)(adh, ) (Entered: 02/23/2021) |
| 02/23/2021 | 4 | STANDING ORDER. Signed by Chief Judge Beryl A. Howell on February 23, 2021. (lcbah2) (Entered: 02/23/2021) |
| 02/25/2021 | 5 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the United States Attorney. Date of Service Upon United States Attorney on 2/25/2021. Answer due for ALL FEDERAL DEFENDANTS by 4/26/2021. (Light, Jeffrey) (Entered: 02/25/2021) |
| 03/02/2021 | 6 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. MICHAEL BOLTON served on 3/2/2021 (Light, Jeffrey) (Entered: 03/02/2021) |
| 03/02/2021 | 7 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed. YOGANANDA D. PITTMAN served on 3/2/2021 (Light, Jeffrey) (Entered: 03/02/2021) |
| 03/02/2021 | 8 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on United States Attorney General. Date of Service Upon United States Attorney General 03/01/2021. (Light, Jeffrey) (Entered: 03/02/2021) |
| 04/26/2021 | 9 | NOTICE of Appearance by Stuart Justin Robinson on behalf of All Defendants (Robinson, Stuart) (Entered: 04/26/2021) |
| 04/26/2021 | 10 | MOTION to Dismiss by MICHAEL BOLTON, YOGANANDA D. PITTMAN. (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Robinson, Stuart) (Entered: 04/26/2021) |
| 04/28/2021 | 11 | NOTICE of Appearance by Michael Andrew Zee on behalf of All Defendants (Zee, Michael) (Entered: 04/28/2021) |
| 04/29/2021 | | RESOLVED.....NOTICE of Provisional/Government Not Certified Status re 11 NOTICE of Appearance by Michael Andrew Zee on behalf of All Defendants (Zee, Michael).<br><br>Your attorney renewal/government certification has not been received. As a result, your membership with the U.S. District & Bankruptcy Courts for the District of Columbia is not in good standing, and you are not permitted to file. Pursuant to Local Civil Rule 83.9, you must immediately correct your membership status by following the appropriate instructions on this page of our website: https://www.dcd.uscourts.gov/attorney−admissions−and−renewal−information.<br><br>Please be advised that the presiding judge in this case has been notified that you are currently not in good standing to file in this court. Renewal Due by 5/6/2021. (znmw) Modified on 5/19/2021 (znmw). (Entered: 04/29/2021) |
| 05/10/2021 | 12 | AMENDED COMPLAINT *(First)* against MICHAEL BOLTON, YOGANANDA D. PITTMAN filed by JASON LEOPOLD, BUZZFEED, INC..(Light, Jeffrey) (Entered: 05/10/2021) |

| | | |
|---|---|---|
| 05/10/2021 | 13 | Memorandum in opposition to re 10 MOTION to Dismiss filed by BUZZFEED, INC., JASON LEOPOLD. (Attachments: # 1 Text of Proposed Order)(Light, Jeffrey) (Entered: 05/10/2021) |
| 05/17/2021 | 14 | REPLY to opposition to motion re 10 MOTION to Dismiss filed by MICHAEL BOLTON, YOGANANDA D. PITTMAN. (Zee, Michael) (Entered: 05/17/2021) |
| 05/24/2021 | 15 | ANSWER to 12 Amended Complaint by MICHAEL BOLTON, YOGANANDA D. PITTMAN.(Zee, Michael) (Entered: 05/24/2021) |
| 06/01/2021 | | MINUTE ORDER (paperless) DENYING AS MOOT defendants' 10 Motion to Dismiss, as defendants conceded in their 14 Reply in Support of Motion to Dismiss that "the Court need not resolve Defendants' Motion to dismiss at this time" in light of plaintiffs' May 10, 2021 filing of their 12 Amended Complaint. Signed by Chief Judge Beryl A. Howell on June 1, 2021. (lcbah2) (Entered: 06/01/2021) |
| 06/08/2021 | 16 | Joint STATUS REPORT by BUZZFEED, INC., JASON LEOPOLD. (Light, Jeffrey) (Entered: 06/08/2021) |
| 06/23/2021 | 17 | MEET AND CONFER STATEMENT. (Attachments: # 1 Text of Proposed Order)(Zee, Michael) (Entered: 06/23/2021) |
| 06/24/2021 | | MINUTE ORDER (paperless) ISSUING, in light of the parties' 17 Joint Meet and Confer Report, the following SCHEDULING ORDER to govern further proceedings in this matter: (1) by September 16, 2021, defendants shall file their motion for summary judgment; (2) by October 14, 2021, plaintiffs shall respond to defendants' motion for summary judgment and file any cross−motion for summary judgment; (3) by November 14, 2021, defendants shall respond to plaintiffs' cross motion for summary judgment and file any reply in support of defendants' motion for summary judgment; and (4) by December 6, 2021, plaintiffs shall file any reply in support of their cross motion for summary judgment. Signed by Chief Judge Beryl A. Howell on June 24, 2021. (lcbah2) (Entered: 06/24/2021) |
| 06/25/2021 | | Set/Reset Deadlines: Summary judgment motion due by 9/16/2021; cross−motion and opposition to summary judgment motion due by 10/14/2021; opposition to cross−motion and reply to opposition to summary judgment motion due by 11/14/2021; reply to opposition to cross−motion due by 12/6/2021. (ztg) (Entered: 06/25/2021) |
| 09/14/2021 | 18 | Consent MOTION for Extension of Time to File *Motion for Summary Judgment* by MICHAEL BOLTON, YOGANANDA D. PITTMAN. (Attachments: # 1 Text of Proposed Order)(Zee, Michael) (Entered: 09/14/2021) |
| 09/16/2021 | | MINUTE ORDER (paperless) GRANTING defendants' 18 Consent Motion for Extension of Time, and AMENDING the SCHEDULING ORDER as follows: (1) defendants shall file their motion for summary judgment by September 30, 2021; (2) plaintiffs shall respond to defendants' motion for summary judgment and file any cross−motion by October 28, 2021; (3) defendants shall respond to any cross−motion and file any reply in support of their motion by November 29, 2021; and (4) plaintiffs shall file any reply in support of a cross−motion by December 20, 2021. Signed by Chief Judge Beryl A. Howell on September 16, 2021. (lcbah2) (Entered: 09/16/2021) |
| 09/20/2021 | | Set/Reset Deadlines: Summary Judgment motion due by 9/30/2021; cross−motion and opposition to motion for summary judgment due by 10/28/2021; opposition to cross−motion and reply to opposition to motion for summary judgment due by 11/29/2021; reply to opposition to cross−motion due by 12/20/2021. (ztg) (Entered: 09/20/2021) |
| 09/30/2021 | 19 | MOTION for Summary Judgment by MICHAEL BOLTON, YOGANANDA D. PITTMAN. (Attachments: # 1 Statement of Facts, # 2 Memorandum in Support, # 3 |

JA-3

| | | |
|---|---|---|
| | | Declaration of Michael Bolton, # 4 Exhibit A − Capitol Police Board Order, # 5 Declaration of James W. Joyce, # 6 Exhibit B − Plaintiffs' Request, # 7 Exhibit C − List of Directives, # 8 Text of Proposed Order)(Zee, Michael) (Entered: 09/30/2021) |
| 10/20/2021 | 20 | Unopposed MOTION for Extension of Time to File Response/Reply as to 19 MOTION for Summary Judgment by BUZZFEED, INC., JASON LEOPOLD. (Attachments: # 1 Text of Proposed Order)(Light, Jeffrey) (Entered: 10/20/2021) |
| 10/22/2021 | | MINUTE ORDER (paperless) GRANTING plaintiffs' 20 Unopposed Motion for Extension of Time to File Response/Reply, and AMENDING the SCHEDULING ORDER as follows: (1) plaintiffs shall file their cross−motion for summary judgment and opposition to defendants' motion by November 10, 2021; (2) defendants shall file their opposition to plaintiffs' cross−motion and any reply in support of their motion for summary judgment by December 17, 2021; and (3) plaintiffs shall file any reply in support of their cross−motion for summary judgment by January, 24, 2022. Signed by Chief Judge Beryl A. Howell on October 22, 2021. (lcbah2) (Entered: 10/22/2021) |
| 10/25/2021 | | Set/Reset Deadlines: Cross−motion and opposition to motion for summary judgment due by 11/10/2021; opposition to cross−motion and reply to motion for summary judgment due by 12/17/2021; reply to opposition to cross−motion due by 1/24/2022. (ztg) (Entered: 10/25/2021) |
| 11/12/2021 | 21 | Memorandum in opposition to re 19 MOTION for Summary Judgment filed by BUZZFEED, INC., JASON LEOPOLD. (Attachments: # 1 Exhibit 1−6, # 2 Statement of Facts, # 3 Text of Proposed Order)(Light, Jeffrey) (Entered: 11/12/2021) |
| 11/12/2021 | 22 | Cross MOTION for Summary Judgment by BUZZFEED, INC., JASON LEOPOLD. (Attachments: # 1 Exhibit 1−6, # 2 Statement of Facts, # 3 Text of Proposed Order)(Light, Jeffrey) (Entered: 11/13/2021) |
| 11/13/2021 | 23 | MOTION for Extension of Time to File Response/Reply as to 19 MOTION for Summary Judgment by BUZZFEED, INC., JASON LEOPOLD. (Attachments: # 1 Text of Proposed Order)(Light, Jeffrey) (Entered: 11/13/2021) |
| 11/16/2021 | 24 | RESPONSE re 23 MOTION for Extension of Time to File Response/Reply as to 19 MOTION for Summary Judgment filed by MICHAEL BOLTON, YOGANANDA D. PITTMAN. (Zee, Michael) (Entered: 11/16/2021) |
| 11/29/2021 | | MINUTE ORDER (paperless) GRANTING plaintiffs' unopposed 23 Motion for Leave to File Late, and ACCEPTING for filing plaintiffs' 21 Memorandum in Opposition to Defendants' Motion for Summary Judgment and 22 Cross Motion for Summary Judgment. Signed by Chief Judge Beryl A. Howell on November 29, 2021. (lcbah2) (Entered: 11/29/2021) |
| 12/17/2021 | 25 | Memorandum in opposition to re 22 Cross MOTION for Summary Judgment filed by MICHAEL BOLTON, YOGANANDA D. PITTMAN. (Attachments: # 1 Statement of Facts Defendants' Response to Plaintiffs' Statement of Material Facts, # 2 Declaration of Michael Bolton (Second), # 3 Text of Proposed Order)(Zee, Michael) (Entered: 12/17/2021) |
| 12/17/2021 | 26 | REPLY to opposition to motion re 19 MOTION for Summary Judgment filed by MICHAEL BOLTON, YOGANANDA D. PITTMAN. (Attachments: # 1 Declaration of Michael Bolton (Second), # 2 Text of Proposed Order)(Zee, Michael) (Entered: 12/17/2021) |
| 01/24/2022 | 27 | REPLY to opposition to motion re 22 Cross MOTION for Summary Judgment filed by BUZZFEED, INC., JASON LEOPOLD. (Light, Jeffrey) (Entered: 01/24/2022) |
| 09/20/2022 | 28 | ORDER GRANTING the defendants' 19 Motion for Summary Judgment and DENYING the plaintiffs' 22 Cross−Motion for Summary Judgment. See Order for further details. The Clerk of Court is directed to close this case. Signed by Chief Judge Beryl A. Howell on September 20, 2022. (lcbah1) (Entered: 09/20/2022) |
| 09/20/2022 | 29 | MEMORANDUM OPINION regarding the defendants' 19 Motion for Summary Judgment and the plaintiffs' 22 Cross−Motion for Summary Judgment. Signed by Chief Judge Beryl A. Howell on September 20, 2022. (lcbah1) (Entered: 09/20/2022) |

| | | |
|---|---|---|
| 11/18/2022 | <u>30</u> | NOTICE OF APPEAL TO DC CIRCUIT COURT as to <u>28</u> Order on Motion for Summary Judgment, by JASON LEOPOLD. Filing fee $ 505, receipt number ADCDC−9683123. Fee Status: Fee Paid. Parties have been notified. (Light, Jeffrey) (Entered: 11/18/2022) |
| 11/18/2022 | <u>31</u> | Transmission of the Notice of Appeal, Order Appealed (Memorandum Opinion), and Docket Sheet to US Court of Appeals. The Court of Appeals fee was paid re <u>30</u> Notice of Appeal to DC Circuit Court. (zed) (Entered: 11/18/2022) |
| 11/22/2022 | | USCA Case Number 22−5304 for <u>30</u> Notice of Appeal to DC Circuit Court filed by JASON LEOPOLD. (zed) (Entered: 11/23/2022) |
| 12/16/2022 | <u>32</u> | NOTICE of Appearance by Kevin Bell on behalf of All Defendants (Bell, Kevin) (Entered: 12/16/2022) |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD,                                    )
6824 Lexington Avenue                             )
Los Angeles, CA 90038,                            )     Civil Action No. 1:21-cv-465 (BAH)
                                                  )
          and                                     )
                                                  )
BUZZFEED, INC.,                                   )
111 E. 18th St.                                   )
New York, NY 10003,                               )
                                                  )
          PLAINTIFFS                              )
     vs.                                          )
                                                  )
YOGANANDA D. PITTMAN,                             )
Acting Chief,                                     )
United States Capitol Police,                     )
119 D St., N.E.                                   )
Washington, DC 20510,                             )
                                                  )
          and                                     )
                                                  )
MICHAEL BOLTON,                                   )
Inspector General of the                          )
United States Capitol Police,                     )
119 D St., N.E.                                   )
Washington, DC 20510,                             )
                                                  )
          DEFENDANTS                              )
                                                  )
                                                  )
_____         )

## FIRST AMENDED COMPLAINT

### STATEMENT OF FACTS

1.  Plaintiff Jason Leopold is a Senior Investigative Reporter for BuzzFeed News covering a

wide range of issues. Plaintiff BuzzFeed, Inc. (BuzzFeed) is a digital media company with a news

and entertainment network that reaches hundreds of millions of people globally. Mr. Leopold seeks

records he intends to use in writing one or more news stories for his employer regarding the United States Capitol Police (USCP).

2.   The Capitol Police is headed by a Chief who is appointed by, and serves at the pleasure of, the Capitol Police Board (CPB). 2 U.S.C. § 1901. Defendant Yogananda Pittman is the Acting Chief of the USCP.

3.   Within the USCP, there is an Office of the Inspector General which is headed by the Inspector General of the United States Capitol Police. 2 U.S.C. § 1909(a). Defendant Michael Bolton is the Inspector General of the United States Capitol Police.

4.   On January 28, 2021, Mr. Leopold sent identical letters to the USCP's Public Information Office (PIO) and the Office of the Inspector General (OIG) requesting access to: Inspector General semiannual reports for 2015 forward; other Inspector General reports, including audits for 2008 forward; annual financial statements and audits of annual financial statements for 2015 forward; semiannual reports of disbursements for 2015 forward; USCP written directives in effect on January 6, 2021; and demonstration permits, denials, or other written memorials of final decisions relating to permits for public gatherings on the Capitol grounds for January 6, 2021.

5.   Mr. Leopold received an email dated February 11, 2021 from James Joyce, counsel for the U.S. Capitol Police, which stated Mr. Leopold may contact OIG regarding the first three parts of his request; that Mr. Leopold could obtain the Statements of Disbursements by requesting them from the House Legislative Resource Center; that USCP directives are not public records and will not be provided; and that USCP Special Events permits do not include public records and will not be provided.

6.   On information and belief, one or more individuals or groups applied for permits to demonstrate on the Capitol Grounds on January 6, 2021.

## JURISDICTION

7.   Jurisdiction is based on 28 U.S.C. § 1361.

2

## COUNT I:
## VIOLATION OF THE COMMON LAW RIGHT OF ACCESS

8.   Despite having a legal obligation to do so under the common law, Defendants have failed to produce the Inspector General semiannual reports for 2015 forward; other Inspector General reports, including audits for 2008 forward; annual financial statements and audits of annual financial statements for 2015 forward; USCP written directives in effect on January 6, 2021; and demonstration permits, denials, or other written memorials of final decisions relating to permits for public gatherings on the Capitol grounds for January 6, 2021.

## COUNT II:
## VIOLATION OF 2 U.S.C. § 1909(c)(2)

9.   Pursuant to 2 U.S.C. § 1909(c)(2), the USCP "Inspector General shall prepare and submit semiannual reports summarizing the activities of the Office in the same manner, and in accordance with the same deadlines, terms, and conditions, as an Inspector General of an establishment under section 5 (other than subsection (a)(13) thereof) of the Inspector General Act of 1978, (5 U.S.C. App. 5)."

10. Section 5(c) of the Inspector General Act of 1978, in turn, provides that "[w]ithin sixty days of the transmission of the semiannual reports of each Inspector General to the Congress, the head of each establishment shall make copies of such report available to the public upon request and at a reasonable cost."

11. Defendants have failed to make copies of the semiannual reports available to Plaintiffs upon request.

## COUNT III:
## VIOLATION OF 2 U.S.C. § 1909(c)(1)

12. Pursuant to 2 U.S.C. § 1909(c)(1), the USCP "Inspector General shall carry out the same duties and responsibilities with respect to the United States Capitol Police as an Inspector General of

an establishment carries out with respect to an establishment under section 4 of the Inspector General Act of 1978, (5 U.S.C. App. 4), under the same terms and conditions which apply under such section."

13. Under § 4(e)(1) of the IG Act, "whenever an Inspector General issues a recommendation for corrective action to the agency, the Inspector General . . . (C) not later than 3 days after the recommendation for corrective action is submitted in final form to the head of the establishment, [shall] post the document making a recommendation for corrective action on the website of the Office of Inspector General."

14. Defendants have failed to post to the website of the Office of Inspector General all documents making a recommendation for corrective action.

15. Under § 8M(b)(1)(A) of the IG Act, "any audit report, inspection report, or evaluation report (or portion of any such report)" must be posted to the IG's website within three days after it is submitted in final form to the head of the Federal agency.

16. Defendants have failed to post to the Inspector General's website all audit reports, inspection reports, and evaluation reports (or portion of any such reports).

17. The Inspector General's website contains only four audits, which are Peer Review Reports from 2019, 2016, 2013, and 2010.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs respectfully request that this Court:

(1) Declare Defendants' conduct to be unlawful;

(2) Order Defendants to produce to Plaintiffs the Inspector General semiannual reports for 2015 forward; other Inspector General reports, including audits for 2008 forward; annual financial statements and audits of annual financial statements for 2015 forward; USCP written directives in effect on January 6, 2021; and demonstration permits, denials, or other

4

written memorials of final decisions relating to permits for public gatherings on the Capitol

grounds for January 6, 2021;

(3)  Order Defendants to post to the website of the Office of Inspector General and to produce to

Plaintiffs all documents making a recommendation for corrective action;

(4) Order Defendants to post to the Inspector General's website and produce to Plaintiffs all

audit reports, inspection reports, and evaluation reports (or portion of any such reports),

except for the four audits already on the website; and

(5) Award Plaintiffs such other and further relief as the Court deems appropriate.


Respectfully Submitted,

  /s/ Jeffrey Light
   Jeffrey L. Light
   D.C. Bar #485360
   1712 Eye St., NW
   Suite 915
   Washington, DC 20006
   (202)277-6213
   Jeffrey@LawOfficeOfJeffreyLight.com

   *Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD; BUZZFEED, INC.,

          Plaintiffs,

   v.

YOGANANDA D. PITTMAN, in her official
capacity as Acting Chief of the United States
Capital Police; MICHAEL BOLTON, in his
official capacity as Inspector General of the
United States Capitol Police,

          Defendants.

Case No. 1:21-cv-00465-BAH

---

### DEFENDANTS' ANSWER TO PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendants, Yogananda D. Pittman, in her official capacity as Acting Chief of the United States Capital Police; and Michael Bolton, in his official capacity as Inspector General of the United States Capitol Police, hereby answer Plaintiffs' Amended Complaint, ECF No. 12. Responding to each paragraph of the Complaint paragraph by paragraph, using the same paragraph numbering as Plaintiffs use in their Complaint, Defendants state:

1.    Defendants lack sufficient knowledge or information to form a belief about the truth of the allegations of this paragraph.

2.    Defendants admit that Defendant Yogananda Pittman is the Acting Chief of the United States Capitol Police (USCP). The remaining allegations in this paragraph consist of conclusions of law to which no response is required.

3.    Defendants admit that Defendant Michael Bolton is the Inspector General of USCP. The remaining allegations in this paragraph consist of conclusions of law to which no response is required.

1

4.      Defendants admit that USCP received an undated letter from Plaintiff Leopold requesting copies of certain documents from USCP, and respectfully refer the Court to that letter for a full and accurate statement of its contents.  The allegations of this paragraph are otherwise denied.

5.      Defendants admit that USCP responded to Plaintiffs' letter by email dated February 11, 2021, and respectfully refer the Court to that email for a full and accurate statement of its contents.  The allegations of this paragraph are otherwise denied

6.      The allegations of this paragraph are admitted.

7.      This paragraph contains a legal conclusion to which no response is required.  To the extent a response is deemed required, the allegation is denied.

8.      The allegations of this paragraph are denied.

9.      This paragraph consists of legal conclusions to which no response is required.

10.     This paragraph consists of legal conclusions to which no response is required.

11.     The allegations of this paragraph are denied.

12.     This paragraph consists of legal conclusions to which no response is required.

13.     This paragraph consists of legal conclusions to which no response is required.

14.     The allegations of this paragraph are denied.

15.     This paragraph consists of legal conclusions to which no response is required.

16.     The allegations of this paragraph are denied.

17.     Defendants admit that the Inspector General's website contains Peer Review Reports from 2019, 2016, 2013, and 2010, and otherwise deny the allegations of this paragraph.

The remaining allegations following the unnumbered paragraph beginning with "WHEREFORE" constitute Plaintiffs' requests for relief, to which no response is required.  To the extent a response is deemed required, USCP denies that Plaintiffs are entitled to the requested

2

relief or any other relief.

Defendants hereby deny all allegations in the Amended Complaint not expressly admitted or denied herein.

The section headings used in Plaintiffs' Amended Complaint are Plaintiffs' characterizations of their claims to which no response is required, but to the extent a response is deemed required, those headings are denied.

## DEFENSES

1.      The Court lacks subject matter jurisdiction to hear the claim in this case.

2.      The Complaint fails to state a claim upon which relief can be granted.

Dated:  May 24, 2021                         Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Acting Assistant Attorney General

                                             JOHN R. GRIFFITHS
                                             Director
                                             Federal Programs Branch

                                             MARCIA BERMAN
                                             Assistant Director
                                             Federal Programs Branch

                                             */s/ M. Andrew Zee*
                                             M. ANDREW ZEE (CA Bar No. 272510)
                                             Attorney
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             450 Golden Gate Ave.
                                             San Francisco, CA 94102
                                             Tel: (415) 436-6646
                                             Fax: (415) 436-6632
                                             E-mail: m.andrew.zee@usdoj.gov

                                             *Counsel for Defendants*

3

JA-13

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD; BUZZFEED, INC.,

       Plaintiffs,

   v.

J. THOMAS MANGER, in his official capacity
as Chief, U.S. Capitol Police; MICHAEL
BOLTON, in his official capacity as Inspector
General of the U.S. Capitol Police,

       Defendants.

Case No. 1:21-cv-00465-BAH

## DECLARATION OF MICHAEL BOLTON

I, Michael Bolton, declare as follows:

1.      I am the Inspector General (IG) for the U.S. Capitol Police (USCP or Department), a position I have held since January 20, 2019. From March 2018 to January 2019, I served as the Acting Inspector General, and from August 2006 to March 2018 as the Assistant Inspector General for Investigations. As Inspector General, I head the Department's Office of Inspector General (OIG), which supervises and conducts audits, inspections, and investigations involving USCP programs, functions, systems, and operations.

2.      OIG's objectives include promoting economy, efficiency, and effectiveness in the administration of USCP programs and operations; preventing and detecting fraud, waste, abuse, and mismanagement in USCP programs and operations; preventing, detecting, and handling cases involving misconduct; and issuing Semiannual Reports to Congress that describe OIG activities. As Inspector General, I report directly to the Capitol Police Board, which, along with Congress, has oversight responsibility for the Department.

3.      On or around January 28, 2021, OIG received from Jason Leopold of Buzzfeed News, both Plaintiffs in this case, a request for certain OIG documents under an asserted common

1

law right of access to public records.  A copy of that request can be found at ECF No. 1-1, Exhibit

1.  Plaintiffs requested three categories of OIG documents, as follows:

- Inspector General semiannual reports for the period of 2015 forward.

- Inspector General reports, including audits, for the period 2008 forward.

- Annual financial statements and audits of annual financial statements for the period of 2015 forward.

Plaintiff also requested three categories of non-OIG information from the USCP.  This request is the subject of the instant litigation, *Buzzfeed, Inc. v. Manger*, No. 21-cv-00465 (D.D.C.).  This Declaration addresses only the categories of requested OIG documents.

4.    Because the second requested category is for all Inspector General "reports," and because such reports include "semiannual reports" (first requested category) and "audits of financial statements" (third requested category), Plaintiffs' second requested category subsumes the other two categories.  OIG has thus interpreted Plaintiffs' request as one for all reports for the period 2008 forward.  OIG has declined to provide any of the materials in response to Plaintiffs' request and, indeed, is prohibited from doing so by statute and order of the Capitol Police Board, as discussed below.  This Declaration provides information in support of OIG's determination not to provide any of the requested information.

5.    In 2005, Congress directed the establishment of the Office of the Inspector General and the appointment of an Inspector General for the Department, and in 2006 the first IG was sworn in.  I am the third individual to occupy the Inspector General position.  The IG is responsible for conducting and supervising audits and investigations of the Department. OIG examines, evaluates and, where necessary, critiques programs and operations, and makes recommendations for ways to carry out USCP responsibilities in the most effective, efficient, and economical manner possible.

2

6.      In general, OIG conducts audits and investigations based on several different criteria.  OIG exercises discretion and can affirmatively select particular programs or activities to audit or investigate; for example, if a program or activity is newly instituted or has not recently been the subject of an OIG audit or investigation.  OIG also conducts audits or investigations when specific subjects are requested by Congress, the Chief of the Capitol Police, or the Capitol Police Board.  Finally, OIG maintains a hotline for any member of the public or any USCP employee to submit a complaint; OIG will typically investigate any non-frivolous complaint that it receives through this hotline.

7.      OIG issues several types of reports.  First, when OIG conducts an audit or investigation, it typically produces a report at the conclusion of that audit or investigation.  Second, as required by statute, OIG produces a semi-annual report summarizing the work OIG initiated and completed during the preceding six-month period.  The semi-annual reports, or SARs, are provided by OIG to the Chief of the Capitol Police, who is then responsible for providing the SARs to the committees of Congress specified by statute.  The contents of each SAR are prescribed by section 5(a) of the Inspector General Act of 1978.  Third, OIG compiles on an annual basis a financial audit report on the USCP's annual financial statements.  Because each SAR is required to include summaries of all work OIG conducted during the preceding six-month period, all categories of reports, whether resulting from audits, investigations, or financial audits, are included in the SAR.  An OIG report might include a finding that the USCP, in implementing a particular program, has not complied with all program requirements, and recommend comprehensive compliance in the future.  A report could also include, for example, findings and recommendations regarding sensitive posting locations for USCP officers and personnel in the Capitol building and on Capitol Grounds in order to improve the security and safety of the Capitol and USCP protectees. Finally, an audit of OIG's financial statements could recommend stronger internal controls in specified areas, for example, for payroll verification purposes.

8.      By Order dated December 12, 2017 (the "2017 Order"), the Capitol Police Board, acting under its statutory authority to determine the release of security information, *see* 2 U.S.C.

§ 1979, prohibited the distribution of *all* Office of Inspector General information, to include audit reports, investigations reports, analyses, review, evaluations, and annual work plans, beyond the USCP or the Capitol Police Board.  That order is entitled Capitol Police Board Order 17.16, *Office of Inspector General Information* (Dec. 12, 2017), and a true and correct copy is attached to this Declaration as Exhibit A.  In addition, the Board, citing the "national security and law enforcement sensitive information" that is "obtain[ed] and secure[d]" by OIG, stated that *all* OIG information was to be "considered and conspicuously designated as law enforcement sensitive and/or deliberative process material subject to applicable statutory restrictions and privileges."  *Id.*  Finally, the Board ordered that secondary distribution—that is, distribution beyond those permitted to obtain it—of any OIG information was prohibited absent prior authorization of the Board and the Inspector General.  *Id.*  The effect of this 2017 Order is to prohibit the release of any OIG information unless that release is specifically authorized by the Capitol Police Board.

9.    Consistent with its terms, OIG implements the 2017 Order by not disclosing any OIG information outside the USCP or the Board unless that disclosure is specifically authorized by the Board.  As a result of the 2017 Order, all OIG information is treated as "security information" as defined by statute, *see* 2 U.S.C. § 1979(a).  For example, when OIG finalizes a report, it conspicuously marks that report as restricted distribution.  OIG will distribute a report to the Capitol Police Chief, the Capitol Police Board, and the USCP's congressional oversight committees (or, if a SAR, to the Chief alone), but makes no further distribution.  Any further distribution of a report requires the specific approval of the Capitol Police Board.  OIG applies this non-disclosure rule to all OIG information, including information that was generated prior to the issuance of the 2017 Order.  (There is an exception to this non-disclosure rule, recognized in 2 U.S.C. § 1979(c), in the event that Congress, typically acting through one of the USCP's oversight committees, requests OIG information; in the event of such a request, Capitol Police Board approval is not required.)

10.    With respect to the OIG reports requested by Plaintiffs in this litigation, the Board has not authorized their public disclosure, and those reports therefore cannot be released.

11.    While the 2017 Order independently prohibits release of the requested OIG information to Plaintiffs, the requested materials are in any event not "public records" to which a common law right of access would apply. OIG reports are not created or kept to memorialize or record any official action by the USCP, nor are they maintained or kept for that purpose. Rather, OIG reports contain findings regarding USCP programs and operations and, if warranted, recommendations to the USCP leadership and the Capitol Police Board for areas of improvement in those programs and operations. OIG reports do not, in and of themselves, result in or compel any action by the Department.

12.    In specifying what is to be included in every SAR, for example, the portions of the Inspector General Act applicable to OIG—sections 5(a)(2) and 5(a)(3)—provide only that OIG is to describe recommendations for corrective action, and to identify prior recommendations for corrective action that have not been completed. OIG lacks authority to implement its own recommendations or otherwise to correct performance areas that it may find deficient or otherwise problematic. The authority to take such action, and any official action on behalf of the Capitol Police, instead resides in the Chief of the Capitol Police and the Capitol Police Board.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 30th day of September, at Washington, D.C.


Michael Bolton





**CAPITOL POLICE BOARD**
**S-151 The Capitol**
**WASHINGTON, DC 20510**
PHONE (202) 224-2341

FRANK J. LARKIN, Chairman
PAUL D. IRVING, Member
STEPHEN T. AYERS, FAIA, LEED AP, Member
MATTHEW R. VERDEROSA, Ex-Officio Member

**CAPITOL POLICE BOARD ORDER 17.16**
**OFFICE OF INSPECTOR GENERAL INFORMATION**

Sec. 1. Pursuant to the authorities of the Capitol Police Board with regard to its general supervision of the Inspector General for the United States Capitol Police and the establishment of the Office of Inspector General under the provisions of 2 U.S. Code § 1909, and pursuant to the authorities provided under 2 U.S. Code § 1979 regarding the statutory authority of the Capitol Police Board to determine the release of security information, the Capitol Police Board hereby orders and directs the following:

(a) Office of Inspector General information (to include, but not limited to, audit reports, investigations reports, analyses, reviews, evaluations, annual work plans) shall not be posted to internal or external websites or distributed outside the United States Capitol Police or Capitol Police Board;

(b) Due to the fact the Office of Inspector General obtains and secures national security and law enforcement sensitive information, all Office of Inspector General information shall be considered and conspicuously designated as law enforcement sensitive and/or deliberative process material subject to applicable statutory restrictions and privileges.

Sec. 2. The Capitol Police Board orders and directs that no secondary distribution of Office of Inspector General information shall be made without prior authorization of the Capitol Police Board and the Inspector General consistent with applicable law, regulation, and policy.

So Ordered and Approved this 2nd Day of December 2017.

Frank J. Larkin
Chairman
Capitol Police Board

Paul D. Irving
Member
Capitol Police Board

Stephen T. Ayers, FAIA, LEED AP
Member
Capitol Police Board

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD; BUZZFEED, INC.,

       Plaintiffs,

   v.

J. THOMAS MANGER, in his official capacity
as Chief, U.S. Capitol Police; MICHAEL
BOLTON, in his official capacity as Inspector
General of the U.S. Capitol Police,

       Defendants.

Case No. 1:21-cv-00465-BAH

## DECLARATION OF JAMES W. JOYCE

I, James W. Joyce, declare as follows:

1.      I am a Senior Counsel in the Office of the General Counsel, General Law Division, for the U.S. Capitol Police (USCP or Department). In this position, I provide general legal advice and legal assistance on, among many other things, criminal matters, constitutional matters, appropriations and procurement matters, matters concerning tort claims, and the overall operations of the Department. I have worked for the USCP in the Office of the General Counsel since November 2004.

2.      As part of my duties, together with the USCP's Public Information Office, I oversee the USCP's responses to requests by members of the public for USCP information. Although the USCP is not subject to the Freedom of Information Act (FOIA) because it is part of the Legislative Branch, *see* 5 U.S.C. §§ 551(1)(A), 552(f)(1) (excluding the Legislative Branch from an "agency" subject to the requirements of FOIA), the USCP nonetheless occasionally receives FOIA and FOIA-like requests for incident reports, arrest reports, video footage, and other documents, records, and information. (The USCP also receives official requests for information from its oversight committees in Congress, the Capitol Police Board, and other official entities. I am not

1

generally responsible for responding to such requests, and they are not the subject of this Declaration.)

3.     On or around January 28, 2021, the USCP received from Jason Leopold of Buzzfeed News, both Plaintiffs in this case, a request for certain documents under an asserted common law right of access to public records.  A true and correct copy of that request is attached to this Declaration as Exhibit B.  Plaintiffs requested six categories of documents, as follows:

- Inspector General semiannual reports for the period of 2015 forward.

- Inspector General reports, including audits, for the period 2008 forward.

- Annual financial statements and audits of annual financial statements for the period of 2015 forward.

- Semiannual reports of disbursements for 2015 forward.

- USCP written directives in effect on January 6, 2021.

- Demonstration permits, denials, or other written memorials of final decisions relating to permits for public gatherings on the Capitol grounds for January 6, 2021.

These requests are the subject of the instant litigation, *Buzzfeed, Inc. v. Manger*, No. 21-cv-00465 (D.D.C.).  The first three categories of documents are maintained by the USCP's Office of Inspector General (OIG).  The fourth category is maintained by the Office of the Clerk of the House of Representatives.  Only the final two categories of documents are maintained by the USCP:

4.     On behalf of the USCP, I responded to Plaintiffs' request by email on February 11, 2021.  A copy of that email can be found at ECF No. 1-1, Exhibit 2.  My response referred Plaintiffs to OIG for the first three categories requested and to the House Legislative Resource Center for the fourth category requested, and declined to provide the final two requested categories of information from the USCP.

2

5.  I understand that on or around April 27, 2021, the Office of the Clerk of the House of Representatives sent to Plaintiffs copies of the requested semiannual reports of disbursements from 2015 forward—that is, the fourth category of documents requested. My understanding is that there is no longer any dispute in this litigation concerning this fourth category of documents.

6.  On August 17, 2021, the USCP made a discretionary release to Plaintiffs. This discretionary release included all documents in the sixth requested category—demonstration permits, denials, or other written memorials of final decisions relating to permits for public gatherings on the Capitol grounds for January 6, 2021. The released documents comprised six permits, the accompanying applications, and related documentation, and contained limited redactions for personal contact information of identified individuals and the names of line-level USCP personnel. My understanding is that there is no longer any dispute in this litigation concerning this sixth category of documents.

7.  In response to Plaintiffs' fifth requested category, the USCP located 178 directives that were in effect on January 6. Plaintiffs themselves had previously obtained one of those directives and attached it as Exhibit 4 to their Petition for a Writ of Mandamus. *See* ECF No. 1-1 at 10. That directive, USCP directive 2053.013, *Rules of Conduct*, is one that the USCP has filed on the public docket in connection with litigation over personnel matters. On August 17, 2021, the USCP made a discretionary release to Plaintiffs of an additional directive, USCP directive 1000.002, *Retrieval of Archived Video*, which it had also filed on the public docket in connection with litigation. Following this discretionary release, that left 176 directives at issue.

8.  In that same August 17 release, in response to a prior request from Plaintiffs' counsel, the USCP provided a list of the 104 written directives that were in effect on January 6, 2021 that had at that time been determined by a USCP Document Review Team not to be "security information" under 2 U.S.C. § 1979. Insofar as these 104 directives are concerned, on September 13, 2021, Plaintiffs stated that they were willing to narrow their request to 34 such directives. On September 16, 2021, the USCP provided an update to Plaintiffs that seven additional directives had been determined not to be security information, and provided Plaintiffs with that list of seven.

3

On September 17, 2021, Plaintiffs stated that they were willing to narrow their request to two of those seven directives, bringing to 36 the total number of non-security information directives that are at issue (out of a total of 111 non-security information directives originally requested).

9.      The remaining 65 (176 – (104 + 7)) of the directives that were in effect on January 6 have been determined by a USCP Document Review Team to be security information under 2 U.S.C. § 1979, and their disclosure is therefore prohibited absent specific authorization from the Capitol Police Board.  The Board has not authorized disclosure of any of these directives, and they are therefore prohibited from release.

10.     Attached as Exhibit C to this Declaration is a list of the titles of the 101 directives that are currently at issue in this litigation (*i.e.*, the 36 non-security information directives and the 65 security information directives).  Exhibit C shows the directive number, the directive title, and whether a directive has been determined to be or not to security information.  In addition, I have set forth below the categorical series headings, corresponding to directive numbers, into which each of the directives in Exhibit C falls:

VOLUME I: OPERATIONS

Series 1000 General Operational Management (Miscellaneous)

Series 1010 Authority &Jurisdiction

Series 1020 Enforcement

Series 1030 Protection, Detection & Assessment

Series 1040 Building Security & Regulations

Series 1050 Response, Deployment & Mitigation

Series 1060 Evidence & Property

Series 1070 Uniforms, Clothing & Equipment

Series 1080 Public Service & Affairs

VOLUME II: ADMINISTRATION

Series 2000 General Administrative Management (Miscellaneous)

Series 2010 Department Publications

Series 2020 Correspondence, Records & Forms

4

Series 2030 Audits, Inspections & Management/Internal Controls

Series 2040 Legal, Regulatory & Legislative Matters

Series 2050 Human Capital

Series 2060 Education & Training

Series 2070 Financial Management

Series 2080 Information Systems & Technology

Series 2090 Facilities & Logistics

11.    None of the requested USCP directives, regardless of whether they are security information under 2 U.S.C. § 1979, constitute "public records" to which the public has a common law right of access.  Each page of every directive is marked "Law Enforcement Sensitive."  The Law Enforcement Sensitive designation—which is distinct from "security information" under 2 U.S.C. § 1979—is used widely throughout federal, state, and local law enforcement agencies to control and safeguard sensitive information.  Within the USCP that designation indicates that such information should only be accessed by those with a need to know and should be reasonably protected from unauthorized disclosure.  As indicated by the Law Enforcement Sensitive designation on each page, these directives contain operational information that would reveal confidential sources and methods, investigative activities and techniques.  They also reflect the USCP's internal policies, rules, protocols, and guidance for USCP personnel on a variety of subjects, including Capitol security, traffic enforcement, law enforcement training, interacting with Congress, and workplace rules and benefits.  The directives consist of, for example, how USCP personnel are to respond to particular threats or incidents; USCP weapons policies; uniform and equipment policies; traffic control policies; and a variety of personnel policies and programs. I note here that, as such, USCP directives describe "information related solely to the internal personnel rules and practices of an agency" and would fall under Exemption 2 of the Freedom of Information Act, if the USCP were subject to the Freedom of Information Act.  Further, USCP directives are not intended to record any official USCP actions, but rather to establish forward-looking policies or guidance for its personnel in executing their job responsibilities, at which point the USCP may take official action or make an official decision.  To my knowledge, none of these

5

directives have been publicly disclosed; those which have been previously disclosed were, as noted above, provided to Plaintiffs in this case.

12.    Were these directives, particularly those determined to be security information, to be publicly disclosed by order of this Court, I believe it would impair the USCP's ability to execute its mission of protecting the U.S. Capitol and the Congress. Granting public access to the sensitive law enforcement information contained in the security information directives could unduly reveal the methods, techniques, and responses that the USCP employs for Capitol Grounds security and could also increase the potential for individuals and groups that wish to disrupt, attack, or harm the Capitol or the Congress to do so.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 30th day of September, at Washington, D.C.

James W. Joyce

6

JA-25

# BuzzFeed.News

6824 Lexington Blvd., Los Angeles, CA 90038

TO: U.S. Capitol Police Public Information Office, PIO@uscp.gov

Pursuant to the federal common law right of access, I request the records described below. I request that all records be provided to me in electronic format by email, or alternatively on optical media such as a CD or DVD. If I do not receive a decision on whether my request will be granted within 20 business days, I will consider my request to be constructively denied.


The records requested are:


      1.      Inspector General semiannual reports

Pursuant to 2 U.S.C. § 1910(a), "The Inspector General shall prepare and submit semiannual reports summarizing the activities of the Office in the same manner, and in accordance with the same deadlines, terms, and conditions, as an Inspector General of an establishment under section 5 (other than subsection (a)(13) thereof) of the Inspector General Act of 1978, (5 U.S.C. App. 5)." I request all such semiannual reports summarizing the activities of the Office of the Inspector General for the period of 2015 forward.

      2.      Inspector General reports, including audits

I request all other Office of the Inspector General (OIG) reports, including any audits, for the period 2008 forward.

      3.      Annual financial statements and audits of annual financial statements

Pursuant to 2 U.S.C. § 1903(b)(2), "The Chief Administrative Officer shall . . . (D) Prepare annual financial statements for the Capitol Police, and such financial statements shall be audited by the Inspector General of the Capitol Police or by an independent public accountant, as determined by the Inspector General." I request all such annual financial statements and audits for the period of 2015 forward.

      4.      Semiannual report of disbursements

Pursuant to 2 U.S.C. § 1910(a), "Not later than 60 days after the last day of each semiannual period, the Chief of the Capitol Police shall submit to Congress, with respect to that period, a detailed, itemized report of the disbursements for the operations of the United States Capitol Police." I request all such semiannual reports of disbursements for the period of 2015 forward.

      5.      United States Capitol Police written directives

I request all United States Capitol Police written directives that were in force as of January 6, 2021.

      6.      Demonstration permits, denials, or other written memorials of final decisions relating to permits for public gatherings on the Capitol grounds for January 6, 2021

Public gatherings occurred on January 6, 2021 on the Capitol grounds. I request any demonstration permits, denials, or other written memorials of final decisions relating to permits



6824 Lexington Blvd., Los Angeles, CA 90038

for public gatherings on the Capitol grounds for January 6, 2021. I note that these public gatherings were not covered by the permit issued by the United States Park Police to Women for America in connection with the "March for Trump," which excluded from its scope "rallies at the United States Capitol to hear the results of Congressional certification of the Electoral College count." *See* U.S. Park Police Permit #21-0278 (Amended).

Thank you.

Jason Leopold

Senior Investigative Reporter

BuzzFeed News

██████████

██████████████████

| Directive Number | Title | § 1979 Review |
|---|---|---|
| 1000 001 | USCP Personnel-Led Tours of the Capitol | Not SI |
| 1010 004 | Providing Police Services to the Thurgood Marshall Federal Judiciary Building {TMFJB} | Not SI |
| 1020 001 | Bias-Based Profiling | Not SI |
| 1020 002 | Handling Juveniles | Not SI |
| 1020 006 | District of Columbia Conditions of Release Enforcement {CORE} Program | Not SI |
| 1020 007 | Emergency Hospitalization of Mentally Ill Persons | Not SI |
| 1020 009 | Handling Interactions with Transgender Individuals | Not SI |
| 1020 010 | Communicating With the Deaf/Hard of Hearing during Arrest, Stops, and Contacts | Not SI |
| 1020 012 | Use of Long-Range Acoustical Device (LRAD) | Not SI |
| 1021 001 | Search of Persons | Not SI |
| 1021 005 | Citation Release Processing | Not SI |
| 1021 006 | Delays in Processing Arrestees | Not SI |
| 1022 001 | Traffic Enforcement | Not SI |
| 1023 004 | Arraignment of Arrestees | Not SI |
| 1032 001 | Conducting Preliminary Investigations | Not SI |
| 1041 002 | Confiscation of Ammunition  Self-Defense Spray, or Stun Gun | Not SI |
| 1060 001 | Cell Phone Recovery | Not SI |
| 1062 001 | Crime Scenes and Evidence | Not SI |
| 1073 001 | Protective Body Armor | Not SI |
| 1080 001 | Media Policy | Not SI |
| 2000 001 | Organizational and Management Structure of the USCP | Not SI |
| 2023 002 | Coordination with MPDC Regarding Reports | Not SI |
| 2023 003 | Security and Release of Police Reports | Not SI |
| 2031 001 | Roles  Authority, and Responsibilities of the Office of Inspector General (OIG) | Not SI |
| 2033 001 | Complaint Process | Not SI |
| 2043 001 | Ethics Policy | Not SI |
| 2052 006 | Notification and Reporting for Duty during Emergency Situations | Not SI |
| 2052 012 | Police Training Officer Program | Not SI |
| 2053 002 | Grievance Procedures | Not SI |
| 2053 011 | Anti-Discrimination and Anti-Harassment Policy | Not SI |
| 2053 013 | Rules of Conduct | Not SI |
| 2053 019 | Employee Use of Electronic Social Media | Not SI |
| 2064 001 | Rayburn House Office Building Range | Not SI |
| 2071 001 | Budget Object Classification Codes | Not SI |
| 2074 003 | Purchase Card Program | Not SI |
| 2081 001 | Acceptable Use of the Internet, Email  and Information Technology Equipment | Not SI |
| 1000 002 | Retrieval of Archived Video | SI |
| 1010 001 | Police Authority Shared with Other Law Enforcement Organizations | SI |
| 1010 002 | Jurisdiction and Authority | SI |
| 1010 003 | Criminal History Requests from Congressional Employers | SI |
| 1012 001 | Demonstration Activities1   Application, Interpretation, and Enforcement | SI |
| 1020 003 | Use of Handcuffs/Restraints | SI |
| 1020 004 | Use of Force | SI |
| 1020 005 | Contact and Processing Individuals with Unique Circumstances {Diplomats  Military Personnel, Members, etc ) | SI |
| 1020 011 | Electronic Control Devices (ECD) | SI |
| 1021 004 | Executing Arrest and Search Warrants | SI |
| 1022 005 | Suspicious Activity and Stop or Contact Report | SI |
| 1022 006 | Truck/Unauthorized Vehicle Interdiction Monitoring Program and Truck/Unauthorized Vehicle Interdiction Program | SI |
| 1030 001 | Securing the Capitol Complex During Active Threats | SI |
| 1031 001 | Congressional Pages | SI |
| 1032 002 | Interception or Recording of Wire or Oral Communications | SI |
| 1033 001 | Information Exchange with Other Police Agencies | SI |
| 1040 001 | Lost, Stolen  Confiscated, or Recovered Congressional ID Cards and USCP-Issued ID Cards | SI |
| 1040 002 | Security Screening | SI |
| 1040 003 | Access and Event Reports | SI |
| 1040 004 | Access Control Clearance Management | SI |
| 1040 005 | Vehicle Screening at Perimeter and Garage Posts | SI |
| 1041 001 | Admittance of Law Enforcement Officers/Agents with Firearms into the Capitol Buildings | SI |
| 1050 001 | Radio Communications System | SI |
| 1052 003 | Incident Command System | SI |
| 1052 004 | Response Tactics to an Active Shooter Situation | SI |
| 1052 005 | Air Threat Response Plan | SI |
| 1053 001 | Vehicular Response | SI |
| 1053 002 | Vehicular Pursuits | SI |
| 1054 001 | Building Evacuations | SI |
| 1056 001 | Utilization of the Hazardous Devices Section | SI |
| 1056 002 | Response  Command  and Control of a 10-100 NBC or Hazardous Materials Incident | SI |
| 1056 003 | Responding to a Suicide Bomber: 10-100 S (Sam) | SI |
| 1056 004 | Advanced Law Enforcement Response Team (ALERT) | SI |
| 1057 001 | Utilization of the Containment and Emergency Response Team (CERT) | SI |

| Directive Number | Title | § 1979 Review |
|---|---|---|
| 1073 003 | Flying Aboard Aircraft While Armed | SI |
| 2011 002 | Handling Classified and Other Sensitive But Unclassified Information | SI |
| 2022 001 | Privacy Policy for Safeguarding Sensitive Personally Identifiable Information and Sensitive Health Information | SI |
| 2052 010 | Identification Cards, Credentials, and Badges | SI |
| 2052 011 | Staffing of Posts During Inclement Weather | SI |
| 2052 015 | Office of Inspector General Credentials and Badges | SI |
| 2061 001 | Recruit Officer Entry-Level Training Program | SI |
| 2075 001 | Momentum Security Policy | SI |
| 2080 003 | Segregation of Duties | SI |
| 2081 002 | Security of Information Generated by Criminal Justice Telecommunications Systems | SI |
| 2081 003 | Office of Information Systems Password Policy | SI |
| 2081 004 | USCP Internet and Intranet Sites | SI |
| 2081 005 | Use of USB Data Storage Devices | SI |
| 2081 006 | Computer Security Incident Response | SI |
| 2081 007 | Account Management | SI |
| 2081 008 | Patch Management | SI |
| 2081 010 | Risk Management | SI |
| 2081 011 | Information Security Continuous Monitoring | SI |
| 2081 012 | Mobile and Wireless Device Security | SI |
| 2081 013 | Antivirus and Malware Protection | SI |
| 2082 001 | Telecommunications | SI |
| 2083 001 | Enterprise Architecture and Planning | SI |
| 2083 002 | Configuration Management | SI |
| 2083 003 | Change Management | SI |
| 2083 004 | Information Systems Auditing and Monitoring | SI |
| 2084 001 | Use and Operation of Mobile Data Computers | SI |
| 2092 002 | Respiratory Protection Program | SI |
| 2092 003 | Self-Contained Breathing Apparatus Inspection and Maintenance | SI |
| 2092 004 | Blood-Borne Pathogen Exposure Control Plan | SI |
| 2093 001 | Property and Asset Management | SI |
| 2093 002 | Maximo Security Policy | SI |

**2053.013**



**Directive**

# Rules of Conduct

| | | | |
|---|---|---|---|
| **Directive #:** | 2053.013 | **Effective Date:** | 11/19/2012 |
| **Initiating Unit:** | Office of Professional Responsibility | **Review Date:** | 11/19/2013 |
| **CALEA:** | 1.2.7, 11.3.1, 11.3.2, 12.1.3, 26.1.1, 26.1.3, 26.1.4, 26.1.5 | | |

# Contents

Authority and Coverage ..................................................1
Definition(s)..................................................................2
General Policy ...............................................................2
Responsibilities/Procedures...........................................2
 *Category A–Duty to Obey* ............................................2
  Rule A1: Knowledge of Laws and Regulations ....2
  Rule A2: Conformance to Laws.............................2
  Rule A3: Compliance with Directives.....................2
  Rule A4: Conflicting Orders ...................................2
  Rule A5: Improper Orders......................................2
  Rule A6: Insubordination .......................................3
  Rule A7: Truthfulness ............................................3
 *Category B–Performance of Duty* ................................3
  Rule B1: Unsatisfactory Performance ..................3
  Rule B2: Personal Appearance .............................3
  Rule B3: Absence from Duty .................................3
  Rule B4: Reporting for Duty...................................3
  Rule B5: Carrying of Credentials and Identification
  ..................................................................................3
  Rule B6: Malingering .............................................3
  Rule B7: Duty Post ................................................4
  Rule B8: Meals and Other Relief Periods............4
  Rule B9: Courtesy..................................................4
  Rule B10: Neglect of Duty .....................................4
  Rule B11: Use of Property and Services, and
  Inspection of Equipment and Facilities.................4
  Rule B12: Operating Vehicles ..............................4
  Rule B13: Use of Force .........................................4
  Rule B14: Use of Weapons ...................................4
  Rule B15: Arrest, Search, and Seizure.................4
  Rule B16: Treatment of Persons in Custody .......4
  Rule B17: Property and Evidence ........................4
  Rule B18: Court Appearances..............................5
  Rule B19: Response to Calls................................5
 *Category C–Detrimental Conduct* ...............................5
  Rule C1: Conduct Unbecoming.............................5
  Rule C2: Discrimination and/or Harassment ........5
  Rule C3: Possession and/or Use of Drugs or a
  Controlled Substance ...........................................5
  Rule C4: Use of Alcohol .......................................5
  Rule C5: Use of Tobacco ......................................5
  Rule C6: Gifts, Gratuities, Bribes, or Rewards .....6
  Rule C7: Improper Associations ...........................6
  Rule C8: Gambling ................................................6
  Rule C9: Communications with Criminals .............6
  Rule C10: Improper Remarks................................6
  Rule C11: Retaliation.............................................6
 *Category D–Administrative Responsibilities* .........6
  Rule D1: Off-Duty Employment ............................6
  Rule D2: Telephone...............................................6
  Rule D3: Changes in Personal Status.................6
 *Category E–Miscellaneous* ........................................6
  Rule E1: Abuse of Process....................................6
  Rule E2: Improper Intervention.............................6
  Rule E3: Work Stoppage .......................................7
  Rule E4: Dissemination of Information .................7
  Rule E5: Public Statements...................................7
  Rule E6: Public Appearances................................7
  Rule E7: Testimonials............................................7
  Rule E8: Service of Civil Processes......................7
  Rule E9: Reports....................................................7
  Rule E10: Compromises........................................7
 *Category F–Supervisors* ............................................7
  Rule F1: Subordinate Compliance.........................7
  Rule F2: Subordinate Discipline ...........................7
  Rule F3: Subordinate Performance.......................7
  Rule F4: Subordinate Failures...............................8
Additional Information .....................................................8
 *Exemptions*..................................................................8
Cancellation ...................................................................8
Appendices.....................................................................8

# Authority and Coverage

The Chief of Police serves as the chief executive officer of the United States Capitol Police (USCP) and

1 is responsible for the day-to-day operation and
2 administration of the USCP.

3 This policy may be revised at the discretion of the
4 Chief of Police, consistent with applicable law, rule,
5 and regulation.

# 6 Definition(s)

7 **Department Rules.** A Department rule is designed to
8 cover situations in which no deviation or flexibility is
9 permitted.

10 **Intoxicant.** Alcohol, liquor, malt beverages that
11 contain alcohol, drugs or other substances which,
12 when ingested, inhaled, or absorbed, deprives an
13 individual of the ordinary use of one's senses or
14 reason.

15 **Supervisor.** An employee in the rank, or civilian
16 equivalent, of Sergeant or above, or a designated
17 supervisor.

# 18 General Policy

19 The policy of the Department is to ensure that all
20 employees, both sworn and civilian, maintain an
21 exemplary standard of personal integrity and the
22 highest professional standards of conduct in both their
23 private lives and in their official capacities. This policy
24 is embodied in the Department's Values. The
25 Department will promote adherence to professional
26 standards of integrity and ethics and foster an
27 environment that emphasizes civility and
28 professionalism.

29 The Rules contained herein are designed to serve as
30 professional standards governing employee conduct.
31 Any employee, who is found to be in violation of one or
32 more of these Rules, will be subject to such
33 disciplinary action as deemed appropriate by the Chief
34 of Police. The Department will absolve employees who
35 are found not to be in violation of Department rules,
36 administer appropriate corrective action, or defer to the
37 appropriate authority for criminal prosecution, if
38 appropriate, when improper acts are confirmed.

# 39 Responsibilities/Procedures

## 40 Category A—Duty to Obey

41 **Rule A1: Knowledge of Laws and Regulations**

42 Employees are required to know and understand all
43 applicable laws, rules, regulations, Directives, orders,
44 written procedures, etc., relevant to their official duties.

45 **Rule A2: Conformance to Laws**

46 Employees will obey all laws of the United States, the
47 District of Columbia, and any state, local, or military
48 jurisdiction in which they may be present. Employees
49 arrested or indicted for a violation of any law, other
50 than minor non-custodial traffic offenses, or
51 summoned to appear in response to a criminal
52 complaint, will immediately notify one of their
53 supervisors, who in turn will notify the Chief of Police
54 through the chain of command.

55 **Rule A3: Compliance with Directives**

56 Employees are required to obey all Departmental
57 rules, regulations, Directives, orders, policies and
58 procedures. Lawful orders from a supervisor, including
59 orders relayed from a supervisor by an employee of
60 equal or lesser rank, will be obeyed promptly.

61 **Rule A4: Conflicting Orders**

62 Should a supervisor issue an order which conflicts with
63 a previously issued order, rule, regulation or Directive,
64 the employee should respectfully call attention to the
65 conflicting order and, if not rescinded by the
66 supervisor, the order will stand and will be carried out
67 promptly. The responsibility for the order will rest with
68 the issuing supervisor and the employee will not be
69 answerable for disobedience of the previously issued
70 order.

71 **Rule A5: Improper Orders**

72 Supervisors will not issue any order which they know,
73 or should know, would require a subordinate to commit
74 any illegal or unethical acts. Employees will not obey
75 any order which they know, or believe, would require
76 them to commit illegal or unethical acts. If in doubt as
77 to an order being illegal or unethical, employees will
78 respectfully request the issuing supervisor to clarify the
79 order or to confer with higher authority.

**Rule A6: Insubordination**

Employees will not refuse to obey, by words or
actions, any lawful order of a supervisor, and will not
utter any disrespectful, rebellious, insolent, or abusive
language to or toward a supervisor.

**Rule A7: Truthfulness**

Employees will make truthful statements at all times,
written or verbal, pertaining to official duties or matters
affecting the Department. Employees are required to
cooperate fully and truthfully during Department
investigations.

## Category B—Performance of Duty

**Rule B1: Unsatisfactory Performance**

Employees will maintain sufficient competency to
properly perform their duties and assume the
responsibilities of their positions. Employees will
perform their duties in a manner which will maintain
the highest standards of efficiency and integrity in
carrying out the functions and objectives of the
Department. Unsatisfactory performance may be
demonstrated by, but will not be limited to:

1.  A lack of knowledge of the application of laws
    required to be enforced.

2.  An unwillingness or inability to perform assigned
    tasks.

3.  The failure to conform to work standards
    established for the respective ranks, grades, or
    positions.

4.  The failure to take appropriate action on the
    occasion of a crime, disruption, or other condition
    deserving police attention.

5.  Repeated poor evaluations or a written record of
    repeated infractions of the rules, regulations,
    Directives or orders of the Department.

6.  Repeated sustained complaints of misconduct.

**Rule B2: Personal Appearance**

Employees will maintain a neat, well-groomed
appearance and comply with all Department policies
pertaining to uniforms, civilian attire, appearance, and
grooming.

**Rule B3: Absence from Duty**

Employees who fail to appear for duty at the date,
time, and place specified without consent of a
supervisor are "Absent Without Leave".

**Rule B4: Reporting for Duty**

Employees will report for duty on time, and at the time
and place required, or they will be tardy. They will be
properly equipped and cognizant of information
required for the proper performance of duty so that
they may immediately assume their duties.

**Rule B5: Carrying of Credentials and Identification**

1.  Sworn employees will carry their Department
    credentials on their person at all times while on
    duty, and while off duty when carrying the issued
    handgun, except when impractical or dangerous to
    their safety or pursuant to an authorized
    investigation.

2.  Civilian employees will carry their identification
    while on duty, display the ID upon request, and
    furnish their name when requested while on duty.

3.  Sworn employees will promptly furnish their name
    and Personal Identification Number (PIN) to any
    person requesting that information when they are
    on duty or while conducting themselves in or
    representing themselves as acting in an official
    capacity, except when the withholding of such
    information is necessary for the performance of
    duty, authorized by a supervisor, or necessary to
    protect the employee's safety or the integrity of an
    authorized investigation.

4.  Employees will not lend their badges, credentials,
    or identification to any other person.

**Rule B6: Malingering**

Employees will not feign illness or injury, falsely report
themselves or others ill or injured, or otherwise
deceive or attempt to deceive any supervisor of the
Department, or any other governmental agency or
individual authorized to conduct such an inquiry, as to
the condition of their health or the health of others.

**Rule B7: Duty Post**

Employees will assume their assigned duty post without unnecessary delay. Employees will not leave their assigned duty post during a tour of duty, or at the conclusion of their tour of duty, except when properly relieved or authorized by a supervisor, and will then proceed immediately to their next assignment or to the area and/or supervisor designated for check out or reassignment.

**Rule B8: Meals and Other Relief Periods**

Employees will be permitted to suspend patrol or other assigned activity, subject to immediate recall, for the purpose of relief or having meals during their tour of duty, but only for such period of time, and at such time and place, as may be established by a supervisor.

**Rule B9: Courtesy**

Employees will be polite, courteous and respectful to all persons at all times. Employees will be tactful, friendly, helpful and understanding in the performance of their assigned duties, control their tempers, exercise the utmost patience and discretion, and not engage in argumentative discussion even in the face of extreme provocation. In the performance of their duties, employees will not use coarse, violent, profane, or insolent language or gestures, will not intimidate, and will not express any prejudice concerning race, religion, gender, politics, national origin, lifestyle, age, disabilities, or other personal characteristics.

**Rule B10: Neglect of Duty**

Employees will devote their full time and attention to the performance of their duties at all times while on duty.

**Rule B11: Use of Property and Services, and Inspection of Equipment and Facilities**

Employees will use the equipment, supplies, services and facilities of or under the care of the Department only for their intended purpose, in accordance with established procedures, and will not abuse or purposely damage such equipment or facilities. All facilities and equipment of or under the care of the Department and/or issued to employees such as desks, vehicles, computers, uniforms, etc., and their contents, will be maintained in proper order, and are subject to inspection at any time with or without prior notice, as directed by the Chief or designee.

**Rule B12: Operating Vehicles**

Employees will operate official vehicles in a careful and prudent manner, and will obey all laws, rules, regulations, Directives and orders of the Department pertaining to such operation. The suspension, expiration or revocation of an employee's driver's license or operator's permit will be reported immediately to such employee's supervisor.

**Rule B13: Use of Force**

Sworn employees will use only such force in any situation that is reasonably necessary under the circumstances, in accordance with applicable laws and the established procedures and training of the Department.

**Rule B14: Use of Weapons**

Sworn employees will not discharge any firearm, nor use or handle any weapon, in a careless or imprudent manner. Sworn employees will carry, store, secure and/or use all firearms and weapons in accordance with applicable laws and the established procedures of the Department.

**Rule B15: Arrest, Search, and Seizure**

Every arrest, search, and seizure will be in accordance with applicable laws and the established procedures of the Department.

**Rule B16: Treatment of Persons in Custody**

Sworn employees will not mistreat persons who are in their custody, and will handle persons in custody in accordance with applicable laws and the established procedures of the Department.

**Rule B17: Property and Evidence**

Property or evidence which has been discovered, gathered, or received in connection with the responsibilities of the Department will be processed in accordance with established Department procedures. Employees will not convert to their own use (or that of another party), manufacture, conceal, falsify, destroy, remove, tamper with, or withhold any property or evidence in connection with an investigation or other police action, except in accordance with established procedures.

**1  Rule B18: Court Appearances**

2 Employees who are subpoenaed, summoned, or
3 otherwise requested to appear and/or testify in a court
4 or hearing of any jurisdiction, in their capacity as a law
5 enforcement officer or in matters pertaining to the
6 Department, including any administrative hearing, will
7 immediately notify their supervisor and then comply
8 with the Directive to appear.

**9  Rule B19: Response to Calls**

10 Employees who are assigned radio communications,
11 cell phones, pagers, or other communications
12 equipment will keep said equipment turned on and on
13 the appropriate channel at all times while on duty or on
14 call, unless authorized by the employee's supervisor to
15 do otherwise. Employees will promptly respond to all
16 communications directed to them.

# 17  Category C—Detrimental Conduct

**18  Rule C1: Conduct Unbecoming**

19 Employees will conduct themselves at all times, both
20 on and off duty, in such a manner as to reflect
21 favorably on the Department. Conduct Unbecoming
22 will include that which brings the Department into
23 disrepute or reflects discredit upon the employee as a
24 member of the Department; impairs the operation or
25 efficiency of the Department or the employee; and is
26 prejudicial to the reputation and good order of the
27 Department.

**28  Rule C2: Discrimination and/or Harassment**

29 Employees will not discriminate against and/or harass
30 any other person on the basis of race, color, national
31 origin, religion, gender, age, sexual orientation,
32 disability, or any other basis prohibited by law or
33 Departmental Directive.

**34  Rule C3: Possession and/or Use of Drugs or a**
**35  Controlled Substance**

36 1. Employees will not possess or use any narcotic,
37     illegal stimulant, or other controlled substance
38     except when prescribed for their personal
39     treatment by a licensed health care provider
40     authorized to dispense a controlled substance
41     during the course of professional practice.

42 2. Employees will not report for duty, be on duty, or
43     when subject to emergency recall, while under the

44     influence of any illegal drug, narcotic or stimulant
45     or controlled substance, whether or not prescribed
46     by a licensed health care provider, unless
47     medically cleared for duty.

**48  Rule C4: Use of Alcohol**

49 1. Employees will not use or consume alcohol or
50     other intoxicants while on duty, or when subject to
51     emergency recall (such as while on official travel),
52     except as permitted by specific orders of a
53     Department supervisor.

54 2. Employees will not report for duty, or be on duty,
55     while impaired or under the influence of an
56     intoxicant, or with an odor of alcohol or other
57     intoxicant on their breath or about their person.
58     The odor of an alcoholic beverage on the breath
59     (as substantiated by a supervisor and at least one
60     other individual) will be considered presumptive
61     evidence of drinking while on duty.

62 3. Sworn employees will not exercise any police
63     authority, operate any USCP-issued mode of
64     transportation, take any official police action, or
65     represent themselves as a police officer while
66     impaired by, or under the influence of, alcohol or
67     other intoxicants.

68 4. Sworn employees will not consume alcohol or
69     other intoxicants while carrying a firearm.

70 5. When off-duty, employees will not wear in public
71     any clothing items identifiable with the USCP
72     when consuming alcohol or other intoxicants. This
73     includes but is not limited to, USCP caps, t-shirts,
74     jackets, uniform shirts, etc.

75 6. When off duty, employees will refrain from
76     consuming alcohol or other intoxicants to the
77     extent that it results in behavior which may
78     discredit the Department, renders the employee
79     unfit to report for the next assigned or regular tour
80     of duty, or adversely affects the employee's work
81     performance or the safety of the employee and/or
82     others.

**83  Rule C5: Use of Tobacco**

84 Employees will use tobacco only in accordance with
85 the policies of the Department.

1 **Rule C6: Gifts, Gratuities, Bribes, or Rewards**

2 Employees will not solicit or accept from any person,
3 business, or organization, any gift (including money,
4 tangible or intangible personal property, food,
5 beverage, loan, promise, service, or entertainment) for
6 the benefit of any employee or any other person,
7 which may give the appearance that such solicitation
8 or acceptance is in return for being influenced in the
9 performance of any official act, or being induced to do
10 or omit to do any act in violation of their duty.

11 **Rule C7: Improper Associations**

12 Employees will avoid regular or continuous
13 associations or dealings with persons whom they
14 know, or should know, are persons under criminal
15 investigation or indictment, or who have a reputation in
16 the community or the Department for present
17 involvement in felonious or criminal behavior, except
18 as necessary in the performance of official duties, or
19 where unavoidable because of immediate familial
20 relationships.

21 **Rule C8: Gambling**

22 Employees will not engage or participate in any form of
23 illegal gambling at any time, except in the performance
24 of duty and while acting under proper authorization
25 from a supervisor.

26 **Rule C9: Communications with Criminals  -**

27 Employees will not communicate verbally or in writing,
28 directly or indirectly, in any manner or form, any
29 information that may enable persons engaged in,
30 suspected of, or guilty of, criminal acts to escape
31 arrest or punishment, or which may permit them to
32 dispose of or conceal any money, goods, or other
33 evidence unlawfully obtained or possessed.

34 **Rule C10: Improper Remarks**

35 Employees will not make malicious, harassing,
36 untruthful, or frivolous remarks or rumors against, or
37 about, other members of the Department or individuals
38 in the workplace.

39 **Rule C11: Retaliation**

40 Employees will not harass, ridicule or retaliate in any
41 form against a complainant, employee, or any witness
42 for complaining or otherwise offering evidence in an

43 internal or external, criminal or administrative
44 investigation.

45 ## Category D—Administrative Responsibilities

46 **Rule D1: Off-Duty Employment**

47 Employees may engage in off-duty employment only in
48 accordance with established Department policies and
49 procedures.

50 **Rule D2: Telephone**

51 Employees will have and maintain in operation a
52 working telephone number through which they may be
53 directly contacted by the Department at all times.
54 Employees will inform the Department of their
55 telephone number, and will immediately report any
56 change of telephone number in accordance with
57 established procedures.

58 **Rule D3: Changes in Personal Status**

59 Employees will report any change in personal status,
60 including residence address or next of kin notification,
61 in accordance with established procedures.

62 ## Category E—Miscellaneous

63 **Rule E1: Abuse of Process**

64 Employees will not intentionally manufacture, tamper
65 with, falsify, destroy, or withhold evidence or
66 information, nor make any false accusations,
67 statements or complaints regarding a criminal charge,
68 traffic offense, or administrative violation.

69 **Rule E2: Improper Intervention**

70 Employees will not interfere with official business
71 being handled by other employees or any other
72 government agency unless ordered to intervene by a
73 supervisor, or the intervening employee reasonably
74 believes that a manifest injustice would result from
75 failure to take immediate action. Employees will not
76 undertake any investigation or other official action not
77 part of their regular duties without obtaining permission
78 from competent authority unless the exigencies of the
79 situation require immediate action.

80

**Rule E3: Work Stoppage**

Employees will not engage in any work stoppage. This includes the concerted failure to report for duty, willful absence from one's position, unauthorized holidays, or the abandonment in whole or in part of the full, faithful, and proper performance of the duties of employment for the purpose of protesting, inducing, influencing, or coercing change in conditions, compensation, rights, privileges, or obligations of employment.

**Rule E4: Dissemination of Information**

Employees will treat the official business of the Department as restricted, and are prohibited from disseminating information concerning Department investigations or operations to any unauthorized person, in accordance with established Department procedures. Employees are prohibited from providing information obtained from the Criminal Justice Information System (CJIS), Motor Vehicle Administration (MVA), Washington Area Law Enforcement System (WALES), National Crime Information Center (NCIC), or any other source to any unauthorized person, except in the performance of their duties and in accordance with proper procedures and law.

**Rule E5: Public Statements**

Employees will not publicly criticize or ridicule the Department, its policies, or other employees by speech, writing, or other expression, where such speech, writing, or other expression is unlawful, violates Department policies regarding the dissemination of sensitive and/or confidential information, or is made with reckless disregard for truth.

**Rule E6: Public Appearances**

Employees will not purport to represent the Department by addressing public gatherings, appearing on radio or television, lecturing on "law enforcement" or other related subjects, preparing any articles for print or electronic publication, acting as a correspondent to a newspaper, periodical or electronic media, releasing or divulging investigative information or any other material regarding matters of the Department without prior approval from the Chief of Police.

**Rule E7: Testimonials**

Employees will not permit their names or photographs indicating their association with the United States Capitol Police to be used in any commercial, political, or other testimonial which alludes to their position or employment without the approval of the Chief of Police.

**Rule E8: Service of Civil Processes**

Sworn employees will not serve civil processes or take part in any such service.

**Rule E9: Reports**

Employees will submit all necessary reports in accordance with established Department procedures. Reports will be truthful, accurate, complete and timely.

**Rule E10: Compromises**

Employees are prohibited from becoming involved, in any way, in an attempt to make a compromise or arrangement between suspected criminal violators and their alleged victims.

## Category F—Supervisors

**Rule F1: Subordinate Compliance**

Supervisors will be responsible for subordinates' adherence to Department rules, regulations, policies, procedures, orders and Directives, and will take reasonable action to ensure compliance.

**Rule F2: Subordinate Discipline**

Supervisors will be responsible and accountable for the maintenance of discipline and will provide leadership, supervision and example to ensure the efficiency and integrity of Department operations.

**Rule F3: Subordinate Performance**

Supervisors will be responsible for the job performance of all subordinates placed under them. Authority and functions may be delegated to subordinates, but responsibility for the accomplishment of overall Department objectives remains with the supervisor who made the assignment.

1  **Rule F4: Subordinate Failures**

2  Supervisors will be responsible and held accountable
3  for all job-related failures on the part of their
4  subordinates when the supervisor was aware, or
5  should reasonably have been aware, of the failure or
6  potential for failure, and did not take the appropriate
7  action to correct or prevent the deficiency.

# 8 Additional Information

## 9 Exemptions

10  In certain instances, the Chief of Police may exempt
11  individuals or units from complying with specific rules
12  contained in this Directive. Such exemptions will be
13  made on a case-by-case basis in recognition of
14  individual or unit requirements for the performance of
15  their duties.

# 16 Cancellation

17  This Directive cancels Operational Directive PRF 1.3,
18  "Rules of Conduct," issued August 23, 2000, and
19  supersedes and replaces any related Department
20  publication consistent with applicable law, rule, or
21  regulation.

# 22 Appendices

23  None.

24  **Thomas P. Reynolds**
25  **Acting Chief of Police**

# Publication of MPD Orders on the Internet



Recommendation of the

## Police Complaints Board

to

## Mayor Anthony A. Williams,
## The Council of the District of Columbia, and
## Chief of Police Charles H. Ramsey

**July 14, 2005**

**Police Complaints Board**

**Maria-Cristina Fernández, Chair**
**Dr. Patricia Fisher**
**Michael Sainte-Andress**
**Marc Schindler**

730 11th Street, N.W., Suite 500
Washington D.C.  20001
(202) 727-3838
Website:  policecomplaints.dc.gov

## I.     INTRODUCTION

The Metropolitan Police Department (MPD) uses a "directive system" to issue departmental policies, procedures, and other information.  The components of the system include MPD's general orders (GO) and special orders (SO).  These orders set forth policies and procedures regarding a wide range of MPD activities, many of which involve encounters with citizens, from "Conduct Toward the Public" (GO 201.26, Part I, Section C) to requirements for officers conducting stops of individuals and frisking them (GO 304.10).  Currently, MPD's general and special orders are not available to the public, except through Freedom of Information Act (FOIA) requests.  The Department's website does not contain the orders.  The Police Complaints Board (PCB), consistent with its policy review function,[1] recommends that MPD post all of its orders, and a corresponding index, on the MPD website.

## II.     BEST PRACTICES

MPD would not be the first department to make its policies and guidelines fully available to the public.  In 2001, the Seattle Police Department Office of Professional Accountability (OPA) recommended that the Seattle Police Department (SPD) publish its entire department manual on the World Wide Web.  Chief Gil Kerlikowske of the SPD "readily agreed and directed the posting."[2]

As a result of that decision, SPD was praised by an expert in police accountability, Professor Samuel Walker of the University of Nebraska at Omaha.  In *The New World of Police Accountability*, Professor Walker recognized SPD for bucking the traditional "attitude of secrecy" that "not only denies to the public basic information about official police policies, but aggravates community relations by sending a message to people that they have no right to know how the department operates."[3]  Some major cities whose police departments have made their policies and procedures available online include the following:

- Seattle, WA[4]

---

[1]  PCB "shall, where appropriate, make recommendations to [the Mayor, the Council, and the Chief of MPD] concerning those elements of management of the MPD affecting the incidence of police misconduct, such as the recruitment, training, evaluation, discipline, and supervision of police officers."  D.C. Official Code § 5-1104(d).  PCB would like to acknowledge the assistance of the Office of Police Complaints (OPC), which is overseen by PCB, in preparing this recommendation under the guidance of the agency's executive director, Philip K. Eure, and deputy director, Thomas E. Sharp.  OPC's summer law clerk, Thomas Moir, who is enrolled at the George Washington University Law School, performed research and provided other valuable assistance.

[2]  Seattle Police Department Office of Professional Accountability, *OPA's Role in Policy Review and Risk Management at SPD*  8 n.4 (2004).  Available at http://www.ci.seattle.wa.us/police/opa/Default.htm.

[3]  Samuel Walker, *The New World of Police Accountability* 190 (2004).

[4]  The Seattle Police Department's orders are available at: http://www.cityofseattle.net/police/publications/.

- Minneapolis, MN[5]

- Denver, CO[6]

- Colorado Springs, CO[7]

- Cincinnati, OH[8]

- Portland, OR[9]

OPA has seen tangible benefits from SPD's publication of its manual on the Internet.  Media inquiries into police conduct have been more informed, as have community interactions with OPA, because the public and news outlets can develop a better sense of how the department operates prior to contacting OPA or SPD.  When the situation allows, OPA can direct citizens to the website for examination of relevant policies at their convenience.  Community outreach is made more meaningful by the ability to reference the publicly available manual.[10]

MPD's orders are not restricted documents; any citizen can request copies of most, if not all, orders under the auspices of FOIA.[11]  Routing such requests through FOIA, however, creates extra paperwork, adds unnecessary cost and labor, and decreases the likelihood that citizens will inquire into the policies of their police department when, in fact, they have every right to do so.  Posting the orders on MPD's website would eliminate the FOIA "middleman," allowing citizens to review MPD policies that affect their encounters with police officers, such as stop-and-frisk procedures (GO 304.10), the taking of traffic accident (GO 401.03) and missing persons (GO 304.03) reports, issuing traffic tickets (GO 303.1), traffic enforcement (GO 303.1), use of oleoresin capsicum or

---

[5]  The Minneapolis Police Department's orders are available at: http://www.ci.minneapolis mn.us/mpdpolicy.

[6]  The Denver Police Department's orders are available at: http://198.202.202.66/Police/template311677.asp.

[7]  The Colorado Springs Police Department's orders are available at: http://www.springsgov.com/Page.asp?NavID=1472.

[8]  The Cincinnati Police Department's orders are available at:  http://www.cincinnati-oh.gov/police/pages/-5109-/.

[9]  The Portland Police Bureau's orders are available at: http://www.portlandonline.com/police/index.cfm?c=29867.  Other notable cities include Olympia, WA, and Iowa City, IA.

[10]  Conversation with Sam Pailca, director of OPA, June 21, 2005.

[11]  The orders are also available for sale from Laborcops.com, a "professional organization of attorneys and labor consultants who are experienced in representing law enforcement unions," at http://www.laborcops.com.  PCB believes that the public should not have to seek out and pay a third party for access to police policies that could be posted on the Internet at virtually no cost to the government.

"pepper" spray (GO 901.04), and the processing of persons with mental illness (GO 308.4).

The publication of the orders on the Department's website would also be consistent with MPD's goal to ensure the online availability of the orders to its own employees. As PCB understands it, MPD is currently in the process of revising and updating the Department's orders and directives, which MPD then intends to make available online to its employees. PCB further understands that MPD first wants to make the materials available online to its own employees before considering public access on the Internet. As far back as 1998, a special committee of the Council of the District of Columbia had recommended that MPD "investigate the possibility of making the General Orders accessible by mobile digital computer. The current three-volume set of the General Orders is much too bulky to be of any use to the officer in the field. By placing the General Orders online, officers can take advantage of their guidance as the need arises."[12] While the fulfillment of MPD's goal to allow employees to have online access to the Department's directives will be an important step forward, PCB cannot think of any legitimate reason why citizens and police officers alike should not have the same online access to these materials right from the start, given the benefits to both groups.

The publication of the orders on the Department's website would also provide a showcase for MPD's development of model use-of-force policies and other "best practices" policies. Because of the increasing use of the Internet, other police departments would be able to improve their own policies by considering those of MPD, and vice-versa should other departments follow suit by also publishing their directives online. The result would be to promote best practices and greater accountability in law enforcement within the District and beyond.

## III.    RECOMMENDATION

PCB recommends that MPD publish its orders and directives, including an index, on the MPD website. Publication of the orders in a conspicuous manner would signal that MPD respects and values the community's interest in a cooperative, mutually-beneficial relationship between citizens and police. MPD has already taken important steps toward openness on its website, which contains information about how citizens can file complaints against the police, including a link to OPC's website, helpful information on a wide range of MPD programs, and a comprehensive "newsroom." PCB believes that MPD should extend that openness by making its orders and directives more accessible to the public.

---

[12]  Council of the District of Columbia, *Report of the Special Committee on Police Misconduct and Personnel Management of the Council of the District of Columbia*  35 (1998).

STATEMENT OF INSPECTOR GENERAL MICHAEL A. BOLTON
UNITED STATES CAPITOL POLICE
OFFICE OF INSPECTOR GENERAL


Committee on House Administration
United States House of Representatives
April 15, 2021


Good afternoon, my name is Michael A. Bolton.  I am the Inspector General for the United States Capitol Police (USCP or Department).  I have been with the Inspector General's office since 2006. In January 2019, the Capitol Police Board appointed me as the Inspector General. Thank you for this opportunity to appear before you, the Committee on House Administration, to discuss our Review of Events in regards to USCP's Departmental Operation, Programs and Policies that were in effect during January 6, 2021.


I would like to extend my appreciation to the Committee for holding this hearing. This hearing is different in many ways. I am addressing not only Committee members exercising their Constitutional Role of Oversight, but I am testifying to witnesses, as well as, survivors who are affected by the events of January 6, 2021. On January 6, 2021, a physical security breach of the U.S. Capitol Building occurred during a Joint Session of Congress to certify the Electoral College vote.  My goal is to provide each of you with a better understanding of how the events of January 6, 2021 occurred in relation to the preparation and response of the Department. Other factors were involved and other entities are reviewing those aspects outside of USCP. I will discuss the non-law enforcement sensitive findings detailed in my two "Flash Reports."  I would be happy to answer any law enforcement sensitive questions in a "closed door" setting.


Shortly after the events of January 6th, I notified the Department, Board and the Committees that my office would be suspending all future projects listed in the Office of Inspector General (OIG) Annual Plan for 2021 to allow my entire staff to conduct a full review of these events. In order to accomplish this goal, both OIG Audit and Investigations, would combine their collective talents to achieve a complete review of the Department.  In addition to

1

JA-42

my staff, I brought on two additional contractors with the expertise and knowledge to assist my Office. A retired Deputy Assistant Director for the United States Secret Service and a retired Senior Special Agent Chief of the Federal Bureau of Investigation (FBI).

We did not design or intend our reports to cast blame on any one individual or group. OIG intends these reports to be an independent objective review of the Department's programs and operations to better protect the Capitol Complex, members, staff, visitors, and the rank and file officers, who have shown their commitment and bravery each and every day by keeping all safe. USCP must undertake a collective effort, to ensure that each and every officer, when their shift is over, gets to go home to their families. As well as the safety of those who work and visit the first branch of government.

In accordance with our statutory authority Public Law (P.L.) 109-55, the USCP Office of Inspector General began a review of the operations and programs that were in place prior to and during the takeover of the U.S. Capitol on January 6, 2021. Our objective, for this review, is to determine if the Department (1) established adequate measures for ensuring the safety and security of Members of Congress, their Staff and the Capitol Complex, (2) established adequate internal controls and processes that complied with Department policies and procedures and, (3) complied with applicable laws and regulations. The scope included reviewing the controls, processes, and operations surrounding the security measures prior to the planned demonstrations and the response during the takeover of the Capitol building. We made our recommendations by conducting interviews, document reviews, the combined knowledge and expertise of my staff and following best practices throughout the Federal Government of those relevant agencies with similar functions of the Department.

We are currently providing the Department, Board and Committees, a series of flash reports every 30 days. We are reviewing selected elements within the Department, noting any areas for improvement. We are providing any corresponding recommendations to compel the Department to move towards a Protective Agency as opposed to a Police Agency. At the time of this hearing, my office has completed two flash reports. The first report was a review of operational planning for January 6th including a review of the Intelligence gathering process

required for the operational plan that related to January 6th.  Our second flash report focused on the Civil Disturbance Unit (CDU) and the Department's intelligence operations as a whole.  OIG will issue our third flas report on April 30th, which will be focusing on threat assessment and the counter-surveillance unit.  We anticipated our comprehensive Review would extend for the remainder of FY 2021.  Other areas of our reviews will include, but will not be limited to: Reviews of Containment Emergency Response Team (CERT), which in previous testimony was referred to as SWAT. That term is inaccurate in that SWAT is a Police term as opposed to a Protective function or tactical team supporting the Departments mandate to protect the Capitol Complex, Members, staff and visitors.  Additional reviews will include Manpower usage (communication, makeup and structure of the command staff), Training, Security Services Bureau, K-9. Essentially every element or component that played a major role in the events of January 6th.

As our work continues, my office sees continuing areas in our findings that USCP needs address.  Those areas are Intelligence, Training, Operational Planning, and culture change.  In regards to culture change, we see that the Department needs to move away from the thought process as a traditional Police Department and move to the posture as a Protective Agency.  A police department is a reactive force. A crime is committed; police respond and make an arrest.  Whereas, a Protective Agency is postured to being proactive to prevent events such as January 6th.

OIG designed our first flash report to communicate any deficiencies with the Department's operational planning and intelligence for planned demonstrations on January 6, 2021.  The deficiencies included the following (a) lack of a comprehensive operational plan or adequate guidance for operational planning, (b) failure to disseminate relevant information obtained from outside sources, (c) lack of consensus on the interpretation of threat analyses, (d) dissemination of conflicting intelligence, and (e) lack of security clearances.

In order to improve its operational planning capabilities, USCP should implement detailed guidance for operational planning.  The guidance should include policies and procedures that designate the entity or entities responsible for overseeing the operational planning and

3

JA-44

execution process, require documentation of supervisory review and approval, and standardize planning document formats. All Department employees should be required to obtain and maintain a security clearance as a condition of employment. Guidance should also require that individual units develop plans and coordinate those plans with other units for a comprehensive, Department-wide effort. Additionally, the guidance should communicate when specific operational planning documents are required. For, example the Department could use a multi-tiered system based on the anticipated size and scope of an event as criteria for determining the required level of operational planning documentation it needs to prepare.

Implementing formal guidance requiring that employees communicate any intelligence reports and concerns from external sources to appropriate commanders would improve USCP ability to effectively disseminate intelligence throughout the Department. Providing additional training to personnel on how to better understand intelligence assessments and an increased role for Department entities that have intelligence analysis and dissemination responsibilities in operational planning would also improve USCP ability to achieve a consensus on threat analyses. Furthermore, the Department should require supervisory review and approval for intelligence products to ensure the Department supports products with relevant intelligence information and ensures internal consistency. Lastly, receiving classified briefings on emerging threats and tactics would better prepare the Department's sworn and operational civilian employees to identify and counter threats and tactics in the field.

The Department lacked adequate guidance for operational planning. USCP did not have policies and procedures in place that communicated which personnel were responsible for operational planning, what type of operational planning documents its personnel should prepare, nor when its personnel should prepare operational planning documents. Additionally, USCP lacked guidance requiring that its various entities coordinate their planning efforts into a comprehensive plan.

Interviews with Department officials revealed inconsistencies in the types of planning documents USCP should have prepared for January 6, 2021. Former Chief of Police Steven Sund stated the Department used documents commonly referred to as a "Plan of Action" for

large events and that such a Plan of Action signed by an Assistant Chief should have existed for the events of January 6, 2021. Former Chief Sund also stated that the Commander of the Uniformed Services Bureau's Capitol Division should have completed an "Incident Action Plan" for the Joint Session of Congress. Former Chief Sund stated that he believed there were Department policies addressing those planning documents. However, we could not find any policies that clearly addressed creation of those specific planning documents.

According to the Operational Services Bureau (OSB) official responsible for preparing the *CDU Plan*, prior to the summer of 2020 there were no formal planning documents for CDU events. After protest activity during the summer of 2020, OSB began utilizing a planning document from the International Association of Chiefs of Police as a guide for creating such a plan. The official stated that OSB forwards a CDU Operational Plan by email to an Assistant Chief for approval and OSB receives a confirmation with no correspondence log or other documented approval. Certain CDU commanders provide input to the plan but OSB does not distribute the plan to any other Department commanders. Several Department officials stated that they were not familiar with the *CDU Operational Plan* for January 6, 2021.

USCP failed to disseminate relevant information obtained from outside sources, lacked consensus on the interpretation of threat analyses, and disseminated conflicting intelligence information regarding planned events for January 6, 2021. Additionally, the Department did not require that all of its sworn and operational civilian employees obtain security clearances.

USCP failed to disseminate relevant information obtained from outside sources regarding planned events for January 6, 2021. According to the Department's timeline, on January 5, 2021, at approximately 7 p.m. to 8 p.m., a USCP task force agent embedded with the FBI emailed the Intelligence Operations Section (IOS) a memorandum from the FBI Norfolk Division providing additional details regarding the January 6, 2021, event.

The Acting Assistant Chief of Police for Protective and Intelligence Operations stated that the memorandum was a "Situational Information Report," which he viewed differently than an Intelligence Assessment because Situational Information Reports are not necessarily

authenticated or followed-up; the FBI produces them to communicate something its agents saw or learned. The Acting Assistant Chief acknowledged it was hard to view it that way after January 6, 2021. The Acting Assistant Chief also stated that to his knowledge the FBI never formally sent the memorandum to USCP. The FBI Norfolk Division produced the document, and placed it on an FBI intranet or other internal system. Late in the evening on January 5, 2021, a USCP task force officer (TFO) assigned to the FBI Guardian Squad Task Force pulled the memorandum from the FBI system and emailed it to a USCP IOS email distribution list.

According to an Acting Assistant Chief, the memorandum did not surface again until the Intelligence and Interagency Coordination Division (IICD) attached it to an information package sent out late on January 6, 2021, after the security breach occurred. In the days following January 6, 2021, the memorandum began to surface in the media and Members of Congress began to ask USCP if it had received it. The Department was originally under the impression that it had not received the document until a Department official inquired with USCP's TFOs about it. An Acting Assistant Chief stated that to his knowledge, prior to the events of January 6, 2021, the memorandum did not make it out of the IOS email distribution list to IICD or other Department commanders. In their statements to OIG, former Chief Sund, Acting Chief Pittman and the Director of IICD stated they did not see the FBI bulletin prior to January 6th.

According to an Acting Assistant Chief, after January 6, 2021, the FBI produced a similar situational report about a threat to the State of the Union, but USCP received that report through its formal channels with the Joint Terrorism Task Force executive board, which includes the Acting Assistant Chief and Acting Chief Pittman. As of February 11, 2021, PSB requires that all reports or concerns must be sent to the Investigations Division as well as IICD Commanders— which was not required or always happening before January 6, 2021. Implementing formal guidance requiring that employees communicate any intelligence reports and concerns from external sources to appropriate commanders would significantly improve the ability of USCP to effectively disseminate intelligence throughout the Department.

Interviews with USCP officials revealed a lack of consensus about whether intelligence information regarding planned events on January 6, 2021, actually indicated specific known

threats to the Joint Session of Congress. Certain officials believed USCP intelligence products indicated there may be threats but did not identify anything specific, while other officials believed it would be inaccurate to state that there were no known specific threats to the Joint Session based on those same USCP intelligence products.

The threat analysis in the *CDU Operational Plan* for January 6, 2021, dated January 5, 2021, states, "At this time there are no specific known threats related to the Joint Session of Congress – Electoral College Vote Certification." While a prior version of Special Event Assessment 21-A-0468, dated December 16, 2020, contains the exact same statement and updated versions of the assessment published later that month contain similar language, the final version dated January 3, 2021, does not contain that statement. The IICD Director stated that IICD periodically revised the assessment as it received more information, and IICD updated the final version based on concerns communicated by the Department's law enforcement partners. An OSB official responsible for preparing the *CDU Operational Plan* dated January 5, 2021, admitted it was most likely an error on their part that the Department did not update the threat analysis in the plan. However, multiple Department officials with intelligence dissemination responsibilities stated they had never even seen the threat analysis included in the *CDU Operational Plan* dated January 5, 2021.

Providing additional training to personnel on how to better understand and interpret intelligence assessments and requiring that any threat analyses included in operational planning are coordinated with Department entities with intelligence analysis and dissemination responsibilities would improve USCP ability to achieve a consensus on its threat analyses.

Our second flash report communicated deficiencies with the Department's CDU and intelligence operations. As part of our review, OIG also conducted a follow-up analysis of the Department's implementation of recommendations contained in *Follow-up Analysis of the United States Capitol Police Intelligence Analysis Division*, Investigative Number 2018-I-0008, dated March 2019, to confirm the Department took the corrective actions in implementing the recommendations.

USCP did not have adequate policies and procedures for CDU defining its responsibilities, duties, composition, equipment, and training. CDU was operating at a decreased level of readiness because of a lack of standards for equipment, deficiencies noted from the events of January 6, 2021, a lapse in certain certifications, an inaccurate CDU roster, staffing concerns for the unit, a lack of properly performed quarterly audits, and property inventories not in compliance with guidance.

The Department should implement detailed policies and procedures that address several aspects of CDU and its operations. Implementation of the Department's formal training guidance, requirements, and lesson plans is crucial to its mission. Formalizing and implementing equipment standards will provide officers with proper functioning equipment. Additionally, the Department should require that all types of weapon systems classified as less lethal are staged prior to large events as well as ensure that the Department train and certify additional CDU Grenadiers[1].

Ensuring that the Department conducts periodic safety inspections would prevent CDU from deploying or using expired munitions. Also, the Department needs a formal process for management within CDU to ensure that when munitions do expire CDU exchanges them appropriately with the Property and Asset Management Division for proper disposal in a timely manner. Further, USCP should store its riot shields in the proper temperature-stable climate to prevent compromise of the riot shield's life span.

USCP Directive 2055.001, *Specialty Pay Program*, effective August 1, 2019, states that "the Chief of Police is authorized to establish and determine positions within the USCP as specialty assignments or requiring certain proficiencies eligible for additional compensation." The Department has and continues to experience difficulty in recruiting and retaining officers in serving in the CDU Unit. Exploring options for incentivizing the CDU Program would go a long way toward increasing participation because of its hazardous nature. As well, holding management accountable for incomplete CDU audits would enforce controls.

---

[1] A Grenadier is an officer trained and qualified in the use of Department issued less-lethal weapons. Grenadiers deploy less-lethal weapons in support of CDU operations.

Based on our follow-up analysis, a condition identified in two previous reports, the Department's failure to update and document evaluations of its intelligence priorities reemerged. We also identified intelligence related deficiencies with the Department's organizational structure, training, professional standards, internal controls, and capability to effectively collect, process, and disseminate intelligence information.

To increase the efficiency of its intelligence resources, the Department should consider reorganizing its intelligence functions into a single intelligence bureau. A formal Intelligence Training Program is necessary; otherwise, the Department cannot ensure the proper training of its intelligence employees or ensure that they are up to date on policies and procedures related to IICD personnel duties. Furthermore, implementing additional formal guidance that applies to USCP's collection, processing, and reporting of information would improve its ability to effectively disseminate intelligence throughout the Department. Lastly, the Department should address gaps in meeting the intelligence needs of its operational stakeholders; the lack of training, certification, or professional standards for its intelligence analysts; and determine the necessary staffing, security clearances, and technology IICD needs to accomplish its mission.

In conclusion, the Department is comprised of extraordinary men and women who are dedicated to protecting our democracy, putting their own lives in harm's way in order for Congress to exercise their Constitutional duties in a safe and open manner. It is our duty to honor those officers who have given their lives but also ensuring the safety of all those working and visiting the Capitol Complex by making hard changes within the Department.

Thank you for the opportunity to appear before you today. I would be very happy to answer any questions the Committee may have at this time.

 

# UNITED STATES CAPITOL POLICE
# OFFICE OF INSPECTOR GENERAL

## Review of the Events Surrounding the
## January 6, 2021, Takeover of the U.S. Capitol

## Flash Report: Operational Planning and Intelligence

### Investigative Number 2021-I-0003-A

### February 2021

### *Report Restriction Language*

**Distribution of this Document is Restricted**

This report may contain sensitive law enforcement information and/or is part of the deliberative process privilege. This is the property of the Office of Inspector General and is intended solely for the official use of the United States Capitol Police, the Capitol Police Board, or any agency or organization receiving the report directly from the Office of Inspector General. No secondary distribution may be made, in whole or in part, outside the United States Capitol Police or the Capitol Police Board, by them or by other agencies or organizations, without prior authorization by the Inspector General or the Capitol Police Board.

## EXECUTIVE SUMMARY

On January 6, 2021, a physical breach of U.S. Capitol Building security occurred during a Joint Session of Congress to certify the Electoral College vote. See Appendix A for the United States Capitol Police's (USCP or Department) official timeline of events leading up to and during the physical security breach.

In accordance with our statutory authority Public Law (P.L.) 109-55, the USCP Office of Inspector General (OIG) began a review of the events surrounding the takeover of the U.S. Capitol on January 6, 2021. Our objectives for this review were to determine if the Department (1) established adequate measures for ensuring the safety and security of the Capitol Complex as well as Members of Congress, (2) established adequate internal controls and processes for ensuring compliance with Department policies, and (3) complied with applicable policies and procedures as well as applicable laws and regulations. The scope included controls, processes, and operations surrounding the security measures prior to the planned demonstrations and response during the takeover of the Capitol building.

Based on this ongoing work, this flash report is designed to communicate any deficiencies with the Department's operational planning and intelligence for planned demonstrations on January 6, 2021. The deficiencies included the following (a) lack of a comprehensive operational plan or adequate guidance for operational planning, (b) failure to disseminate relevant information obtained from outside sources, (c) lack of consensus on the interpretation of threat analyses, (d) dissemination of conflicting intelligence, and (e) lack of security clearances.

In order to improve its operational planning capabilities, USCP should implement detailed guidance for operational planning. The guidance should include policies and procedures that designate the entity or entities responsible for overseeing the operational planning and execution process, require documentation of supervisory review and approval, and standardize planning document formats. Guidance should also require that individual units develop plans and coordinate those plans with other units for a comprehensive, Department-wide effort. Additionally, the guidance should communicate when specific operational planning documents are required. For, example the Department could use a multi-tiered system based on the anticipated size and scope of an event as criteria for determining the required level of operational planning documentation it needs to prepare.

Implementing formal guidance requiring that employees communicate any intelligence reports and concerns from external sources to appropriate commanders would improve USCP ability to effectively disseminate intelligence throughout the Department. Providing additional training to personnel on how to better understand intelligence assessments and an increased role for

1

Department entities that have intelligence analysis and dissemination responsibilities in operational planning would also improve USCP ability to achieve a consensus on threat analyses. Furthermore, the Department should require supervisory review and approval for intelligence products to ensure the products are supported by relevant intelligence information and are internally consistent. Lastly, receiving classified briefings on emerging threats and tactics would better prepare the Department's sworn and operational civilian employees to identify and counter threats and tactics in the field. See Appendix B for a complete list of recommendations.

This is the first in a series of flash reports OIG will produce as part of its ongoing review of the events surrounding the takeover of the U.S. Capitol on January 6, 2021. Therefore, we may still perform additional, in-depth work related to those areas during our review. We anticipate that our next flash report will focus on the Department's intelligence operations and Civil Disturbance Unit.

## BACKGROUND

On January 6, 2021, a physical breach of U.S. Capitol security occurred during a Joint Session of Congress to certify the Electoral College vote. See Appendix A for the United States Capitol Police's (USCP or Department) official timeline of events leading up to and during the physical security breach.

The Department's Protective Services Bureau (PSB) and Security Services Bureau are the two operational bureaus that report to the Assistant Chief of Police for Protective and Intelligence Operations. According to PoliceNet,[1] PSB's mission is to "provide safety and security to the Capitol, Members of Congress, Officers of Congress, and their immediate family." PSB has a Dignitary Protection Division, Investigations Division, and Intelligence and Interagency Coordination Division (IICD).

The PSB Investigations Division has three sections: the Criminal Investigations Section, the Threat Assessment Section, and the Intelligence Operations Section (IOS).

PoliceNet states that IOS:

- Provides overt and covert patrol of the Congressional Community to identify and disrupt individuals or groups intent on engaging in illegal activity directed at the Congressional Community and its legislative process.

- Provides an investigative response to identified or reported suspicious activity to determine any nexus to terrorism or other criminal activity.

- Conducts protective intelligence operations to support Department operations related to Member Protection, Threat Assessment, and Intelligence Collection.

---

[1] PoliceNet is the Department's intranet.

2

# *Listing of Recommendations*

**Recommendation 1:** We recommend the United States Capitol Police establish policies and procedures requiring documentation for supervisory review and approval, standardized planning document formats, and communication to personnel of criteria for determining the level of operational planning documentation necessary for each anticipated event.

**Recommendation 2:** We recommend the United States Capitol Police establish policies and procedures designating the specific entity or entities responsible for overseeing the operational planning and execution process for each anticipated event.

**Recommendation 3:** We recommend the United States Capitol Police establish policies and procedures requiring that individual units develop operational plans and coordinate those plans with other units for a comprehensive, Department-wide effort.

**Recommendation 4:** We recommend the United States Capitol Police implement formal guidance requiring that employees communicate any intelligence reports and concerns from external sources to appropriate commanders.

**Recommendation 5:** We recommend the United States Capitol Police implement detailed policies and procedures requiring any threat analysis included in operational planning is coordinated with Department entities having intelligence analysis and dissemination responsibilities.

**Recommendation 6:** We recommend the United States Capitol Police provide training to its personnel on how better to understand and interpret intelligence assessments.

**Recommendation 7:** We recommend the United States Capitol Police revise Standard Operating Procedure PS-602-08, *Analytic Standards*, dated February 1, 2018, to require supervisory review and approval for intelligence products to ensure its products are supported by relevant intelligence information and internally consistent.

**Recommendation 8:** We recommend the United States Capitol Police require its sworn and operational civilian employees to obtain a Top Secret clearance and require that administrative civilian employees obtain a minimum of a Secret clearance.

# U.S. CAPITOL POLICE BUDGET CONCERNS

# HEARING

BEFORE THE

## SUBCOMMITTEE ON CAPITOL SECURITY

OF THE

## COMMITTEE ON HOUSE ADMINISTRATION

## HOUSE OF REPRESENTATIVES

ONE HUNDRED ELEVENTH CONGRESS

SECOND SESSION

———

HELD IN WASHINGTON, DC, JULY 29, 2010

———

Printed for the use of the Committee on House Administration



Available on the Internet:
*http://www.gpoaccess.gov/congress/house/administration/index.html*

———

U.S. GOVERNMENT PRINTING OFFICE

58–000                        WASHINGTON : 2010

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2104   Mail: Stop IDCC, Washington, DC 20402–0001

COMMITTEE ON HOUSE ADMINISTRATION

ROBERT A. BRADY, Pennsylvania, *Chairman*

ZOE LOFGREN, California,
  *Vice-Chairwoman*
MICHAEL E. CAPUANO, Massachusetts
CHARLES A. GONZALEZ, Texas
SUSAN A. DAVIS, California
ARTUR DAVIS, Alabama

DANIEL E. LUNGREN, California,
  *Ranking Minority Member*
KEVIN McCARTHY, California
GREGG HARPER, Mississippi

PROFESSIONAL STAFF

JAMIE FLEET, *Staff Director*
VICTOR ARNOLD-BIK, *Minority Staff Director*

————

SUBCOMMITTEE ON CAPITOL SECURITY

MICHAEL E. CAPUANO, Massachusetts, Chairman
ROBERT A. BRADY, Pennsylvania                DANIEL E. LUNGREN, California

(II)

JA-56

# HEARING ON U.S. CAPITOL POLICE BUDGET CONCERNS

———

### THURSDAY, JULY 29, 2010

House of Representatives,
Subcommittee on Capitol Security,
Committee on House Administration,
*Washington, DC.*

The subcommittee met, pursuant to call, at 11:00 a.m., in room 1310, Longworth House Office Building, Hon. Michael E. Capuano (chairman of the subcommittee) presiding.

Present: Representatives Capuano and Lungren.

Staff Present: Jamie Fleet, Staff Director; Matt Pinkus, Professional Staff/Parliamentarian; Kyle Anderson, Press Director; Joe Wallace, Legislative Clerk; Darrell O'Connor, Professional Staff; Ryan Caimi, Intern; and Katie Ryan, Minority Professional Staff.

Mr. Capuano. The hearing will come to order. The purpose of the hearing is to exercise the subcommittee's oversight function. In considering the Inspector General's audit of the Capitol Police budget, formulation process, significant problems were discovered earlier this year. The subcommittee would like some explanation as to what went wrong and how it is being corrected.

Today we have I believe only two people testifying, Chief Morse and Mr. Hoecker from the Inspector General. And with that, I am going to forgo any introductory comments and yield to the ranking member.

[The information follows:]

2



# UNITED STATES CAPITOL POLICE
# OFFICE OF INSPECTOR GENERAL

## Audit of USCP Budget Formulation Process

### Report Number OIG-2010-03
### June 2010

*Important Notice – Distribution of This Document Is Restricted*

This report is intended solely for the official use of the United States Capitol Police or the Capitol Police Board, or any agency or organization receiving a copy directly from the Office of Inspector General. No secondary distribution may be made, in whole or in part, outside the United States Capitol Police or the Capitol Police Board, by them or by other agencies or organizations, without prior authorization by the Inspector General or the Capitol Police Board.

3

# UNITED STATES CAPITOL POLICE
*WASHINGTON, DC*



*INSPECTOR GENERAL*

**PREFACE**

The Office of Inspector General (OIG) prepared this report pursuant to the Inspector General Act of 1978, as amended. It is one of a series of audit, reviews, and investigative and special reports prepared furtherance of our responsibility to identify and prevent fraud, waste, abuse, and mismanagement within the programs and operations of the United States Capitol Police.

This report is the result of an assessment of the strengths and weaknesses of the office or function under review. It is based on interviews with employees and officials of relevant agencies and institutions, direct observation, and a review of applicable documents.

The recommendations herein have been developed on the basis of the best knowledge available to the OIG, and have been discussed in draft with those responsible for implementation. It is my hope that these recommendations will result in more effective, efficient, and/or economical operations.

I express my appreciation to all of those who contributed to the preparation of this report.

*Carl W Hoecker*

**Carl W. Hoecker**
**Inspector General**

i

4

*TABLE OF CONTENTS*

|  | Page |
|---|---|
| Abbreviations | iii |
| Executive Summary | 1 |
| Background | 3 |
| Objectives, Scope and Methodology | 5 |
| Results | 8 |
| Inadequate Controls | 9 |
| Past Processes and Practices not Followed | 13 |
| Overarching Cause "Tone at the Top" | 18 |
| Inaccurate Salaries and Benefits Budget Submissions | 23 |
| Potential Shortfall in the Radio Modernization Project | 39 |
| Other Matters | 40 |
| Appendices |  |
| Appendix A - Summary of Recommendations | 42 |
| Appendix B - Department Comments  (COP 100579) | 44 |
| Appendix C - Department Comments  (COP 100576) | 49 |
| Appendix D - OIG Evaluation of Department Response to Draft Report | 56 |
| Exhibit 1- USCP Budget Formulation Process | 72 |

JA-60

76

**_Comment Provided By The Chief_** - Page 39, third full paragraph - The new Executive Sponsor was appointed in March 2010, rather than January 2010.

**OIG Response:** As previously stated, through our quality control process, OIG found and corrected the appointment date of the new Executive Sponsor.

**_Comment Provided By The ET_** - Page 40, first full paragraph under "OTHER MATTERS" - As stated previously in the Department's recommendations response memorandum, the Department does not make reference to investigatory activities in document that are intended for publication in order to protect the due process rights of those involved.

**OIG Response:** As previously stated, as required by _Government Auditing Standards,_ when auditors conclude, based on sufficient, appropriate evidence, that fraud, illegal acts, or significant abuse either has occurred or is likely to have occurred, they should report the matter as finding. OIG also must consider whether the omission could distort the audit results or conceal improper and illegal practices. Our enabling legislation requires OIG to report to the Chief, Capitol Police Board, and Congress, as demonstrated by the Semiannual Report to Congress. In reporting this audit, OIG did not disclose the identities of those suspected of misconduct. Thus, we have accurately reported our activity to our stakeholders and without compromising the investigation. Additionally, in accordance with OIG's reporting protocols, the _Executive Summary; Objectives, Scope, and Methodology;_ and _Body_ of the report must all stand alone and can be read as separate documents. Thus, this issue is reported in the _Executive Summary_ as well as other areas of the report.

JA-61

U.S. Election Assistance Commission
Office Of Inspector General



System Review Report for the Audit Peer Review of the

# United States Capitol Police

# Office of Inspector General

For the Year Ended September 30, 2016

No. E-PR-USCP-01-17
March 2017



**U.S. ELECTION ASSISTANCE COMMISSION**
1335 EAST-WEST HIGHWAY, SUITE 4300
SILVER SPRING, MD 20910
*OFFICE OF THE INSPECTOR GENERAL*

### System Review Report

March 16, 2017

Fay F. Ropella, CPA, CFE
Inspector General
United States Capitol Police

We have reviewed the system of quality control for the audit organization of the United States Capitol Police, Office of Inspector General (USCP OIG) in effect for the year ended September 30, 2016. A system of quality control encompasses USCP OIG's organizational structure and the policies adopted and procedures established to provide it with reasonable assurance of conforming with *Government Auditing Standards*. The elements of quality control are described in *Government Auditing Standards*. USCP OIG is responsible for establishing and maintaining a system of quality control that is designed to provide USCP OIG with reasonable assurance that the organization and its personnel comply with professional standards and applicable legal and regulatory requirements in all material respects. Our responsibility is to express an opinion on the design of the system of quality control and USCP OIG's compliance therewith based on our review.

Our review was conducted in accordance with *Government Auditing Standards* and the Council of the Inspectors General on Integrity and Efficiency (CIGIE) *Guide for Conducting Peer Reviews of the Audit Organizations of Federal Offices of Inspector General*. During our review, we interviewed USCP OIG personnel and obtained an understanding of the nature of the USCP OIG audit organization, and the design of USCP OIG's system of quality control sufficient to assess the risks implicit in its audit function. Based on our assessments, we selected audits and administrative files to test for conformity with professional standards and compliance with USCP OIG's system of quality control. The audits selected represented a reasonable cross-section of USCP OIG audit organization, with emphasis on higher-risk audits. Prior to concluding the peer review, we reassessed the adequacy of the scope of the peer review procedures and met with USCP OIG management to discuss the results of our review. We believe that the procedures we performed provide a reasonable basis for our opinion.

In performing our review, we obtained an understanding of the system of quality control for the USCP OIG audit organization. In addition, we tested compliance with USCP OIG's quality control policies and procedures to the extent we considered appropriate. These tests covered the application of USCP OIG's policies and procedures on selected audits. Our review was based on

selected tests; therefore, it would not necessarily detect all weaknesses in the system of quality control or all instances of noncompliance with it.

There are inherent limitations in the effectiveness of any system of quality control, and, therefore, noncompliance with the system of quality control may occur and not be detected. Projection of any evaluation of a system of quality control to future periods is subject to the risk that the system of quality control may become inadequate because of changes in conditions, or because the degree of compliance with the policies or procedures may deteriorate.

Enclosure 1 to this report identifies the USCP OIG audits that we reviewed.

In our opinion, the system of quality control for the audit organization of USCP OIG in effect for the year ended September 30, 2016, has been suitably designed and complied with to provide USCP OIG with reasonable assurance of performing and reporting in conformity with applicable professional standards in all material respects. Audit organizations can receive a rating of *pass*, *pass with deficiencies*, or *fail*. USCP OIG has received an External Peer Review rating of *pass*.

In addition to reviewing its system of quality control to ensure adherence with *Government Auditing Standards*, we applied certain limited procedures in accordance with guidance established by the CIGIE related to USCP OIG's monitoring of audits performed by Independent Public Accountants (IPAs) under contract where the IPA served as the auditor. It should be noted that monitoring of audits performed by IPAs is not an audit and, therefore, is not subject to the requirements of *Government Auditing Standards*. The purpose of our limited procedures was to determine whether USCP OIG had controls to ensure IPAs performed contracted work in accordance with professional standards. However, our objective was not to express an opinion and accordingly, we do not express an opinion, on USCP OIG's monitoring of work performed by IPAs.

*Patricia L. Layfield*

Patricia L. Layfield, CPA, CIA, CISA
Inspector General


Enclosures

## Scope and Methodology

We tested compliance with USCP OIG audit organization's system of quality control to the extent we considered appropriate. These tests included a review of three of four audit reports issued during the period October 1, 2015, through September 30, 2016. We also reviewed the internal quality control reviews performed by USCP OIG.

In addition, we reviewed USCP OIG's monitoring of the one audit performed by IPAs where the IPA served as the auditor during the period October 1, 2015, through September 30, 2016. During the period, USCP OIG contracted for the audit of its agency's fiscal year 2015 financial statements.

We visited USCP OIG's only office, located in Washington, DC.

| Reviewed Audits Performed by USCP OIG | | |
|---|---|---|
| Report No. | Report Date | Report Title |
| OIG-2016-07 | May 2016 | Performance Audit of the United States Capitol Police Training Services Bureau |
| OIG-2016-10 | August 2016 | Performance Audit of the United States Capitol Police Mobile Device Program |

| Reviewed Monitoring Files of USCP OIG for Contracted Audits | | |
|---|---|---|
| Report No. | Report Date | Report Title |
| OIG-2016-01 | December 1, 2015 | Audit of the United States Capital Police's Fiscal Year 2015 Financial Statements |

4

Enclosure 2



# UNITED STATES CAPITOL POLICE

**WASHINGTON, DC 20510**

March 7, 2017

*INSPECTOR GENERAL*

Ms. Patricia L. Layfield, CPA, CIA, CISA
Inspector General
U.S. Election Assistance Commission
1335 East-West Highway, Suite 4300
Silver Spring, MD 20910

Dear Inspector General Layfield:

We appreciate the opportunity to respond to the U.S. Election Assistance Commission, Office of Inspector General's draft System Review Report on the U.S. Capitol Police's Office of Inspector General (USCP OIG) Audit Organization. We are pleased that your review has concluded that the audit organization of USCP OIG has earned a pass rating. We have no further comments on the System Review Report.

USCP OIG is committed to maintaining an effective system of quality controls, and we appreciate the thorough and professional manner in which your office conducted this review. If you have any questions, please contact me at (202) 593-4800, or contact Mr. Thomas Schweinefuss, Assistant Inspector General for Audits, at (202) 593-3867.

Sincerely,

*Fay F. Ropella*

Fay F. Ropella, CPA, CFE
Inspector General

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JASON LEOPOLD; BUZZFEED, INC.,

            Plaintiffs,

    v.

J. THOMAS MANGER, in his official capacity
as Chief, U.S. Capitol Police; MICHAEL
BOLTON, in his official capacity as Inspector
General of the U.S. Capitol Police,

            Defendants.

Case No. 1:21-cv-00465-BAH

**SECOND DECLARATION OF MICHAEL BOLTON**

    I, Michael Bolton, declare as follows:

    1.     I am the Inspector General (IG) for the U.S. Capitol Police (USCP or Department),

a position I have held since January 20, 2019.  From March 2018 to January 2019, I served as the

Acting Inspector General, and from August 2006 to March 2018 as the Assistant Inspector General

for Investigations.  As Inspector General, I head the Department's Office of Inspector General

(OIG), which supervises and conducts audits, inspections, and investigations involving USCP

programs, functions, systems, and operations.  This second declaration supplements my

declaration that was submitted with Defendants' Motion for Summary Judgment, ECF No. 19-3,

and is in response to Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 22.

    2.     After January 6, 2021, OIG began a review of the events surrounding the takeover

of the U.S. Capitol.  As part of that review, OIG has prepared Flash Reports on selected elements

within the USCP.  At the request of the Committee on House Administration of the U.S. House of

Representatives, OIG has provided copies of the Flash Reports to the Committee.  The Capitol

Police Board, consistent with the terms of Capitol Police Board Order 17.16, *Office of Inspector*

*General Information* (Dec. 12, 2017), has approved the public release of portions of these Flash

1

Reports, specifically for the Executive summary and recommendations contained in each Flash Report to be posted on the website of the Committee.

3.      In their Cross-Motion, Plaintiffs have attached as Exhibit 3 my prepared remarks for an April 15, 2021 hearing before the Committee on House Administration, and as Exhibit 4 excerpts from the February 2021 Flash Report: Operational Planning and Intelligence that was provided to the Committee at its request.  The information contained in those referenced documents has been specifically authorized for public release by the Capitol Police Board.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on this 17th day of December, at Washington, D.C.


Michael Bolton

2

JA-68

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JASON LEOPOLD, *et al.*,

                Plaintiffs,

                v.

J. THOMAS MANGER, *in his official
capacity as Chief, U.S. Capitol Police, et al.*,[1]

                Defendants.

Civil Action No. 21-cv-00465 (BAH)

Chief Judge Beryl A. Howell

### <u>ORDER</u>

    Upon consideration of the defendants' Motion for Summary Judgment, ECF No. 19, the plaintiffs' Cross Motion for Summary Judgment, ECF No. 22, the memoranda submitted in support and opposition, the exhibits thereto, and the entire record herein, for the reasons stated in the accompanying Memorandum Opinion issued contemporaneously with this Order, it is hereby

    **ORDERED** that the defendants' Motion for Summary Judgment, ECF No. 19, having been construed as a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), is **GRANTED**; it is further

    **ORDERED** that this case is **DISMISSED WITHOUT PREJUDICE**; it is further

    **ORDERED** that the plaintiff's Cross Motion for Summary Judgment, ECF No. 22, is **DENIED**; and it is further

---

[1]    Chief J. Thomas Manger is substituted as defendant for former Acting Chief Yogananda D. Pittman. *See* FED. R. CIV. P. 25(d).

1

**ORDERED** that the Clerk of Court shall close this case.

**SO ORDERED.**

Date: September 20, 2022

*This is a final and appealable Order.*

_____
BERYL A. HOWELL
Chief Judge

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JASON LEOPOLD, *et al.*

       Plaintiffs,

       v.

J. THOMAS MANGER, *Chief, U.S. Capitol Police*, *et al.*,

       Defendants.

Civil Action No. 21-cv-00465 (BAH)

Chief Judge Beryl A. Howell

**MEMORANDUM OPINION**

Plaintiffs Jason Leopold and his employer Buzzfeed News assert that the common-law right to public access and certain statutory duties of disclosure require defendants, the Chief of the United States Capitol Police ("USCP") and the Inspector General of the Capitol Police, both in their official capacities, to disclose certain requested documents relating to internal USCP operations. *See generally* Am. Compl. ¶¶ 8–17, ECF No. 12.[1]  Defendants contend that sovereign immunity bars the exercise of jurisdiction here and that no valid claim is presented, warranting the grant of summary judgment in their favor, pursuant to Federal Rule of Civil Procedure 56, Defs.' Mot. Summ. J. (Defs.' Mot.) at 1, ECF No. 19; Defs.' Mem. Supp. Mot. Summ. J. ("Defs.' Mem.") at 7–8, ECF No. 19-2, while plaintiffs invoke the common-law and statutory duties of disclosure as creating an exception to sovereign immunity, entitling them to mandamus relief ordering the production of the requested documents, Pls.' Cross-Mot. Summ. J. & Opp'n Mot. Summ. J. ("Pls.' Cross-Mot.") at 1, ECF No. 22; Pls.' Mem. Supp. Cross-Mot. Summ. J. & Opp'n Def.'s Mot. Summ. J. ("Pls.' Opp'n") at 2–4, ECF No. 22.

---

[1]      Chief J. Thomas Manger is substituted as defendant for former Acting Chief Yogananda D. Pittman.  *See* Fed. R. Civ. P. 25(d).

1

For the reasons explained below, defendants' motion for summary judgment is construed to be a motion for dismissal for lack of subject matter jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(1).  *See, e.g.*, *Kirkham v. Société Air Fr.*, 429 F.3d 288, 291 (D.C. Cir. 2005) (treating summary judgment motion, which raised sovereign immunity, as motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction, explaining that summary judgment "represents a decision on the merits, which courts may render only after jurisdiction has been established"); *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 21 (D.D.C. 2020) (Jackson, K.B., J.) (construing motion styled as motion for summary judgment "as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) or, *in the alternative*, a motion for summary judgment under Rule 56(a)" (emphasis in original)); *Whiteru v. WMATA* , 258 F. Supp. 3d 175, 181–82 (D.D.C. 2017) (Jackson, K.B., J.) (construing motion for summary judgment on the basis of sovereign immunity as a motion to dismiss under Rule 12(b)(1)).  *See also Hakki v. Sec'y, Dep't of Veteran Affs.*, 7 F.4th 1012, 1022–23 (11th Cir. 2021) (holding that challenge to subject matter jurisdiction on motion under Rule 56(a) was "reasonably construed" as Rule 12(b)(1) motion); *Smith v. WMATA*, 290 F.3d 201, 205 (4th Cir. 2002) ("[A]n assertion of governmental immunity is properly addressed under the provisions of Rule 12(b)(1) of the Federal Rules of Civil Procedure.").  So construed, defendants' motion is granted, requiring dismissal of the Complaint.

## I.     BACKGROUND

Following the January 6, 2021, attack on the U.S. Capitol, plaintiffs—investigative journalist Jason Leopold and Buzzfeed News—planned to prepare and publish one or more articles about the USCP.  Am. Compl. ¶ 1.  To that end, on January 28, 2021, plaintiffs submitted requests to the USCP's Public Information Office and the USCP Office of Inspector General

("OIG") seeking six categories of documents: (1) "Inspector General semiannual reports for 2015 forward," *id*. ¶ 4; (2) "other Inspector General reports, including audits for 2008 forward," *id.*; (3) "annual financial statements and audits of annual financial statements for 2015 forward," *id.*; (4) "semiannual reports of disbursements for 2015 forward," *id*.; (5) "USCP written directives in effect on January 6, 2021," *id*.; and (6) "demonstration permits, denials, or other written memorials of final decisions relating of final decisions relating to permits for public gatherings on the Capitol grounds on January 6, 2021," *id*.  *See also* Pls.' Pet. Writ of Mandamus ("Pls.' Pet."), Ex. 1, Document Request Emails, ECF No.  1-1;[2] Defs.' Statement of Material Facts As to Which There Is No Genuine Issue ("Defs.' SMF") ¶ 3, ECF No. 19-1.[3]

Shortly thereafter, on February 11, 2021, USCP's general counsel responded to plaintiffs' request by email, declining to provide the documents and suggesting other points of contact to obtain some categories of information.  Pls.' Pet., Ex. 2, Initial Request Response, ECF No. 1-1; Defs.' SMF ¶ 4.  Three weeks later, on February 23, 2021, plaintiffs filed the instant suit to obtain the requested documents, pursuant to the common-law right of public access and a statute governing the USCP OIG, 2 U.S.C. § 1909.  Pls. Pet.; Am. Compl. ¶¶ 8–17.

Since the filing of this lawsuit, defendants have disclosed a number of documents to plaintiffs, narrowing considerably the scope of the requested records remaining at issue in this

---

[2]    Plaintiffs initiated this lawsuit with a filing captioned "Petition for A Writ of Mandamus," ECF No. 1, which defendants sought to dismiss on grounds that plaintiffs had not filed an appropriate complaint, Defs.' Mot. Dismiss, ECF No. 10; Def.' Mem. Supp. Mot. Dismiss at 3–6, ECF No. 10-1.  Plaintiffs thereafter filed the amended complaint, ECF No. 12, resulting in dismissal as moot of defendants' motion, *see* Minute Order (June 1, 2021).

[3]    Plaintiffs have controverted no facts in defendants' statement of material facts, *see* Pls.' Cross-Mot. Supp. Summ. J., Pls.' Statement of Material Facts As to Which There Is No Genuine Issue ("Pls.' SMF"), ECF No. 22-2, and thus the facts set out by defendants may be deemed admitted.  *See* LCvR 7(h)(1) ("In determining a motion for summary judgment, the court may that assume facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: . . . consider the fact undisputed for the purposes of the [summary judgment] motion . . . .").

lawsuit.[4]  Plaintiffs continue to seek, and defendants decline to disclose, the following

documents: (1) 101 USCP written directives in effect on January 6, 2021, which directives detail

internal policies and guidance for USCP operations and have been classified by USCP as "Law

Enforcement Sensitive," Pls.' Reply Supp. Pls.' Cross-Mot. for Summ. J. ("Pls.' Reply) at 4–18;

Defs.' SMF ¶¶ 3, 10; Decl. of James Joyce, Senior Counsel, USCP's Office of the General

Counsel ("OGC Decl.") ¶ 11, ECF No. 19–5; (2) semiannual OIG reports from 2015 to the

present, Pls.' Reply at 18–22; Defs.' SMF ¶ 3; and (3) all other OIG reports, including audits,

from 2008 to the present, Pls.' Reply 22–25; Defs.' SMF ¶ 3.

As to the 101 USCP written directives at issue, defendants maintain that these directives,

which are classified as "Law Enforcement Sensitive," may not be disclosed because they detail

internal policies and guidance for USCP operations and "would reveal confidential sources and

methods, investigative activities and techniques" that should not be made public.  Defs.' SMF

¶ 10; OGC Decl. ¶¶ 10–12.  Furthermore, 65 of the 101 written directives have been designated

by a USCP document review team as "security information," as defined in 2 U.S.C. § 1979(a),

meaning that their disclosure is statutorily prohibited absent authorization from the U.S. Capitol

Police Board ("USCP Board"), which authorization has not been granted.  Defs.' SMF ¶ 8; OGC

Decl. ¶ 9 (citing 2 U.S.C. § 1979).  As to the requested OIG reports, defendants maintain that the

semiannual and other OIG reports are also "Law Enforcement Sensitive" and deemed "security

information" under 2 U.S.C. § 1979(a), and public distribution of these OIG reports has been

---

[4]    The following requested records have been disclosed to plaintiffs: (1) semiannual reports of USCP
disbursements from 2015 to the present, Defs.' SMF ¶ 5; (2) demonstration permits, denials, or other written
materials of final decisions relating to permits for public gatherings on the Capitol grounds on January 6, 2021, *id*.
¶ 6; and (3) two USCP written directives in effect on January 6, 2021, *id*. ¶ 7.  Plaintiffs are no longer asserting a
right to access the requested USCP financial statements, and have narrowed their request for the outstanding USCP
written directors to 101 directives.  *See* Pls' Reply Supp. Pls.' Cross-Mot. Summ. J. ("Pls.' Reply") at 4–25, ECF
No. 27; Decl. of James Joyce, Senior Counsel, USCP's Office of General Counsel ("OGC Decl.") ¶¶ 8-10, ECF No.
19-5; Defs.' Mot., Ex. C, List of Directives, ECF No. 19-7 (listing the specific 101 directives still at issue).

specifically prohibited by the USCP Board in a 2017 order issued pursuant to the Board's statutory authority to regulate the distribution of such security information. Defs.' SMF ¶¶ 13–14; Decl. of Michael Bolton, USCP's Inspector General ("IG Decl.") ¶¶ 7–10, ECF No. 19-3 (citing IG Decl., Ex. A, Capitol Police Board Order 17.16 (Dec. 12, 2017) ("2017 Order"), ECF No. 19-4); *see also* 2 U.S.C. § 1979(b), (d).

The parties' pending motions are now ripe for review.

## II.    LEGAL STANDARD

"Article III of the Constitution prescribes that '[f]ederal courts are courts of limited subject-matter jurisdiction' and 'ha[ve] the power to decide only those cases over which Congress grants jurisdiction.'" *Bronner ex rel. Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir. 2020) (alterations in original) (quoting *Al-Zahrani v. Rodriguez*, 669 F.3d 315, 317 (D.C. Cir. 2012)); *see also Gunn v. Minton,* 568 U.S. 251, 256 (2013) ("'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994))). Federal courts therefore have a corresponding "independent obligation to ensure that they do not exceed the scope of their jurisdiction" and "must raise and decide jurisdictional questions that the parties either overlook or elect not to press." *Henderson v. Shinseki*, 562 U.S. 428, 434 (2011). Absent subject-matter jurisdiction over a case, the court must dismiss it. *See Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506–07 (2006) (citing *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004)); FED. R. CIV. P. 12(h)(3).

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of demonstrating the court's subject-matter jurisdiction over the claim at issue. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). When considering a motion to

dismiss under Rule 12(b)(1), the court must determine jurisdictional questions by accepting as true all uncontroverted material factual allegations contained in the complaint and "'constru[ing] the complaint liberally, granting plaintiff[s] the benefit of all inferences that can be derived from the facts alleged.'" *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 281 (D.C. Cir. 2022) (second alteration in original) (quoting *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011)). The court need not accept inferences drawn by the plaintiff, however, if those inferences are unsupported by facts alleged in the complaint or amount merely to legal conclusions. *Id*. at 288 (making clear that liberally construing complaint in plaintiff's favor "does not entail accept[ing] inferences unsupported by facts or legal conclusions cast in the form of factual allegations" (alteration in original) (internal quotation omitted)); *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). The court "may consider materials outside the pleadings" in assessing whether subject matter jurisdiction may be exercised. *Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## III.    DISCUSSION

Defendants argue that the doctrine of sovereign immunity deprives the Court of jurisdiction over defendants, as Legislative Branch officers who were sued in their official capacity. Defs.' Mem. at 5–7. Plaintiffs counter that an exception to sovereign immunity applies, *see* Pls.' Opp'n at 2–4, and, further, that the common-law right of access and a statutory right of access, under 2 U.S.C. § 1909(c), mandate the disclosure of the requested materials, *see id.* at 4–40, 40–45. Each argument is addressed in turn.[5]

---

[5]     Defendants also argue that plaintiffs' claims fail on the merits for several reasons, including that the Inspector General Act of 1978 ("IG Act"), 5 U.S.C. App. 3, does not amount to a statutory entitlement to the disclosure of OIG reports, a substantial portion of the requested materials are statutorily prohibited from disclosure as security information, and the requested materials do not qualify as public records cognizable under the common law right of access. Defs.' Mem. at 5. Except to the extent these arguments are intertwined with the jurisdictional analysis, *see infra* Part III.A.2, 3, they need not be addressed as the complaint is dismissed for lack of subject-matter jurisdiction. *See Al-Tamimi v. Adelson*, 916 F.3d 1, 7 (D.C. Cir. 2019) (finding that district court properly

### A.      Sovereign Immunity

Generally, "a suit is against the sovereign if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration or if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963) (internal quotations and citations omitted). For such suits, "[t]he basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994) ("Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." (citations omitted)); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *Shuler v. United States*, 531 F.3d 930, 932 (D.C. Cir. 2008) ("The United States is protected from unconsented suit under the ancient common law doctrine of sovereign immunity." (quoting *Gray v. Bell*, 712 F.2d 490, 506 (D.C. Cir. 1983))). Any "waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (citations omitted).

The D.C. Circuit has "generally . . . concluded that '[f]ederal agencies or instrumentalities performing federal functions *always* fall on the "sovereign" side of [the] fault line'" and thus the doctrine of sovereign immunity forecloses claims against those entities as institutions. *Albrecht v. Comm. on Emp. Benefits*, 357 F.3d 62, 67 (D.C. Cir. 2004) (quoting *Auction Co. of Am. v. FDIC*, 132 F.3d 746, 752 (D.C. Cir. 1997)) (alterations and emphasis in

---

considered jurisdictional issue "before considering whether dismissal for failure to state a claim was appropriate under Fed. R. Civ. P. 12(b)(6)"); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868))).

the original).  Agencies within the legislative branch are therefore no exception.  *See, e.g.*,

*Rockefeller v. Bingaman*, 234 F. App'x 852, 855 (10th Cir. 2007) (holding that sovereign

immunity "forecloses . . . claims against the House of Representatives and Senate as

institutions," and against members of both congressional houses "acting in their official

capacities," because "an 'official capacity' suit is treated as a suit against a government entity"

(quoting *Rockefeller v. Bingaman*, No. CIV-06-0198, 2006 WL 4061183, at *3 (D.N.M. Sept.

20, 2006) and citing *Keener v. Cong. of the U.S.*, 467 F.2d 952, 953 (5th Cir. 1972)); *Cofield v.

United States*, 64 F. Supp. 3d 206, 213–14 (D.D.C. 2014) ("[S]overeign immunity bars any claim

for money damages against the United States (including the U.S. Senate) and its

agencies.").  Given that a suit against a government official in his official capacity "generally

represent[s] only another way of pleading an action against an entity of which an officer is an

agent," courts must treat an official capacity suit as "a suit against the entity," and apply the

governing principles of sovereign immunity accordingly.  *Kentucky v. Graham*, 473 U.S. 159,

165–66 (1985) (internal quotations and citations omitted).

      Plaintiffs sued the U.S. Capitol Police and its Inspector General for records generated in

their official capacity.  Am. Compl. ¶¶ 2–4.  The USCP is a federal agency within the Legislative

Branch, *see* 2 U.S.C. § 1901 *et seq.*; Defs.' SMF ¶ 1; *see also, e.g.*, *Baugh v. U.S. Capitol Police*,

Civ. No. 22-139, 2022 WL 2702325, at *4 (D.D.C. July 12, 2022).  As such, plaintiffs apparently

concede that sovereign immunity would ordinarily bar suit, but nonetheless dispute that such

immunity operates to bar this case because, instead of seeking monetary damages, they seek

mandamus relief under 28 U.S.C. § 1361.  Pls.' Opp'n at 2.  Specifically, they contend that the

so-called *Larson-Dugan* exception to sovereign immunity applies to permit this suit to go

forward.  *Id.* at 2–3 (first citing *Wash. Legal Found. v. U.S. Sent'g Comm'n* ("*WLF II*"), 89 F.3d

897, 901 (D.C. Cir. 1996), then *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949),

then *Dugan v. Rank*, 372 U.S. 609 (1963)).  As the analysis that follows shows, even upon

application of the *Larson-Dugan* exception to sovereign immunity, no disclosure of the

requested records is required.

### 1.     *Application of the* Larson-Dugan *Exception*

In *Larson v. Domestic & Foreign Commerce Corp.*, the plaintiff sued the head of the War

Assets Administration, not for money damages, but for specific performance of the delivery of

surplus coal in accordance with the plaintiff's contract with the government, 337 U.S. 682, 684–

85 (1949).  Finding that the Administrator's action in refusing the coal shipment to the plaintiff

was not unconstitutional or *ultra vires* conduct outside the scope of the Administrator's

authority, nor contrary to statute or order, *id.* at 703, the Supreme Court concluded that the

Administrator's action "was, therefore, inescapably the action of the United States and the effort

to enjoin it must fail as an effort to enjoin the United States," *id.*; *see also id.* at 688 (noting suit

would be barred "not because it is a suit against an officer of the Government, but because it is,

in substance, a suit against the Government over which the court, in the absence of consent, has

no jurisdiction").  The Court thereby clarified, and made explicit in *Dugan v. Rank*, 372 U.S. 609

(1963), an exception to sovereign immunity in actions seeking specific relief for "(1) action by

[government] officers beyond their statutory powers [or] (2) even though within the scope of

their authority, the powers themselves or the manner in which they are exercised are

constitutionally void."  *Id.* at 621–22.  "In either of such cases the officer's action 'can be made

the basis of a suit for specific relief against the officer as an individual.'"  *Id.* at 622 (quoting

*Malone v. Bowdoin*, 369 U.S. 643, 647 (1962)); *see also Dalton v. Specter*, 511 U.S. 462, 472

(1994)) (quoting *Larson*, 337 U.S. at 691 n.11) (summarizing *Larson* as holding "that sovereign

immunity would not shield an executive officer from suit if the officer acted either

'unconstitutionally *or* beyond his statutory powers'" (emphasis in original)); *Pollack v. Hogan*,

703 F.3d 117, 119–21 (D.C. Cir. 2012); *id.* at 120 (quoting *Larson,* 337 U.S. at 689) ("Under

[the *Larson-Dugan*] exception, 'suits for specific relief against officers of the sovereign'

allegedly acting 'beyond statutory authority or unconstitutionally' are not barred by sovereign

immunity.").

Defendants first contend that "to proceed with this suit, Plaintiffs must identify a waiver

of sovereign immunity that is 'unequivocally expressed in statutory text,'" and that because they

have not, sovereign immunity remains in force.  Defs.' Mem. at 12 (quoting *Lane*, 518 U.S. at

192).  This argument is insufficient.  As *Judicial Watch, Inc. v. Schiff*, 474 F. Supp. 3d 305

(D.D.C. 2020), states regarding mandamus relief, defendants' argument "merely begs the

question," *id.* at 312, because, if the *Larson-Dugan* exception does apply, "[n]o separate waiver

of sovereign immunity is required to seek a writ of mandamus to compel an official to perform a

duty required in his official capacity," *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005); *see

also WLF II*, 89 F.3d at 901 ("If a plaintiff seeks a writ of mandamus to force a public official to

perform a duty imposed upon him in his official capacity, however, no separate waiver of

sovereign immunity is needed." (citing *Chamber of Cong. of U.S. v. Reich*, 74 F.3d 1322, 1329

(D.C. Cir. 1996))).

Defendants' next argument is that the *Larson-Dugan* exception is inapplicable because

"Plaintiffs have not identified any officer of the sovereign who they allege is exceeding his or her

statutory or constitutional authority."  Defs.' Mem. at 12 (internal quotation omitted).  Instead,

plaintiffs only allege a failure to act under purported statutory duties and a violation of a

common law (as opposed to statutory or constitutional) right of access.  *Id.* at 12–13.  Binding

D.C. Circuit precedent, however, is clear that these violations can indeed trigger the *Larson-Dugan* exception. In *WLF II*, plaintiffs sought, pursuant to the common-law right of public access to government records, disclosure of documents "compiled or created by an advisory committee established by the United States Sentencing Commission." 89 F.3d at 898–99. In the Circuit's analysis, the relevant "duty" owed by the defendants in the case stemmed from the common-law right itself, not a separate statute or regulation. *Id.* at 901. Whether the *Larson-Dugan* exception to sovereign immunity applies "depends upon whether the Government has a duty to the plaintiff, *viz.* to allow it access to certain government records." *Id.*[6]

As a result, applicability of the exception turns first on the existence of the duty, and application of sovereign immunity merges with the claimed duty to disclose asserted in the Complaint. The D.C. Circuit explained: "the question of jurisdiction merges with the merits," triggering an assessment of the validity of plaintiff's claim under the common-law right of access. *Id.* at 902. *See also Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996) (determining whether "the *Larson-Dugan* exception would be triggered and hence no waiver of sovereign immunity is required" rested on "discussion of the central merits question in the case, namely

---

[6]     The D.C. Circuit's expansion of the *Larson-Dugan* doctrine to allow claims akin to those brought against federal agencies, under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, seeking disclosure of records from other federal government components, pursuant to the common-law right of public access, significantly broadens this exception to sovereign immunity beyond the parameters articulated by the Supreme Court and, at first blush, is not easily reconciled with Supreme Court jurisprudence that waivers of sovereign immunity must be expressly set out by statute. *See, e.g., PennEast Pipeline Co., LLC v. New Jersey*, 141 S. Ct. 2244, 2253–54 (2021) (referring to "this Court's precedents holding that Congress cannot abrogate state sovereign immunity in the absence of an 'unmistakably clear' statement" (quoting *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 786 (1991)); *United States v. Bormes*, 568 U.S. 6, 9 (2012) ("Sovereign immunity shields the United States from suit absent a consent to be sued that is 'unequivocally expressed.'" (quoting *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34 (1992) (citing *Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89, 95 (1990))) (internal quotation marks omitted)). Indeed, in the instant case, plaintiffs insist that "a *Vaughn* index is necessary" listing each record withheld by defendants, with appropriate justification to overcome the common law right of access, Pls.' Reply at 14, thereby importing and applying to a Legislative Branch entity a tool used in the FOIA litigation context, *see Union Leader Corp. v. United States Dep't of Homeland Sec.*, 749 F.3d 45, 49 n.3 (1st Cir. 2014) ("A Vaughn index is a now standard tool conceived by the District of Columbia circuit to facilitate resolution of FOIA disputes, derived from the D.C. Circuit's decision in *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973)." (internal quotation omitted)). Nonetheless, the Court is bound by D.C. Circuit authority, which demands this analysis.

whether" challenged government action violated statute); *Mashiri v. Dep't of Educ.*, 724 F.3d 1028, 1031–32 (9th Cir. 2013); *id.* at 1032 (following D.C. Circuit's practice when finding that "the question of '[w]hether the *Larson-Dugan* exception' applied 'merge[d] with the question on the merits,'" and therefore turning "to address the substantive merits of the mandamus claim before it'" (quoting *WLF II*, 89 F.3d at 901–02) (alterations in original)); *accord Int'l Fed'n. of Prof'l & Tech. Eng'rs v. United States*, 934 F. Supp. 2d 816, 821–22 (D. Md. 2013) (applying *Larson-Dugan* exception to avoid sovereign immunity bar and reach merits of suit by union and employees of legislative branch entities against Secretary of the United States Senate and Sergeant at Arms of the Senate in their official capacities, claiming parts of the Stop Trading on Congressional Knowledge Act were unconstitutional); *Ctr. for Arms Control & Non-Proliferation v. Lago*, Civ. No. 05-682 (RMC), 2006 WL 3328257, at *4–*6 (D.D.C. Nov. 15, 2006) (in suit for disclosure of materials used by defunct presidential commission in developing a report to the President, finding that sovereign immunity defense was "auxiliary to the ultimate question on the merits" as to whether the commission owed duty of disclosure under sunshine provisions of Federal Advisory Committee Act and therefore addressing the merits).

Accordingly, the merits of plaintiffs' request, under the common-law right of access, that defendants disclose 101 USCP written directives in effect on January 6, 2021 and OIG reports, including semiannual reports and audits, must be considered to assess whether sovereign immunity bars this lawsuit against defendants.

## 2.    *No Common-Law Right of Access to Requested Records*

The Supreme Court has made "clear that the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns*, 435 U.S. 589, 597 (1978) (footnote omitted).  This

right of access is "not absolute," *id.* at 598, but "left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case," *id.* at 599; *see SEC v. Am. Int'l Grp.*, 712 F.3d 1, 3 (D.C. Cir. 2013) ("Of course, even if a document is a record of the type subject to the common law right of access, the right is not absolute: it is defeated when the government's interest in secrecy outweighs the public's interest in disclosure.").  Binding precedent in this Circuit ensures that "the common law right of access extends beyond judicial records to the 'public records' of all three branches of government." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 936 (D.C. Cir. 2003) (citing *WLF II*, 89 F.3d at 903–04); *see also Schwartz v. U.S. Dep't of Justice*, 435 F. Supp. 1203, 1204 (D.D.C. 1977) (holding "that Congress is subject to the common law rule which guarantees the public a right to inspect and copy public records" and explaining that even though "Congress has exempted itself from the requirements of the Freedom of Information Act, 5 U.S.C. § 552, by 5 U.S.C. § 551(1)(A)[,] [t]hat Act, however, is not coextensive with the common law rule").

        a)      *Displacement of the Common-Law Right of Public Access for OIG Reports and Certain Written Directives*

     Certain documents still sought by plaintiffs are not subject to the common-law right of public access, however, because a statute in place displaces that default right. Specifically, a statute governing USCP operations provides, in pertinent part:

> [A]ny security information in the possession of the Capitol Police may be released by the Capitol Police to another entity, including an individual, *only if the Capitol Police Board determines* in consultation with other appropriate law enforcement officials, experts in security preparedness, and appropriate committees of Congress, *that the release of the security information will not compromise the security and safety of the Capitol buildings and grounds or any individual whose protection and safety is under the jurisdiction of the Capitol Police.*

2 U.S.C. § 1979(b) (emphasis added).  "Security information" is broadly defined as that which "is obtained by, on behalf of, or concerning" the USCP and "is sensitive with respect to the

policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds." *Id.* § 1979(a)(1), (2).

As far as "security information" is concerned, then, Congress has crafted a specific statutory scheme regarding public access that involves the USCP Board and others considering the material and determining whether public release is appropriate—not the federal courts applying the common law test for the right of public access. Where Congress has enacted a particular statutory scheme governing access to certain information, that scheme "preempts the common law right" of public access, for "[i]t would make no sense" for Congress to create such a scheme only for courts to "turn and determine that the statute ha[s] no effect on a preexisting common law right of access." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 937 (D.C. Cir. 2003); *see also Milwaukee v. Illinois*, 451 U.S. 304, 313–14 (1981) ("[F]ederal common law . . . is resorted to in the absence of an applicable Act of Congress." (internal quotation omitted)).

Much of the requested material still at issue has been identified by a USCP document review team and by the USCP Board as "security information" and so is subject to this statutory scheme governing disclosure, not to the common-law right of public access. *See* Defs.' SMF ¶¶ 8; 13–14 (detailing that the requested OIG reports and 65 of the USCP written directives have been determined to be security information, under 2 U.S.C. § 1979(a), and implementing regulations authorized under 2 U.S.C. § 1979(d)); OGC Decl. ¶ 9; IG Decl. ¶ 8.

Specifically, 65 of the 101 written USCP directives at issue, constitute security information, under 2 U.S.C. § 1979(a), because these directives "contain operational information that would reveal [the] confidential sources and methods, investigative activities and techniques"

of USCP and "reflect the USCP's internal policies, rules, protocols, and guidance for USCP

personnel on a variety of subjects."  OGC Decl. ¶ 11.  For example, some of these directives

outline how USCP personnel are to respond to specific types of threats (e.g., active shooters,

suicide bombers, hazardous material incidents), various physical and information technology

security protocols (e.g., the handling of identification badges, the use of computer passwords and

anti-virus software, and the maintenance of physical equipment like self-contained breathing

apparatuses), and operating procedures for regular USCP law enforcement activities (e.g., the use

of handcuffs, executing arrest and search warrants, vehicular pursuits, and building evacuations).

*See* Defs.' Mot., Ex. C, List of Directives, ECF No. 19-7.  Even a brief perusal of the titles of

these 65 USCP directives makes clear the sensitive operational nature of the contents, with titles

including, for example, "Use of Handcuffs/Restraints," "Use of Force," "Vehicular Pursuits,"

"Building Evacuations" and "Responding to a Suicide Bomber: 10-100 S (Sam)."  *Id.*

  Given the subject matter contemplated by these directives, defendants persuasively posit

that if the "sensitive law enforcement information contained in the security information

directives" were to be made available for the public, it "could unduly reveal the methods,

techniques, and responses that the USCP employs for Capitol Grounds security and could also

increase the potential for individuals and groups that wish to disrupt, attack, or harm the Capitol

or the Congress to do so."  *See* OGC Decl. ¶ 12.  Their designation as "security information" and

the resultant limitations on access contemplated by 2 U.S.C. 1979(b) is therefore proper.

  The OIG reports at issue—both the semiannual reports from 2015 forward and all other

reports, including audits, from 2008 forward—have also been designated "security information"

by the USCP Board, which acted under its statutory authority to determine the release of security

information, *see* 2 U.S.C. § 1979(b), (d), by specifically prohibiting the distribution of all OIG

information "including, but not limited to, audit reports, investigations reports, analyses, reviews, evaluations, [and] annual work plans" beyond the USCP or the USCP Board absent prior authorization.  *See* 2017 Order.  These limitations are justified in consideration of the fact that "the [OIG] obtains and secures national security and law enforcement sensitive information," *id.*, and, as a result, the office's reports could "include, for example, findings and recommendations regarding sensitive posting locations for USCP officers and personnel in the Capitol building and on Capitol Grounds in order to improve the security and safety of the Capitol and USCP protectees," or sensitive details regarding particular internal USCP programs in their recommendations for "comprehensive compliance."  IG Decl. ¶ 7.  Again, the OIG reports' designation as security information and the concomitant limitations on its access pursuant to 2 U.S.C. § 1979 (b) are proper.

As a result, the common-law right of public access is not in play as to the requested OIG reports (both the semiannual reports from 2015 forward and the other reports, including audits, from 2008 forward) and to the 65 USCP written directives classified as security information.

> *b)*    *Two-Part Test for Application of Common-Law Right of Public Access Applies to 36 USCP Non-Security Information Written Directives*

The remaining documents at issue that are not subject to a particular statutory disclosure scheme, must be considered under the two-step process outlined by the D.C. Circuit for determining whether the common-law right of access applies.  *Wash. Legal Found. v. U.S. Sent'g Comm'n* ("*WLF I*"), 17 F.3d 1446, 1451–52 (D.C. Cir. 1994).  First, a court must decide "whether the document sought is a 'public record,'" *id*. at 1451, and, if it is, then, second, "the court should proceed to balance the government's interest in keeping the document secret against the public's interest in disclosure," *id*. at 1451–52; *see also WLF II*, 89 F.3d at 899 (summarizing prior holding).  As to the first prong, under "federal common law," a "public record" subject to

16

the public right of access "is a government document created and kept for the purpose of memorializing or recording an official action, decision, statement, or other matter of legal significance, broadly conceived." *Id.* at 905; *see also Am. Int'l Grp.*, 712 F.3d at 3 (same). In applying the second prong of this test, courts "should focus on the specific nature of the governmental and public interests as they relate to the document itself," rather than engaging in "an abstract inquiry." *WLF I*, 17 F.3d at 1452.

In *WLF I*, the D.C. Circuit found that the "district court erred" by concluding categorically that the common-law right did not apply "without knowing" precisely which documents were at issue, and thus instructed that "the court should have analyzed each category of document requested." *Id.* Here, only one category of documents remains as to which the common-law right of access arguably applies, namely, the 36 USCP written directives in effect on January 6, 2021 that are not classified as security information. *See* OGC Decl. ¶ 8. As explained below, these 36 USCP written directives do not satisfy the two-part public access test.

> **(1)    The 36 USCP Non-Security Information Written Directives Are Not Public Records.**

As an initial matter, the 36 USCP Directives that do not qualify as security information also do not qualify as "public records," as that term has been described by the D.C. Circuit. Not every ministerial or preliminary action by a government entity amounts to the creation of a "public record." In fashioning the definition of "public records" subject to the common law right of public access, the D.C. Circuit articulated two guideposts: "adequately protect[ing] the public's interest in keeping a watchful eye on the workings of public agencies—an interest we regard as fundamental to a democratic state," *WLF II*, 89 F.3d at 905 (internal quotations and citations omitted), and "yet narrow enough to avoid the necessity for judicial application of the second-step balancing test to documents that are preliminary, advisory, or, for one reason or

17

another, do not eventuate in any official action or decision being taken," *id*.  As examples of the
latter materials "not encompass[ed]" by the definition, the Circuit cited "the preliminary
materials upon which an official relied in making a decision or other writings incidental to the
decision itself—for example, the report of a blood test provided in support of an application for a
marriage license, the job application of a would-be government employee, a government
auditor's preliminary notes used in the preparation of an official report, or a cover memorandum
circulated with a copy of an official report or study." *Id.* at 905-06.  *Cf.* 5 U.S.C. § 552(b)(2)
(FOIA provision exempting from disclosure agency records that are "related solely to the
internal personnel rules and practices of an agency").

      The 36 non-security information directives at issue may be consulted to guide the action
of USCP personnel but, as such, amount to preliminary material and advisory guidance that may
only eventually lead to an official action.  The directives deal with topics like employee social
media use, internal complaint and grievance processes, training, specific types of interactions
with the public, and guidance governing investigations, arrests, and traffic enforcement.  *See*
Defs.' Mot., Ex. C, List of Directives, ECF No. 19-7.  These written directives are internal
memoranda and guidance for USCP employees that is intended to "establish forward-looking
policies or guidance for [USCP] personnel in executing their job responsibilities."  OGC. Decl.
¶ 11.  Only after considering this guidance may USCP personnel reach a point of "tak[ing]
official action or mak[ing] an official decision." *Id*.  These documents do not "memorialize or
record any official action taken by the [USCP]," *Pentagen Techs. Int'l, Ltd. v. Comm. on
Appropriations of the U. S. House of Representatives*, 20 F. Supp. 2d 41, 45 (D.D.C. 1998),
*aff'd*, 194 F.3d 174 (D.C. Cir. 1999), and instead concern only the sort of "administrative matters
internal to the [USCP]" that the D.C. Circuit has held not to be public records, *WLF II*, 89 F.3d at

18

900.  Thus, the non-security information written directives do not constitute "public records" as the term has been construed by the D.C. Circuit, and therefore do not give rise to the common-law right of public access.

> ### (2)    The Government's Interest in Secrecy Outweighs the Public's Interest in Disclosure of the 36 USCP Non-Security Information Written Directives.

For good measure, even if the 36 USCP written directives qualified as public records, their requested disclosure would nonetheless fail the second part of the test for public access, which requires "balanc[ing] the government's interest in keeping the document[s] secret against the public's interest in disclosure."  *WLF II*, 89 F.3d at 903.  The D.C. Circuit has made clear that "the government has a compelling interest in protecting the secrecy of information important to our national security" and that the "need to guard against risks to national security interests overcomes a common-law claim for access."  *Dhiab v. Trump*, 852 F.3d 1087, 1098 (D.C. Cir. 2017) (internal quotations and citations omitted); *see also Am. Int'l Grp.*, 712 F.3d at 3 ("Of course, even if a document is a record of the type subject to the common law right of access, the right is not absolute: it is defeated when the government's interest in secrecy outweighs the public's interest in disclosure.").

All the written directives at issue—including the 36 not considered "security information" under 2 U.S.C. § 1979(a)—are designated "Law Enforcement Sensitive," a label widely used "throughout federal state, and local law enforcement agencies to control and safeguard sensitive information."  OGC Decl. ¶ 11.  The USCP treats information so labelled as accessible on a need-to-know basis only and as requiring "reasonab[le] protection from unauthorized disclosure."  *Id.*  While plaintiffs correctly assert that in general, "[m]atters of substantive law enforcement policy . . . are properly the subject of public concern," Pls.' Opp'n at 14 (quoting *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d

19

1082, 1093 (D.C. Cir. 2014)), the 36 non-security information directives at issue are administrative and personnel-related in nature and focus on the internal workings of USCP as an organization rather than the manner in which USCP substantively enforces the law. As defendants point out, certain of these "USCP directives describe 'information related solely to the internal personnel rules and practices of an agency' and would fall under Exemption 2 of the Freedom of Information Act, if the USCP were subject to the [FOIA]." OGC Decl. ¶ 11; *see also* FOIA, 5 U.S.C. § 552(b)(2) (exempting from federal agency disclosure obligations "matters that are . . . related solely to the internal personnel rules and practices of an agency"). Such internal administrative information may relate to "trivial administrative matters of no genuine public interest," *Pub. Citizen, Inc. v. Office of Mgmt. and Budget*, 569 F.3d 434, 439 (D.C. Cir. 2009) (addressing FOIA Exemption 2) (quoting *Schiller v. NLRB*, 964 F.2d 1205, 1207 (D.C. Cir. 1992)), and even minimal public interest would, in any event, be outweighed by the government's interest in restricting access to Law Enforcement Sensitive information, disclosure of which, USCP cautions, "could unduly reveal the methods, techniques, and responses that the USCP employs for Capitol Grounds security and could also increase the potential for individuals and groups that wish to disrupt, attack, or harm the Capitol or the Congress to do so," OGC Decl. ¶ 12.

***

Consequently, disclosure of the requested documents under the common-law right of public access is not required.

### 3.    *No Statutory Duty to Disclose the Requested Records*

As an alternative to the common law right of access, plaintiffs point to various provisions of the organic statute creating the USCP OIG, 2 U.S.C. § 1909, as providing a statutory right of

20

access to the OIG semiannual reports, but their reasoning is predicated on repeated misreading of the statutory text and therefore fails.

First, plaintiffs assert that 2 U.S.C. § 1909(c)(2), which incorporates certain provisions of the Inspector General Act of 1978, 5 U.S.C. App. 3 (the "IG Act"), is a statutory source for defendants' purported duty to disclose the requested OIG semiannual reports. *See* Am. Compl. ¶¶ 9-11. This statutory provision, § 1909(c)(2), consists of three sentences, the first of which provides that:

> The Inspector General shall prepare and submit semiannual reports summarizing the activities of the Office in the same manner, and in accordance with the same deadlines, terms, and conditions, as an Inspector General of an establishment under section 5 (other than subsection (a)(13) thereof) of the Inspector General Act of 1978, (5 U.S.C. App. 5)[,]

2 U.S.C. § 1909(c)(2), and the last sentence of which provides that:

> The Chief [of the Capitol Police] shall, within 30 days of receipt of a report, report to the Capitol Police Board, the Committee on House Administration, the Senate Committee on Rules and Administration, and the Committees on Appropriations of the House of Representatives and of the Senate consistent with section 5(b) of such Act.

*Id.* Plaintiffs seemingly conflate the first and last sentences to read § 1909(c)(2) as requiring the USCP OIG to disclose to the public, upon request, semiannual reports as other OIGs are required to do under 5 U.S.C. App. 3 § 5(c). Yet, the incorporation of IG Act provisions in the first sentence only applies to the manner in which the USCP IG "prepare[s] and submit[s]" semiannual reports, not to its subsequent dissemination. *See* 2 U.S.C. § 1909(c)(2). The final sentence of § 1909(c)(2) addresses dissemination of the semiannual reports by the Chief of USCP to various congressional entities, and makes no provision for public access nor incorporates the public disclosure requirements of the IG Act. *See id.* In short, § 1909(c)(2) imposes no statutory duty on defendants to disclose the semiannual reports, and thus cannot trigger the *Larson-Dugan* exception to sovereign immunity.

21

Plaintiffs also invoke 2 U.S.C. § 1909(c)(1) as the source of a separate duty to disclose

the remaining requested OIG reports, including audits.  Pls.' Opp'n at 40–45; Am. Compl.

¶¶ 12–17.  Again, their argument hinges on the reference to the IG Act in § 1909(c)(1), which

provides:

> The Inspector General shall carry out the same duties and responsibilities with respect to the
> United States Capitol Police as an Inspector General of an establishment carries out
> with respect to an establishment under section 4 of the Inspector General Act of 1978, (5
> U.S.C. App. 4), under the same terms and conditions which apply under such section.

2 U.S.C. § 1909(c)(1).  The plaintiffs contend that by dint of this subsection, two provisions of

the IG Act—section 4(e)(1) and section 8M(b)(1)(A), each of which requires certain reports to

be posted to the Inspector General's website—apply to impose a duty of disclosure on the USCP

OIG.  Pls.' Opp'n at 40–41; Compl. ¶¶ 12–17; *see* 5 U.S.C. App. 3 § 4(e)(1) ("In carrying out the

duties and responsibilities established under this Act, whenever an Inspector General issues a

recommendation for corrective action to the agency, the Inspector General . . . not later than 3

days after the recommendation for corrective action is submitted in final form to the head of the

establish, [shall] post the document making a recommendation for corrective action on the

website of the Office of Inspector General.");[7] *id.* § 8M(b)(1)(A) ("The Inspector General of

each Federal agency and designated Federal entity shall . . . not later than 3 days after any audit

report, inspection report, or evaluation report (or portion of any such report) is submitted in final

form to the head of the Federal agency or head of the designated Federal entity, as applicable,

post that report (or portion of that report) on the website of the Office of Inspector General.").

---

[7]        This provision of the IG Act may be ambiguous as to whether the operative modal verb in section
4(e)(1)(C) is "shall" (from section 4(e)(1)(A)) or "may" (from section 4(e)(1)(B)).  The Court concludes that this
provision is not incorporated by reference into 2 U.S.C.§ 1909(c)(1) regardless and that the distinction is without
consequence here.

22

Neither provision of the IG Act relied upon by plaintiffs works to provide relief here.

First, 2 U.S.C. § 1909(c)(1) makes no reference to, and therefore does not incorporate, 5 U.S.C.

App. 3 § 8M(b)(1)(A).  Indeed, Section 8M's posting requirement only applies to the Inspectors

General of "Federal agenc[ies]" and "designated Federal entit[ies]," both of which are defined

terms that do not include the USCP.  *See* 5 U.S.C. App. 3 § 8M(b)(1)(A), (c); *id.* § 8G(a); *id.*

§ 12(5).  Second, while 2 U.S.C. § 1909(c)(1) does incorporate 5 U.S.C. App. 3 § 4(e)(1), the

public posting requirement in section 4(e)(1) was not added until 2016, *see* Inspector General

Empowerment Act of 2016, Pub. L. No. 114-317, § 4(d) , 130 Stat. 1595, 1602 (2016) (adding

subsection 4(e)(1) to the IG Act), years after the enactment of 2 U.S.C. § 1909(c)(1) in 2005, *see*

Legislative Branch Appropriations Act, 2006, Pub. L. No. 109-55, § 1004, 119 Stat. 572 (2005).

The Supreme Court has recently explained that "a statute that refers to another statute by specific

title or section number in effect cuts and pastes the referenced statute as it existed when the

referring statute was enacted, without any subsequent amendments."  *Jam v. Int'l Fin. Corp.*, 139

S. Ct. 759, 769 (2019).  2 U.S.C. § 1909(c)(1) does precisely that, and so its reference to the

"duties" under section 4 of the IG Act does not include the subsequently added duty of public

disclosure.

In sum, contrary to plaintiffs' arguments, no statutory duty of disclosure for the requested

USCP OIG semiannual reports or other reports, including audits, is imposed by 2 U.S.C.

§ 1909(c)(1) or (c)(2).

## IV.    CONCLUSION

For the reasons set forth above, plaintiffs have no right to demand disclosure of the 101

USCP written directives in effect on January 6, 2021 and the USCP OIG reports, including

semiannual reports from 2015 forward and other reports, including audits, from 2008 forward,

and thus defendants' non-disclosure of these records does not trigger the *Larson-Dugan*
exception to sovereign immunity. This case is therefore dismissed for lack of subject-matter
jurisdiction.

    An Order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: September 20, 2022

_Beryl A. Howell_
BERYL A. HOWELL
Chief Judge

24

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JASON LEOPOLD, | ) | |
| | ) | |
| PLAINTIFF | ) | Civil Action No. 1:21-cv-465 (BAH) |
| vs. | ) | |
| | ) | |
| J. THOMAS MANGER, *et al.*, | ) | |
| | ) | |
| | ) | |
| DEFENDANTS | ) | |
| | ) | |
| _____ | ) | |

## <u>NOTICE OF APPEAL TO THE D.C. CIRCUIT</u>

Notice is hereby given this 18th day of November that Plaintiff Jason Leopold appeals to the United States Court of Appeals for the D.C. Circuit from the order of this Court entered September 20, 2022 [ECF: dkt 28] granting judgment to Defendants.

Respectfully Submitted,

___/s/ Jeffrey Light___
Jeffrey L. Light, D.C. Bar #485360
1629 K St., NW, Suite 300
Washington, DC 20006
(202)277-6213
Jeffrey@LawOfficeOfJeffreyLight.com

*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this 20th day of April 2023, I caused to be filed with the Court by way of the ECF filing system the Corrected Joint Appendix. I also caused the Joint Appendix to be served on all parties through the Court's ECF filing system.

_/s/ Jeffrey L. Light_____
Jeffrey L. Light