**[ORAL ARGUMENT NOT SCHEDULED]**

**No. 22-5304**

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

JASON LEOPOLD,

Plaintiff-Appellant,

v.

J. THOMAS MANGER, Chief, United States Capitol Police, and
RONALD GREGORY, Acting Inspector General of the United States
Capitol Police,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

**BRIEF FOR APPELLEES**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

MICHAEL S. RAAB
THOMAS PULHAM
*Attorneys, Appellate Staff*
*Civil Division, Room 7323*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4332*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A.    Parties and Amici

The plaintiffs in district court were Jason Leopold and Buzzfeed, Inc.  The defendants in district court were Yogananda Pittman, in her official capacity as Acting Chief, U.S. Capitol Police; J. Thomas Manger, in his official capacity as Chief, U.S. Capitol Police; and Michael Bolton, in his official capacity as Inspector General for the U.S. Capitol Police. There were no intervenors or *amici*.

The appellant in this Court is Jason Leopold.  The appellees are J. Thomas Manger, in his official capacity as Chief, U.S. Capitol Police, and Ronald Gregory, in his official capacity as Acting Inspector General for the U.S. Capitol Police.  There are no intervenors or *amici*.

## B.    Rulings Under Review

The ruling under review (issued by Chief Judge Beryl A. Howell) is an order entered on September 20, 2022, granting the defendants' motion to dismiss for lack of jurisdiction.  The memorandum opinion accompanying this order is reported at 630 F. Supp. 3d 71.

## C.  Related Cases

This case has not previously been before this Court or any court other than the district court.  Counsel for appellees are not aware of any related cases within the meaning of Circuit Rule 28(a)(1)(C), but two cases currently pending in this Court involve similar issues.  *See Musgrave v. Warner*, No. 22-5252 (D.C. Cir.); *Schilling v. U.S. House of Representatives*, No. 22-5290 (D.C. Cir.).

/s/ Thomas Pulham
Thomas Pulham

# TABLE OF CONTENTS

**Page**

GLOSSARY ................................................................. xiii

INTRODUCTION ......................................................... 1

STATEMENT OF JURISDICTION .................................... 2

STATEMENT OF THE ISSUES ...................................... 2

PERTINENT STATUTES AND REGULATIONS .................. 3

STATEMENT OF THE CASE ......................................... 3

    A.   Background .................................................... 3

    B.   Prior Proceedings ......................................... 7

SUMMARY OF ARGUMENT ......................................... 11

STANDARD OF REVIEW .............................................. 15

ARGUMENT .............................................................. 15

THE DISTRICT COURT CORRECTLY DISMISSED THIS ACTION ...... 15

    A.   Sovereign Immunity Bars Leopold's Claims ......... 15

    B.   The Common Law Provides No Right of Access to the Documents Leopold Seeks ................................ 24

        1.   There Is No Common-Law Right of Access to Legislative Branch Documents ..................... 24

        2.   Section 1979 Preempts Any Common-Law Right of Access with Respect to Security Information ...... 32

      3.    The District Court Correctly Held that the
Common Law Does Not Compel Disclosure of Any
Other Directives ............................................................ 41

   C.   The Inspector General Has No Clear and Indisputable
Statutory Duty To Publish Reports ...................................... 52

CONCLUSION ........................................................................... 63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                    **Page(s)**

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997) ............................................................ 29

*Association of Am. Med. Colls. v. Califano,*
   569 F.2d 101 (D.C. Cir. 1977) ........................................... 54

*Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands,*
   461 U.S. 273 (1983) ............................................................ 15

*Breiterman v. U.S. Capitol Police,*
   15 F.4th 1166 (D.C. Cir. 2021) ............................................ 3

*Brewer v. Watson,*
   71 Ala. 299 (1882) .............................................................. 27

*Buckley v. Valeo,*
   424 U.S. 1 (1976) ............................................................... 27

*Cable News Network, Inc. v. Federal Bureau of Investigation,*
   984 F.3d 114 (D.C. Cir. 2021) .................................... 25, 48

*Center for Nat'l Sec. Studies v. U.S. Dep't of Justice,*
   331 F.3d 918 (D.C. Cir. 2003) ...................... 31, 32, 33, 35

*Changji Esquel Textile Co. v. Raimondo,*
   40 F.4th 716 (D.C. Cir. 2022) ............................................ 20

*Cheney, In re,*
   406 F.3d 723 (D.C. Cir. 2005) ........................................... 24

*Cheney v. U.S. Dist. Court for the Dist. of Columbia,*
   542 U.S. 367 (2004) ........................................................... 52

*Citizens for Responsibility & Ethics in Washington v. Trump,*
   924 F.3d 602 (D.C. Cir. 2019) ........................................... 53

*City of Milwaukee v. Illinois & Michigan,*
   451 U.S. 304 (1981) ............................................................ 32

*City of St. Matthews v. Voice of St. Matthews,*
   519 S.W.2d 811 (Ky. 1974) ................................................. 46

*Clark v. Library of Cong.*,
750 F.2d 89 (D.C. Cir. 1984) ........................................ 16, 20

*Drawbaugh, Ex parte*,
2 App. D.C. 404 (1894) ..................................................... 27

*Dugan v. Rank*,
372 U.S. 609 (1963) ................................................ 9, 11, 17

*Dunlap v. Presidential Advisory Comm'n on Election Integrity*,
944 F.3d 945 (D.C. Cir. 2019) ........................................... 52

*Edmond v. United States*,
520 U.S. 651 (1997) .......................................................... 62

*Federal Deposit Ins. Corp. v. Meyer*,
510 U.S. 471 (1994) .......................................................... 15

*Florida Dep't of State v. Treasure Salvors, Inc.*,
458 U.S. 670 (1982) .......................................................... 18

*Food Mktg. Inst. v. Argus Leader Media*,
139 S. Ct. 2356 (2019) ...................................................... 51

*Fraternal Order of Police Library of Cong. Labor Comm. v.
Library of Cong.*,
639 F. Supp. 2d 20 (D.D.C. 2009) ......................................... 3

*Goland v. Central Intelligence Agency*,
607 F.2d 339 (D.C. Cir. 1978) ............................................. 28

*Hein v. Freedom From Religion Found., Inc.*,
551 U.S. 587 (2007) .......................................................... 29

*Higg-A-Rella, Inc. v. County of Essex*,
660 A.2d 1163 (N.J. 1995) ................................................. 42

*Illinois v. Ferriero*,
60 F.4th 704 (D.C. Cir. 2023) ........................... 14, 53, 54, 61

*Jam v. International Fin. Corp.*,
139 S. Ct. 759 (2019) ...................................... 14, 56, 57, 58

*Judicial Watch, Inc. v. Schiff*,
   988 F.3d 989 (D.C. Cir. 2021) ............................................................ 45

*Judicial Watch, Inc. v. U.S. Secret Serv.*,
   726 F.3d 208 (D.C. Cir. 2013) ............................................................ 30

*Larson v. Domestic & Foreign Commerce Corp.*,
   337 U.S. 682 (1949) ......................................... 11, 16, 17, 18, 20, 21, 22

*Leopold to Unseal Certain Elec. Surveillance Applications*
*& Orders, In re*,
   964 F.3d 1121 (D.C. Cir. 2020) .................................... 25, 29, 34, 35, 52

*Lewis v. Clarke*,
   581 U.S. 155 (2017) ............................................................................ 16

*Liberation News Serv. v. Eastland*,
   426 F.2d 1379 (2d Cir.1970) ............................................................. 53

*Lovitky v. Trump*,
   949 F.3d 753 (D.C. Cir. 2020) ..................................................... 24, 53

*McBurney v. Young*,
   569 U.S. 221 (2013) ............................................................................ 26

*McLean v. United States*,
   566 F.3d 391 (4th Cir. 2009) ............................................................. 16

*Metlife, Inc. v. Financial Stability Oversight Council*,
   865 F.3d 661 (D.C. Cir. 2017) ........................................... 15, 25, 32, 51

*Mistretta v. United States*,
   488 U.S. 361 (1989) ...................................................................... 27, 28

*Morrison v. Olson*,
   487 U.S. 654 (1988) ............................................................................ 28

*Motions of Dow Jones & Co., In re*,
   142 F.3d 496 (D.C. Cir. 1998) ............................................................ 33

*National Broad. Co., In re*,
   653 F.2d 609 (D.C. Cir. 1981) ............................................................ 47

*New York ex rel. New York State Office of Children &*
    *Family Servs. v. U.S. Dep't of Health & Human Servs.'*
    *Admin. for Children & Families,*
    556 F.3d 90 (2d Cir. 2009) ...................................................... 59

*Nixon v. Warner Commc'ns, Inc.,*
    435 U.S. 589 (1978) .................................. 24, 26, 28, 33, 47

*Pennhurst State Sch. & Hosp. v. Halderman,*
    465 U.S. 89 (1984) ............................................... 20, 21, 23

*Pollack v. Hogan,*
    703 F.3d 117 (D.C. Cir. 2012) ............................... 17, 20, 24

*Port Auth. of New York & New Jersey v. Department of Transp.,*
    479 F.3d 21 (D.C. Cir. 2007) .............................................. 61

*Power v. Barnhart,*
    292 F.3d 781 (D.C. Cir. 2002) ...................................... 54, 62

*Reichelderfer v. Johnson,*
    72 F.2d 552 (D.C. Cir. 1934) ........................................ 54, 62

*Rodriguez v. Federal Deposit Ins. Corp.,*
    140 S. Ct. 713 (2020) .................................................... 30, 32

*Rubin v. Islamic Republic of Iran,*
    138 S. Ct. 816 (2018) ......................................................... 41

*Schwartz v. U.S. Dep't of Justice,*
    435 F. Supp. 1203 (D.D.C. 1977) ...................................... 31

*Sierra Club v. Wheeler,*
    956 F.3d 612 (D.C. Cir. 2020) ........................................... 15

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ........................................... 20

*Trackwell v. U.S. Gov't,*
    472 F.3d 1242 (10th Cir. 2007) ......................................... 53

*Undisclosed LLC v. State,*
    807 S.E.2d 393 (Ga. 2017)............................................ 25, 26

*United States v. Anderson,*
   583 F.3d 504 (7th Cir. 2009) .......................................... 60

*United States v. Chemical Found., Inc.,*
   272 U.S. 1 (1926) ............................................................. 39

*United States v. Choi,*
   818 F. Supp. 2d 79 (D.D.C. 2011) .................................... 53

*United States v. El-Sayegh,*
   131 F.3d 158 (D.C. Cir. 1997) ......................................... 15

*United States v. Head,*
   552 F.3d 640 (7th Cir. 2009) .......................................... 60

*United States v. Ho,*
   984 F.3d 191 (2d Cir. 2020) ............................................ 59

*United States v. Russell,*
   411 U.S. 423 (1973) ........................................................ 29

*United States ex rel. Chicago Great W. R.R. Co. v.*
*Interstate Commerce Comm'n,*
   294 U.S. 50 (1935) ......................................................53-54

*United States ex rel. McLennan v. Wilbur,*
   283 U.S. 414 (1931) ........................................................54

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press,*
   489 U.S. 749 (1989) ....................................................... 49

*Washington Legal Found. v. U.S. Sentencing Comm'n,*
   17 F.3d 1446 (D.C. Cir. 1994) ................................ 37, 42, 51

*Washington Legal Found. v. U.S. Sentencing Comm'n,*
   89 F.3d 897 (D.C. Cir. 1996) .................................. 9, 19, 23, 24, 25, 31,
                               42, 43, 44, 45, 46, 47

*Wilbur v. United States ex rel. Kadrie,*
   281 U.S. 206 (1930) ........................................................ 62

*Wyoming v. United States,*
   279 F.3d 1214 (10th Cir. 2002) ....................................... 22

**U.S. Constitution:**

Art. I, § 5, cl. 3.................................................................. 28

**Statutes:**

Act of Dec. 27, 2022,
  Pub. L. No. 117-286, 123 Stat. 4196:
    § 2(b)(1), 123 Stat. at 4196 ............................... 61
    § 3(b), 123 Stat. at 4206.................................... 60
    § 4(b)(4)(A), 123 Stat. at 4342 ......................... 60

Administrative Procedure Act,
  5 U.S.C. § 701(b)(1)(A) ..................................... 37

Freedom of Information Act (FOIA):
  5 U.S.C. § 552(a)(3)(A) ..................................... 40
  5 U.S.C. § 552(a)(4)(B) ..................................... 40
  5 U.S.C. § 552(b) .............................................. 41
  5 U.S.C. § 552(b)(7)(E) ..................................... 50

Inspector General Empowerment Act of 2016,
  Pub. L. No. 114-317, § 4(d), 130 Stat. 1595, 1602................................56

Mandamus Act,
  28 U.S.C. § 1361 ...................................... 2, 53

2 U.S.C. § 1901 ........................................... 4

2 U.S.C. § 1901a(a) ..................................... 4

2 U.S.C. § 1901a(a)(2) ................................. 4

2 U.S.C. § 1901b ......................................... 4

2 U.S.C. § 1909 ........................................... 60

2 U.S.C. § 1909(a) ....................................... 4

2 U.S.C. § 1909(b)(1) ................................... 4

2 U.S.C. § 1909(c) ......................................................... 4

2 U.S.C. § 1909(c)(1) .......................... 3, 8, 10, 14, 55

2 U.S.C. § 1909(d)(1) .................................................... 4

2 U.S.C. §§ 1961-1967 ................................................. 3

2 U.S.C. § 1979 ........................................... 10, 12, 47

2 U.S.C. § 1979(a) ..................................... 5, 34, 39

2 U.S.C. § 1979(b) ................................... 4, 5, 34, 35

2 U.S.C. § 1979(c) ............................................. 5, 38

5 U.S.C. app. 3 § 4(e)(1) ..................................... 22

5 U.S.C. app. 3 § 4(e)(1)(C) ............................... 55

5 U.S.C. app. 3 § 4(e)(2) .............................. 55, 61

5 U.S.C. app. 3 § 12(2) ........................................ 55

28 U.S.C. § 1291 .................................................... 2

**Legislative Materials:**

H. Comm. on the Judiciary, 97th Cong., Rep. Identifying
  Court Proceedings and Actions of Vital Interest to Congress,
  No. 5 (Comm. Print 1980) ...................................... 31

H.R. Rep. No. 116-447 (2020) .................................... 57

H.R. Rep. No. 117-80 (2021) ........................... 51, 57, 58

H.R. Rep. No. 117-389 (2022) ......................... 57, 58

H. Select Comm. on Congressional Operations & S. Comm.
  on Rules & Admin., 95th Cong., Rep. Identifying Court
  Proceedings and Actions of Vital Interest to Congress,
  pt. 6 (Comm. Print 1978) ...................................... 31

**Other Authorities:**

H. Cross, *The People's Right to Know* (1953) ........................................ 26

*Subpoena*, Black's Law Dictionary (11th ed. 2019) ............................. 45

2B Sutherland Statutory Construction § 51:8 (7th ed.),
   Westlaw (database updated Nov. 2022) ............................................ 59

# GLOSSARY

FOIA                  Freedom of Information Act

JA                       Joint Appendix

OIG                   Office of the Inspector General

## INTRODUCTION

The U.S. Capitol Police and its Office of the Inspector General are entities within the Legislative Branch. As such, they are not subject to the Freedom of Information Act, and Congress has not imposed upon them any other legal requirement to disclose their internal records to the public. Unsatisfied with Congress's deliberate choice to shield legislative branch agencies from such obligations, plaintiff Jason Leopold asks the federal courts to step in. He claims that courts can fashion federal common law to superintend the recordkeeping decisions of a coordinate branch of government and modify the statute governing the Inspector General to include a disclosure obligation that Congress imposed only on similar officials within the Executive Branch.

Numerous obstacles stand in Leopold's way. First, sovereign immunity shields the Chief of the Capitol Police and the Inspector General from suit. Leopold identifies no applicable statutory waiver and does not fit within the established exception available for officer suits. Second, the common law would not provide Leopold with access to the records he wants even if he could bring suit. Federal courts cannot fashion common law to interfere with the operations of the

Legislative Branch, and the types of documents Leopold seeks would not be subject to a common-law right of access in any event. Third, Leopold cannot demonstrate entitlement to the mandamus-style relief he seeks because no statute imposes a clear and compelling duty on the Inspector General to disclose any of the requested reports. The district court's judgment dismissing Leopold's complaint for lack of subject-matter jurisdiction should therefore be affirmed.

## STATEMENT OF JURISDICTION

Leopold attempted to invoke the district court's mandamus jurisdiction pursuant to 28 U.S.C. § 1361. JA-7. The district court dismissed the complaint for lack of subject-matter jurisdiction on September 20, 2022. JA-69. Leopold filed a timely notice of appeal on November 18, 2022. JA-95. This Court has jurisdiction over Leopold's appeal under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether sovereign immunity bars Leopold's claims.

2. Whether common law provides a right of access to written directives of the U.S. Capitol Police and reports created by its Inspector General.

3.  Whether Leopold demonstrates entitlement to mandamus-style relief on his claim that 2 U.S.C. § 1909(c)(1) incorporates a requirement that the Inspector General publicly post certain reports.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    Background

**1.**  The U.S. Capitol Police is a law enforcement entity within the Legislative Branch.  *See Fraternal Order of Police Library of Cong. Labor Comm. v. Library of Cong.*, 639 F. Supp. 2d 20, 22 (D.D.C. 2009). "Congress established the Capitol Police to ensure the safety and security of the Capitol's facilities and to allow Congress to fulfill its constitutional and legislative responsibilities in a safe, secure, and open environment." *Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1170 (D.C. Cir. 2021) (quotation marks omitted).  *See generally* 2 U.S.C. §§ 1961-1967 (establishing the powers and duties of the Capitol Police). The Capitol Police is headed by a Chief and is generally overseen by the Capitol Police Board, which consists of the Sergeant at Arms of the House of Representatives, the Sergeant at Arms of the Senate, and the

Architect of the Capitol.  *Id.* §§ 1901, 1901a(a).[1]  Additional oversight is

provided by designated committees in the Senate and House of

Representatives.  *Id.* § 1901b.

Within the Capitol Police there is an Office of the Inspector

General (OIG) headed by the Inspector General of the U.S. Capitol

Police.  2 U.S.C. § 1909(a).  The Inspector General generally serves the

same functions as his counterparts within the Executive Branch—to

promote economy, efficiency, and effectiveness in the administration of

department programs; to prevent and detect fraud, waste, abuse, and

mismanagement; to handle cases involving misconduct; and to provide

periodic reports to Congress.  *Id.* § 1909(c), (d)(1); JA-14.  Like the Chief

of the Capitol Police, the Inspector General acts under the general

supervision of the Capitol Police Board.  2 U.S.C. §§ 1901, 1909(b)(1).

Among other responsibilities, Congress has tasked the Capitol

Police Board with controlling access to sensitive information relating to

the functions of the Capitol Police.  *See* 2 U.S.C. § 1979(b) ("Authority of

---

[1] The Chief of the Capitol Police also serves *ex officio* as a non-voting member.  2 U.S.C. § 1901a(a)(2).

Board to determine conditions of release").  Specifically, Congress

directed that,

> [n]otwithstanding any other provision of law, any security
> information in the possession of the Capitol Police may be
> released by the Capitol Police to another entity, including an
> individual, only if the Capitol Police Board determines . . .
> that the release of the security information will not
> compromise the security and safety of the Capitol buildings
> and grounds or any individual whose protection and safety is
> under the jurisdiction of the Capitol Police.

*Id.*  "[S]ecurity information" is broadly defined to include information

that "(1) is sensitive with respect to the policing, protection, physical

security, intelligence, counterterrorism actions, or emergency

preparedness and response relating to Congress, any statutory

protectee of the Capitol Police, and the Capitol buildings and grounds"

and "(2) is obtained by, on behalf of, or concerning the Capitol Police

Board, [or] the Capitol Police."  *Id.* § 1979(a).  This law does not,

however, "affect the ability" of Congress "to obtain information from the

Capitol Police."  *Id.* § 1979(c).

Acting pursuant to this authority, the Capitol Police Board issued

Order 17.16 on December 12, 2017.  JA-19.  That order prohibits the

distribution of any "Office of Inspector General information," including

any "reports, analyses, reviews, [and] evaluations" to anyone outside

5

the Capitol Police or Board and further prohibits any "secondary distribution" (*e.g.*, distribution by the Capitol Police) "without prior authorization of the Capitol Police Board." JA-19. By virtue of this order, "all OIG information is treated as 'security information'" under § 1979. JA-17.

**2.** Plaintiff Jason Leopold is an investigative reporter who seeks to write news stories about the Capitol Police following the insurrection at the U.S. Capitol on January 6, 2021. JA-6-7, 72. To that end, he submitted requests to the Capitol Police and the Inspector General seeking (1) all Inspector General reports issued since 2008; (2) all semiannual reports of disbursements for operations of the Capitol Police submitted to Congress since 2015; (3) all Capitol Police written directives in effect on January 6, 2021; and (4) all permits or denials of permits for public gatherings on the Capitol Grounds for January 6. Dkt. No. 1, Ex. 1; JA-15 (describing the requests for Inspector General reports). Upon being informed by counsel for the Capitol Police that the disbursement reports could be obtained from the House Legislative Resource Center, Leopold submitted an additional request there. Dkt. No. 1, Exs. 2-3. When the requested documents had not been provided

within the 20-day deadline Leopold unilaterally set in his requests, he sued the Chief of the Capitol Police and the Inspector General to compel disclosure.[2]

## B.    Prior Proceedings

**1.**  Leopold initiated his suit by filing a "Petition for Writ of Mandamus."  Dkt. No. 1.  He acknowledged that the Capitol Police "is a legislative agency and therefore not subject to the Freedom of Information Act (FOIA)," but he claimed "a common-law right of access to the requested records" enforceable through mandamus.  *Id.* at 2, 4.

After the defendants moved to dismiss on the ground that Leopold had failed to commence a civil action properly, Leopold filed a "First Amended Complaint."  JA-6.  Invoking the Mandamus Act, 28 U.S.C. § 1361, as the sole basis for the district court's jurisdiction, JA-7, the complaint listed three counts.  The first count alleged a violation of Leopold's common-law right of access to the documents he requested. JA-8.  The second and third counts alleged that the Inspector General

---

[2] Leopold's employer at the time, BuzzFeed News, joined in the lawsuit.  Leopold now works at Bloomberg News, and BuzzFeed is no longer involved in this litigation.  *See* Order of Feb. 14, 2023 (terminating BuzzFeed).

had failed to comply with statutory provisions requiring that certain reports be made available to the public. JA-8-9. On appeal, Leopold presses only part of one of these statutory claims. *See* Br. 3, 9-10, 48-55. For simplicity, this brief will discuss only the statutory claim that remains live: that 2 U.S.C. § 1909(c)(1) incorporates by reference a provision of the Inspector General Act that requires other inspectors general to post publicly reports containing recommendations for corrective action.

Since this action was filed, Leopold has received many of the documents he requested, and the scope of the dispute between the parties has narrowed significantly. The Office of the Clerk of the House of Representatives provided all the requested reimbursement reports (category 2 above). JA-22. The Capitol Police also produced, with limited redactions for personal privacy, documents related to permits or denials for public gatherings on Capitol grounds on January 6, 2021 (category 4 above). JA-22. Following further narrowing of the dispute over the Capitol Police written directives, the parties' dispute as it was briefed to the district court was limited to: 101 written directives and all Inspector General reports since 2008. JA-74.

**2.** The district court dismissed the complaint for lack of subject-matter jurisdiction. The court explained that the defendants would be immune from suit unless Leopold's claims fell within the "*Larson-Dugan* exception," which provides "an exception to sovereign immunity in actions seeking specific relief for '(1) action by [government] officers beyond their statutory powers [or] (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void.'" JA-79 (alterations in original) (quoting *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963)). Although Leopold had not alleged that either circumstance applied, the district court read *Washington Legal Foundation v. U.S. Sentencing Commission* (*Washington Legal Found. II*), 89 F.3d 897 (D.C. Cir. 1996), to "expan[d]" the *Larson-Dugan* exception to any case in which "the Government has a duty to the plaintiff," even if "the relevant duty . . . stemmed from the common[ ]law." JA-81 & n.6 (quotation marks omitted). Thus, in the district court's view, "the application of sovereign immunity merge[d] with" the merits of Leopold's claims. JA-81.

On the first claim, the district court held that the common law did not provide Leopold with a right to the documents he sought. First, the court held that 2 U.S.C. § 1979 preempts the common law with respect to documents containing "security information" because it establishes "a specific statutory scheme" under which decisions "regarding public access" are made by the Capitol Police Board, "not the federal courts." JA-84. Accordingly, "the common-law right of public access is not in play as to the requested OIG reports . . . and to the 65 [Capitol Police] written directives classified as security information." JA-86. As for the remaining written directives, the district court held that they are not "public records" and that the balance of interests weighed against disclosure. JA-87-90.

The district court also rejected Leopold's statutory claim, holding that 2 U.S.C. § 1909(c)(1) incorporates only those provisions of the Inspector General Act that existed at the time § 1909 was enacted and therefore imposes "no statutory duty of disclosure" for Inspector General reports. JA-93. Because there is no duty, the court concluded, this claim "does not trigger the *Larson-Dugan* exception to sovereign immunity." JA-93-94.

## SUMMARY OF ARGUMENT

**A.**  Sovereign immunity generally bars suits against government officers in their official capacity.  But under the "*Larson-Dugan* exception" to sovereign immunity, suits for specific relief against government officers may proceed if they allege that the officer acted *ultra vires* (*i.e.*, beyond any statutory authority) or unconstitutionally. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689-90 (1949); *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963).  The Supreme Court expressly rejected the argument that suits based on claims under the common law should be similarly excepted from the general rule of sovereign immunity.  *Larson*, 337 U.S. at 692.

Leopold's claim under the common-law right of access does not fall within this exception to sovereign immunity.  Thus, such a claim "may not be brought unless the sovereign has consented," *Larson*, 337 U.S. at 693, and no consent is available here.  Leopold's other claim is based on statute, but statutory claims are excepted from sovereign immunity only if the officer has acted without any authority at all.  A claim of error in the exercise of delegated authority is not sufficient, even if the result is the denial of a right protected by statute.  *Id.* at 690, 693.

Leopold's contention that the Inspector General failed to post certain reports publicly falls into the latter category.

**B.** To the extent that any consideration of the merits is warranted, Leopold's claims also fail on that ground. Exercising supervisory authority over their own records, courts have long recognized a common-law right of access to judicial records. But there is no similar general right of access to non-judicial records, and neither this Court nor the Supreme Court has ever invoked the common law to compel disclosure of documents belonging to the Legislative Branch. Any attempt by a federal court to fashion new common law in this regard would unduly interfere with the operations of a coordinate branch of government and therefore raise significant separation-of-powers concerns. The Court should decline Leopold's invitation to sail these uncharted waters.

Further, any common-law right of access would be displaced where Congress has enacted legislation governing access to a particular type of record. In 2 U.S.C. § 1979, Congress prohibited the disclosure of "any security information in the possession of the Capitol Police" absent approval of the Capitol Police Board. Much of the material Leopold

seeks is security information and is therefore subject to this statutory scheme rather than any common-law right.  Indeed, all the Inspector General reports and 65 of the 101 written directives have been designated as security information.  Leopold's attempts to challenge these designations lack support in the record and the law.

Assuming the common law could reach legislative branch records at all, the remaining directives would be subject to a two-step inquiry: (1) are the documents sought public records and (2) does a balancing of interests favor disclosure.  The directives are not public records because they constitute preliminary guidance upon which Capitol Police personnel rely when carrying out their duties.  They lack any legal significance in their own right.  And even if the directives were public records, the district court reasonably exercised its discretion in concluding that the government's interest in keeping the directives confidential outweighs any public interest in accessing internal administrative documents of the Capitol Police.

**C.**  Finally, Leopold fails to demonstrate entitlement to mandamus-style relief on his statutory claim.  Such relief is available only where the challenged action is "plainly and palpably wrong as a

matter of law" and "there is no room for an honest difference of opinion" regarding the official's interpretation of law. *Illinois v. Ferriero*, 60 F.4th 704, 714-16 (D.C. Cir. 2023) (quotation marks omitted). Here, the Inspector General did not act unlawfully, much less indisputably so, in declining to disclose the requested reports. The law establishing his duties incorporates a provision of the Inspector General Act that, at the time Congress created the office, did not contain any public posting requirement. *See* 2 U.S.C. § 1909(c)(1). Such a specific reference incorporates the law as it existed at the time and does not include any subsequent amendments. *Jam v. International Fin. Corp.*, 139 S. Ct. 759, 769 (2019). Further, even if that law did impose a general obligation to post reports, a more specific statute forbids the distribution of security information without the approval of the Capitol Police Board, which has emphatically prohibited the distribution of Inspector General Reports. Leopold therefore fails to demonstrate any error at all, much less plain and palpable error, and cannot obtain mandamus-style relief.

## STANDARD OF REVIEW

This Court reviews a dismissal for lack of subject-matter jurisdiction de novo. *Sierra Club v. Wheeler*, 956 F.3d 612, 616 (D.C. Cir. 2020). Questions of law, including whether the common law provides a right of access to particular documents, are reviewed de novo. *Metlife, Inc. v. Financial Stability Oversight Council*, 865 F.3d 661, 666 (D.C. Cir. 2017). If such a right exists, the district court's decision whether to permit access is reviewed for abuse of discretion. *United States v. El-Sayegh*, 131 F.3d 158, 160 (D.C. Cir. 1997).

## ARGUMENT

### THE DISTRICT COURT CORRECTLY DISMISSED THIS ACTION

### A.    Sovereign Immunity Bars Leopold's Claims

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983); *see also Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475 (1994) ("Sovereign immunity is jurisdictional in nature."). That immunity covers not only suits against government entities themselves but also "lawsuits brought against employees in their official capacity," which are simply "another way of pleading an action against an entity

15

of which an officer is an agent." *Lewis v. Clarke*, 581 U.S. 155, 162 (2017) (quotation marks omitted).  Thus, both the Chief of the Capitol Police and the Inspector General are generally immune from suit absent a waiver.  *See McLean v. United States*, 566 F.3d 391, 401 (4th Cir. 2009), *abrogated on other grounds by Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721 (2020) (sovereign immunity bars suit against Congress); *Clark v. Library of Cong.*, 750 F.2d 89, 102-03 (D.C. Cir. 1984) (same for suit against Librarian of Congress).

There are, however, two categories of "suits for specific relief against officers of the sovereign which are not suits against the sovereign." *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949).  The first is "where the officer's powers are limited by statute" and the officer takes "actions beyond those limitations." *Id.* The second is where "the statute or order conferring power upon the officer to take action in the sovereign's name is claimed to be unconstitutional." *Id.* at 690.  In both circumstances, the unauthorized actions are considered "beyond the officer's powers" and therefore "not the conduct of the sovereign," such that they "may be made the object of specific relief" without implicating sovereign immunity. *Id.* at 689-90.

Together, these categories of permitted suits are sometimes referred to as the "*Larson-Dugan* exception" to sovereign immunity, *see, e.g.*, *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012) (per curiam), after the Supreme Court opinions that linked them together. *Larson*, 337 U.S. at 689-90; *Dugan v. Rank*, 372 U.S. 609, 621-22 (1963) (explaining that "the recognized exceptions" to the "general rule" of sovereign immunity "are (1) action by officers beyond their statutory powers and (2) even though within the scope of their authority, the powers themselves or the manner in which they are exercised are constitutionally void").

The Supreme Court has made clear that these "two types" of suits are "the only ones in which a restraint may be obtained against the conduct of Government officials." *Larson*, 337 U.S. at 690. In *Larson* itself, the Court expressly rejected the argument that "there exists a third category of cases in which the action of a Government official may be restrained or directed," based on claims that the official's conduct is "'illegal' as a matter of general law," such as the common law of torts. *Id.* at 692. Thus, the rule articulated in that case is that an officer's action "can be regarded as so 'illegal' as to permit a suit for specific

relief against the officer as an individual only if it is not within the officer's statutory powers or, if within those powers, only if the powers, or their exercise in the particular case, are constitutionally void." *Id.* at 701-02; *see Florida Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 688-89 (1982) (summarizing *Larson*'s holding).

Leopold's claim under the common-law right of access does not fall within this exception to sovereign immunity. That is clear from *Larson* itself, which expressly rejected the argument that an officer's conduct alleged to violate a common-law duty "is ipso facto beyond his delegated powers." 337 U.S. at 695. The Supreme Court made clear that an officer's actions are imputed to the sovereign as long as they "do not conflict with the terms of his valid statutory authority," regardless of "whether or not they are tortious under general law." *Id.* at 695. Thus, a claim based in common law to challenge such actions "may not be brought unless the sovereign has consented." *Id.* at 693.

Contrary to the district court's view, JA-80-81 & n.6, this Court's decision in *Washington Legal Foundation II* does not hold otherwise. The Court in that case stated that "[w]hether the *Larson-Dugan* exception applie[d]" to a claim of access to records of the U.S.

Sentencing Commission turned on "whether the Government has a duty to the plaintiff, *viz.* to allow it access" to those records. *Washington Legal Found. II*, 89 F.3d 897, 901 (D.C. Cir. 1996). But the Court also acknowledged that "the only basis upon which [the Government] resist[ed] application" of the exception was that the common law did not impose such a duty. *Id.* at 901-02.[3] The Court was therefore not directly confronted with the antecedent question whether a duty based on judicially fashioned common law should be treated the same as a duty imposed by statute, and the Court did not address the part of *Larson* that answers that question.

*Washington Legal Foundation II* should not be interpreted to resolve a question it did not consider, much less in a way that would make it inconsistent with well-established Supreme Court precedent. *See* JA-81 n.6 (noting that such an interpretation "significantly broadens this exception to sovereign immunity beyond the parameters articulated by the Supreme Court"). Indeed, in cases both before and after *Washington Legal Foundation II*, this Court has described the

---

[3] The Court agreed on the ground that the documents sought were not public records. *Washington Legal Found. II*, 89 F.3d at 907.

*Larson-Dugan* exception as applying only to suits against federal officers "allegedly acting beyond statutory authority or unconstitutionally," with no reference to the common law. *Pollack*, 703 F.3d at 120 (quotation marks omitted); *see also, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996); *Clark*, 750 F.2d at 102.

Leopold's statutory claim also falls outside the narrow *Larson-Dugan* exception to sovereign immunity. Under this exception, "a claim that an officer has exceeded his 'delegated power' is not barred by sovereign immunity," *Pollack*, 703 F.3d at 121 n.*, on the theory that the officer's "actions are *ultra vires* his authority and therefore may be made the object of specific relief . . . without impleading the sovereign." *Larson*, 337 U.S. at 689-90 (emphasis added). But as the Supreme Court has made clear, an "officer may be said to act *ultra vires* only when he acts 'without any authority whatever.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101 n.11 (1984); *cf. Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 725 (D.C. Cir. 2022) ("[F]or an *ultra vires* claim to succeed, the agency must 'plainly act[ ] in excess of its delegated powers,' and . . . its error must be 'jurisdictional or nearly so.'" (second alteration in original) (citation omitted)).

Leopold cannot plausibly allege that the Inspector General lacks any authority whatever to withhold security information. Indeed, the Inspector General is legally required to do so. Section 1979 prohibits the release of security information without approval from the Capitol Police Board, and the Board has not approved the release of any reports to Leopold. On the contrary, the Board has ordered that no "Office of Inspector General information" shall be posted on a website or "distributed outside the United States Capitol Police or Capitol Police Board." JA-19. In following this order, the Inspector General acted *within*, not "beyond," his statutory authority. *Larson*, 337 U.S. at 689. Therefore, his "action is the sovereign's and a suit to enjoin it may not be brought unless the sovereign has consented." *Id*. at 693.

Leopold's speculation (Br. 39-48) that some parts of the reports he seeks might not be properly classified as security information under § 1979 fails to establish that the Inspector General exceeded his statutory authority. "As the Court in *Larson* explained, an *ultra vires* claim rests on 'the officer's *lack* of delegated power. A claim of error in the exercise of that power is therefore not sufficient.'" *Pennhurst*, 465 U.S. at 102 (quoting *Larson*, 337 U.S., at 690) (emphasis added); *see*

*also Wyoming v. United States*, 279 F.3d 1214, 1230 (10th Cir. 2002)

("[T]he question of whether a government official acted ultra vires is

quite different from the question of whether that same official acted

erroneously or incorrectly as a matter of law."). Further, any error in

the designation of material as security information was made by the

Capitol Police Board in issuing Order 17.16. Leopold has not sued the

Capitol Police Board and he offers no argument that the Board acted in

excess of its delegated authorities in issuing that order.

Nor can Leopold trigger the *Larson-Dugan* exception by asserting

"a statutory right of access to certain OIG material" under a provision

that requires public posting of documents making recommendations for

corrective action. Br. 9 (citing 5 U.S.C. app. 3 § 4(e)(1)).[4] While this

argument would be directed at an action of a defendant here, it would

still be only a claim of legal error and would not establish that the

Inspector General acted beyond his statutory authority. *See Larson*,

337 U.S. at 693 ("The mere allegation that the officer, acting officially,

---

[4] Some statutory provisions were revised as part of a codification
effort after the district court entered judgment. Unless otherwise
indicated, this brief will use the same section numbering used during
district court proceedings.

wrongfully holds property to which the plaintiff has title does not meet that requirement.  True, it establishes a wrong to the plaintiff.  But it does not establish that the officer, in committing that wrong, is not exercising the powers delegated to him by the sovereign.").  As the Supreme Court has explained, "it would make the constitutional doctrine of sovereign immunity a nullity" if a plaintiff "need only to claim a denial of rights protected or provided by statute" in order to trigger the *Larson-Dugan* exception.  *Pennhurst*, 465 U.S. at 112.

If Leopold clears these initial hurdles, the Court could proceed to consider the merits of his claims.  But such consideration would still go toward establishing jurisdiction.  In *Washington Legal Foundation II*, the Court explained that when a plaintiff seeks mandamus-style relief to compel the disclosure of government records, application of "the *Larson-Dugan* exception . . . depends upon whether the Government has a duty to the plaintiff, *viz.* to allow it access."  89 F.3d at 901.  Thus, "the question of jurisdiction merges with the question on the merits."  *Id.* at 902.[5]

_____

[5] *Washington Legal Foundation II* involved only a claim under common law, but this Court has indicated that the same merging would

*Continued on next page.*

## B. The Common Law Provides No Right of Access to the Documents Leopold Seeks

This Court has recognized that "the common law bestows upon the public a right of access to public records and documents." *Washington Legal Found. II*, 89 F.3d at 902. But this right "is not absolute," *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978), and important principles limit a court's ability to compel the disclosure of government records. Several of those principles foreclose Leopold's claim.

### 1. There Is No Common-Law Right of Access to Legislative Branch Documents

It is "difficult" to provide "a comprehensive definition of what is referred to as the common-law right of access," and the Supreme Court has declined to "delineate precisely [its] contours." *Nixon*, 435 U.S. at 599; *see also Washington Legal Found. II*, 89 F.3d at 903 (noting "[t]he

---

apply to statutory claims. *See Pollack*, 703 F.3d at 121 n.* ("*Larson* did note that there may be some intertwining of the merits and jurisdictional inquiries in cases raising statutory claims . . . ."); *Swan*, 100 F.3d at 981 (explaining that "the *Larson–Dugan* exception would be triggered" in that case "[i]f Swan's removal violated the NCUA statute"). In any event, the only potential source of jurisdiction over Leopold's statutory claim is the Mandamus Act, and it is well-established that "mandamus jurisdiction under § 1361 merges with the merits." *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020) (quoting *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc)).

limited nature of the federal case law on the subject"). When the right is invoked in federal court, it is "almost always in cases involving access to court documents." *Washington Legal Found. II*, 89 F.3d at 902; *see, e.g.*, *Cable News Network, Inc. v. Federal Bureau of Investigation*, 984 F.3d 114 (D.C. Cir. 2021); *In re Leopold to Unseal Certain Elec. Surveillance Applications & Orders*, 964 F.3d 1121 (D.C. Cir. 2020); *Metlife, Inc. v. Financial Stability Oversight Council*, 865 F.3d 661 (D.C. Cir. 2017). Indeed, when faced with "a claim of access to the documents of a government entity, the Sentencing Commission, that is within the judicial branch but is not a court," this Court found itself "in uncharted waters." *Washington Legal Found. II*, 89 F.3d at 903. This much is clear, though: this Court has never exercised common lawmaking power to compel disclosure of documents from a legislative branch entity, and it should decline to do so now.

Courts applying the common-law right of access have long distinguished between judicial records and other types of records. *See, e.g., Undisclosed LLC v. State*, 807 S.E.2d 393, 397 n.4 (Ga. 2017) ("The rights of access to public records and court records were historically distinct and separate."). In *Nixon*, the Supreme Court appeared to

suggest otherwise when it said that "the courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." 435 U.S. at 597 (footnote omitted). But that case specifically involved only "the right to inspect and copy judicial records." *Id.* at 598. In a subsequent case involving a claim of access to other types of documents, the Court clarified that for "non-judicial records," there was "'no general common law right in all persons (as citizens, taxpayers, electors or merely as persons) to inspect public records or documents.'" *McBurney v. Young*, 569 U.S. 221, 233 (2013) (quoting H. Cross, *The People's Right to Know* 25 (1953)). The Court cited English and American cases alike limiting access to such records to individuals who could show some kind of "personal interest" in them. *Id.* at 233-34; *see also Undisclosed LLC*, 807 S.E.2d at 397 ("Under the common law, the right of access to *public* records was generally restricted to those persons with a sufficient interest in them, such as those needing the records to prosecute or defend a legal action. The right of access to *court* records, however, did not require a special interest." (citations omitted)).

Indeed, when this Court first recognized the common-law right of access, it explained that state courts had distinguished "between judicial records and other mere official records." *Ex parte Drawbaugh*, 2 App. D.C. 404, 407 (1894) (citing *Brewer v. Watson*, 71 Ala. 299 (1882)). The Court further stressed that "a public court of record" is "governed by very different principles and considerations, in respect to its records and proceedings, from those that apply to an executive department." *Id.* at 405.

But whatever the precise contours of the common law in other courts, federal courts are limited by the Constitution, and creating a common-law right of access to records of the Legislative Branch would raise significant separation-of-powers concerns. The separation of powers "built into the tripartite Federal Government" guards against "the encroachment or aggrandizement of one branch at the expense of the other." *Mistretta v. United States*, 488 U.S. 361, 382 (1989) (quoting *Buckley v. Valeo*, 424 U.S. 1, 122 (1976)). Recognizing that there is a "hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power," the Supreme Court has stood vigilant against efforts to "either accrete to a single Branch powers

more appropriately diffused among separate Branches or [to] undermine the authority and independence of one or another coordinate Branch." *Id.* (quotation marks omitted). The Court has specifically warned against the danger "that the Judicial Branch neither be assigned nor allowed 'tasks that are more properly accomplished by [other] branches.'" *Id.* at 383 (alteration in original) (quoting *Morrison v. Olson*, 487 U.S. 654, 680-681 (1988)).

Courts may properly fashion common law to govern access to judicial records because "[e]very court has supervisory power over its own records and files." *Nixon*, 435 U.S. at 598. But courts have no similar power over the records and files of other branches. On the contrary, the Constitution's Journal Clause gives Congress the authority to determine which activities of the Legislative Branch to make public and which to keep confidential. *See* U.S. Const. art. I, § 5, cl. 3 ("Each House shall keep a Journal of its Proceedings, and from time to time publish the same, excepting such parts as may in their Judgment require Secrecy . . . ."); *see Goland v. Central Intelligence Agency*, 607 F.2d 339, 346 (D.C. Cir. 1978) (per curiam) ("Congress has undoubted authority to keep its records secret, authority rooted in the

Constitution, longstanding practice, and current congressional rules." (footnotes omitted)). Thus, just as "[p]roviding public access to judicial records is the duty and responsibility of the Judicial Branch," *In re Leopold*, 964 F.3d at 1134, determining access to records of Legislative Branch agencies is the province of that branch.

The fact that access is ultimately determined by an ad hoc weighing of interests exacerbates the level of potential interference. The absence of clear rules means that access is ultimately "dependent upon the court's gestalt judgment or overarching impression" of the appropriate level of transparency for a particular government process. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997). The Constitution does not, however, "give the federal judiciary a 'chancellor's foot' veto over [confidentiality] practices of which it d[oes] not approve." *United States v. Russell*, 411 U.S. 423, 435 (1973). And "courts must be reluctant to expand their authority by requiring intrusive and unremitting judicial management of the way [another] Branch performs its duties." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 617 (2007) (Kennedy, J., concurring).

This Court has recognized such separation-of-powers concerns in cases seeking to compel disclosure under FOIA of congressional documents in the possession of Executive Branch agencies. *See, e.g.*, *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 221, 225-26 (D.C. Cir. 2013). If such concerns arise where Congress has created a statutory right of access, they are necessarily heightened where a court exercises a common lawmaking power to compel disclosure. *See Rodriguez v. Federal Deposit Ins. Corp.*, 140 S. Ct. 713, 717 (2020) ("Judicial lawmaking in the form of federal common law plays a necessarily modest role under a Constitution that vests the federal government's 'legislative Powers' in Congress and reserves most other regulatory authority to the States.").

Adopting a categorical rule that the common-law right of access does not apply to Legislative Branch documents would not contradict the holdings of any prior decision of this Court or the Supreme Court. Neither has invoked common law to compel the disclosure of such documents. This Court has on two occasions suggested that the common-law right of access applied to Legislative Branch records, but these statements were plainly *dicta*. First, in *Washington Legal*

*Foundation II*—a case seeking records from a judicial branch entity—

the Court observed that "*it has been said* in this district that '[t]he

general rule is that all three branches of government, legislative,

executive, and judicial, are subject to the common law right.'" 89 F.3d

at 903 (alteration in original) (emphasis added) (quoting *Schwartz v.*

*U.S. Dep't of Justice*, 435 F. Supp. 1203, 1203 (D.D.C. 1977)).[6] Some

time later, and without further explanation, the Court cited *Washington*

*Legal Foundation II* as having "held that the common law right of

access extends beyond judicial records to the 'public records' of all three

branches of government" before finding "any pre-existing common law

right" pre-empted by FOIA as to Executive Branch agencies. *Center for*

*Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 936-37 (D.C.

_____

[6] Elsewhere, *Washington Legal Foundation II* cited the *Schwartz* ruling as having been affirmed, *see* 89 F.3d at 903, but this is inaccurate. What this Court affirmed was a later decision in the *Schwartz* case regarding the Department of Justice's withholding under FOIA; that ruling did not involve the common-law right of access to Legislative Branch records. *See* H. Comm. on the Judiciary, 97th Cong., Rep. Identifying Court Proceedings and Actions of Vital Interest to Congress, No. 5, at 94-97 (Comm. Print 1980) (summarizing the litigation history); H. Select Comm. on Congressional Operations & S. Comm. on Rules & Admin., 95th Cong., Rep. Identifying Court Proceedings and Actions of Vital Interest to Congress, pt. 6, at 106-09, 273-81 (Comm. Print 1978) (reprinting the district court decisions).

Cir. 2003).  The Court would break perilous new ground were it to create common law subjecting Legislative Branch recordkeeping practices to judicial oversight.  It should not do so.

> **2.  Section 1979 Preempts Any Common-Law Right of Access with Respect to Security Information**

**a.**  The Supreme Court has long recognized that "[f]ederal common law is a necessary expedient" to be invoked only "in absence of an applicable Act of Congress." *City of Milwaukee v. Illinois & Mich.*, 451 U.S. 304, 314 (1981) (alteration and quotation marks omitted).  "[W]hen Congress addresses a question . . . the need for such an unusual exercise of lawmaking by federal courts disappears." *Id.*; *see also Rodriguez*, 140 S. Ct. at 717 (noting the "necessarily modest role" for common law in a constitutional system that reserves the legislative power to Congress).  Thus, the common-law right of access "must yield to a statute 'when Congress has spoken directly to the issue at hand.'" *Metlife*, 865 F.3d at 669 (quoting *Center for Nat'l Sec. Studies*, 331 F.3d at 937).

For example, in *Nixon*, the Supreme Court recognized that a federal statute restricting the Executive Branch's ability to disclose

certain records would preclude a court from ordering those records to be released.  In that case, the Court held that the Presidential Records Act had displaced the common law by "creat[ing] an administrative procedure for processing and releasing" all presidential records— including White House audiotapes admitted during a criminal trial— "on terms meeting with congressional approval."  435 U.S. at 603.

This Court has also applied the "principle that a statutory disclosure scheme preempts the common law right" of access.  *Center for Nat'l Sec. Studies*, 331 F.3d at 936.  In *Center for National Security Studies*, this Court held that FOIA preempts any common-law right that would apply to records held by federal agencies because Congress has already "balanc[ed] the benefits and harms of disclosure" in that "carefully calibrated statutory scheme."  *Id.* at 937.  And in *In re Motions of Dow Jones & Co.*, 142 F.3d 496 (D.C. Cir. 1998), after rejecting the argument that the common law had ever provided a right of access to grand jury materials, the Court held in the alternative that "the common law has been supplanted" by the Federal Rules of Criminal Procedure, which "now govern" the disclosure of such material.  *Id.* at 504.

Section 1979 speaks directly to the issue of access to security information. That statute prohibits the release of "any security information in the possession of the Capitol Police" absent the approval of the Capitol Police Board. 2 U.S.C. § 1979(b). Congress defined "security information" broadly to mean information that

> (1) is sensitive with respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds; and

> (2) is obtained by, on behalf of, or concerning the Capitol Police Board, the Capitol Police, or any incident command relating to emergency response.

*Id.* § 1979(a). Congress also identified the standard that must be met before any release could be made: "only if the Capitol Police Board determines in consultation with other appropriate law enforcement officials, experts in security preparedness, and appropriate committees of Congress, that the release of the security information will not compromise the security and safety" of Capitol facilities or personnel. *Id.* § 1979(b).

This provision plainly displaces any application of the common law. It "expressly directs secrecy as the default position," *In re Leopold*, 964 F.3d at 1130; "specifies a standard . . . different from the interests

34

balanced" under common law, *id.*; and grants to the Capitol Police Board, not the courts, the "[a]uthority . . . to determine conditions of release," 2 U.S.C. § 1979(b). Moreover, Congress instructed that § 1979 applies "[n]otwithstanding any other provision of law." *Id.* "'[I]t would make no sense' for Congress to create such a scheme only for courts to 'turn and determine that the statute ha[s] no effect on a preexisting common law right of access.'" JA-84 (second alteration in original) (quoting *Center for Nat'l Sec. Studies*, 331 F.3d at 937).

As the district court explained, "[m]uch of the requested material still at issue" is security information and is therefore "subject to this statutory scheme governing disclosure, not to the common-law right of public access." JA-84. In Order 17.16, the Capitol Police Board invoked its authority under § 1979 "to determine the release of security information" to prohibit the distribution of all OIG information outside the Capitol Police "without prior authorization of the Capitol Police Board . . . consistent with applicable law." JA-19. As a result, all such information, including all the Inspector General reports requested by Leopold, are designated as security information and cannot be disclosed to a member of the public except in accordance with § 1979. The same

restriction applies to the majority of the written directives in effect on January 6, 2021. Of the 101 directives at issue in this litigation, 65 have been determined by the Capitol Police to be security information under § 1979. JA-23. As with the Inspector General reports, these directives cannot be disclosed absent express approval from the Capitol Police Board.

Because the Board has not authorized disclosure of the Inspector General reports or the written directives, JA-17, 23, § 1979 prohibits their disclosure to Leopold, and the district court correctly granted summary judgment on these requests.

**b.**  Leopold does not dispute the district court's conclusion that § 1979 displaces the common law with respect to security information. Nor does he dispute that the conditions for disclosure under that statute do not exist. Br. 28. Instead, Leopold challenges the designation of the materials he seeks as security information, and he invokes cases applying FOIA to demand that the defendants provide additional information to justify their denial of his requests.

Leopold's contention (Br. 39) that "[t]he record does not support the conclusion that all OIG material is Security Information" is

especially perplexing. The record contains Order 17.16, in which the Capitol Police Board specifically invoked its authority "to determine the release of security information" in Order 17.16 to prohibit the disclosure of all Inspector General information without approval of the Board. JA-19. Thus, the record clearly establishes that all the reports Leopold requested have "been designated 'security information' by the [Capitol Police] Board." JA-85.

Leopold does not attempt to offer (and has therefore forfeited) any argument that Order 17.16 was unlawful or not binding on the Inspector General. Indeed, Leopold does not address the order at all. In any event, § 1979 does not provide for judicial review of determinations as to what qualifies as security information under that statute, and the actions of the Capitol Police Board are not subject to review under the Administrative Procedure Act. *See* 5 U.S.C. § 701(b)(1)(A); *Washington Legal Found. v. U.S. Sentencing Comm'n* (*Washington Legal Found. I*), 17 F.3d 1446, 1449 (D.C. Cir. 1994) ("[W]e have interpreted the [Administrative Procedure Act] exemption for 'the Congress' to mean the entire *legislative* branch."). Even if Leopold had raised the issue, the common-law right of access provides no avenue to

collaterally attack a generally applicable agency order taken pursuant to congressionally delegated statutory authority.

Instead of addressing the Inspector General's stated basis for withholding the reports, JA-16-17, Leopold offers a series of non sequiturs. For example, he notes that the inspectors general of other agencies, like the National Security Agency, are able to publicly release some of their reports. Of course, those inspectors general are not subject to Order 17.16 or § 1979. He also points (Br. 43) to "public Flash Reports made available by Congress which pertains [sic] to the events surrounding the January 6, 2021 takeover of the U.S. Capitol." But § 1979 does not prohibit the Inspector General from providing information to Congress, nor does it restrict the ability of Congress to release any such information. 2 U.S.C. § 1979(c). In any event, the Capitol Police Board approved the release of those reports. JA-67-68. And finally, Leopold observes (Br. 47-48) that he had "submitted an excerpt from one publicly available" audit of the Capitol Police's budget formulation process that, in his view, does not "appea[r] to contain Security Information." As the document itself demonstrates, this report was made publicly available by a House subcommittee, not the

Inspector General, JA-55-58, many years before Order 17.16 was adopted.

As for the written directives, here too the record provides more than adequate basis for the denial of Leopold's request. A dedicated Capitol Police document review team determined that 65 of the 101 written directives at issue constitute security information under § 1979. JA-9. That statute leaves to the Capitol Police the obligation to determine what information qualifies as "sensitive" within the broadly expansive categories set out in the definition, 2 U.S.C. § 1979(a), and the agency's conclusion cannot be rejected based on mere speculation. *See, e.g., United States v. Chemical Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.").

Further, as the district court observed, the determination here is consistent with other record evidence. The 65 directives

> outline how [Capitol Police] personnel are to respond to specific types of threats (e.g., active shooters, suicide bombers, hazardous material incidents), various physical and information technology security protocols (e.g., the

handling of identification badges, the use of computer
passwords and anti-virus software, and the maintenance of
physical equipment like self-contained breathing
apparatuses), and operating procedures for regular [Capitol
Police] law enforcement activities (e.g., the use of handcuffs,
executing arrest and search warrants, vehicular pursuits,
and building evacuations).

JA-85. Indeed "[e]ven a brief perusal of the titles" of these directives

"makes clear the sensitive operational nature of the contents, with titles

including, for example, 'Use of Handcuffs/Restraints,' 'Use of Force,'

'Vehicular Pursuits,' 'Building Evacuations' and 'Responding to a

Suicide Bomber: 10-100 S (Sam).'" *Id.*

Leopold's insistence that more information is required flips § 1979

on its head and finds no support in this Court's case law. That statute

specifically prohibits the disclosure of information unless a specific

determination is made. This stands in marked contrast to FOIA, which

*requires* the disclosure of information and puts the burden on an agency

to justify any withholdings. 5 U.S.C. § 552(a)(3)(A), (4)(B). Leopold's

reliance (Br. 34-36) on cases applying that Act is therefore misplaced.

Similarly misguided are Leopold's efforts to invoke the concept of

segregability. FOIA provides that "[a]ny reasonably segregable portion

of a record shall be provided to any person requesting such record after

deletion of the portions which are exempt." 5 U.S.C. § 552(b). Leopold cites no authority for importing this concept into the common-law right of access, especially when the relevant question is whether that right is pre-empted by statute. Even if a statute could theoretically preempt the common law with respect to portions of a record, Congress did not include a segregability requirement when it enacted § 1979 in 2004, even though one had been part of FOIA for decades. *See Rubin v. Islamic Republic of Iran*, 138 S. Ct. 816, 826 (2018) ("Had Congress likewise intended [the statute] to have such an effect, it knew how to say so."). Nor does such a concept make sense in the context of a statute that provides no right of access and instead presumes that information will be kept secret.

### 3. The District Court Correctly Held that the Common Law Does Not Compel Disclosure of Any Other Directives

The remaining 36 written directives that are not subject to the statutory disclosure scheme set out in § 1979 remain subject to the common-law right of access (assuming that this right applies to Legislative Branch documents at all). "[T]he decision whether a document must be disclosed pursuant to the common law right of access

involves a two-step inquiry." *Washington Legal Found. II*, 89 F.3d at 902. At the first step, the court "must decide whether the document sought is a public record." *Id.* (quotation marks omitted). At the second, the court must "balance the government's interest in keeping the document secret against the public's interest in disclosure." *Id.* (quotation marks omitted). Leopold fails at both steps.

### a. The Directives Are Not Public Documents

"[T]he common law right extends only to 'public records,' not to every document contained in government files." *Washington Legal Found. I*, 17 F.3d at 1451. This Court has only had one occasion to consider the definition of "public records" as applied to a government entity that was not a court. In *Washington Legal Foundation II*, the Court rejected a sweeping definition of "public records" that would have "include[d] almost every document recorded, generated, or produced by public officials whether or not required by law to be made, maintained or kept on file." *Washington Legal Found. II*, 89 F.3d at 904 (quoting *Higg-A-Rella, Inc. v. County of Essex*, 660 A.2d 1163, 1168 (N.J. 1995). Instead, the court adopted a narrower definition: "a government document created and kept for the purpose of memorializing or

recording an official action, decision, statement, or other matter of legal significance, broadly conceived." *Id.* at 905. The Court specifically carved out "documents that are preliminary, advisory, or, for one reason or another, do not eventuate in any official action or decision being taken." *Id.* Thus, a "public record" does not "encompass the preliminary materials upon which an official relied in making a decision or other writings incidental to the decision itself." *Id.*

The district court correctly concluded that "the non-security information written directives do not constitute 'public records.'" JA-89. These directives contain "policies, rules, protocols, and guidance for [Capitol Police] on a variety of subjects, including Capitol security, traffic enforcement, law enforcement training, interacting with Congress, and workplaces rules and benefits." JA-23-34, 28. They are not backward-looking memorializations that "preserv[e] a precise record of an official decision or action" already taken. *Washington Legal Found. II*, 89 F.3d at 905. Rather, they are "forward-looking" guides for employees to use "in executing their job responsibilities, at which point the [employee] may take official action." JA-24. In other words, the

directives are "the preliminary materials upon which an official relie[s] in making a decision." *Washington Legal Found. II*, 89 F.3d at 905.

Leopold contends (Br. 13) that the written directives are not preliminary "precisely *because* they are intended to be consulted to guide" subsequent agency action, as a party's legal brief is intended to guide the decision of a judge. But *Washington Legal Foundation II* specifically distinguished judicial proceedings from "the processes for much decisionmaking by executive and legislative officials." 89 F.3d at 906. And the Court made clear that preliminary materials in the latter type of proceedings are not public records—even when they may guide (or even determine) the official decision. *See id.* at 905-06 (providing examples of "the report of a blood test provided in support of an application for a marriage license" and "the job application of a would-be government employee").

Leopold next argues (Br. 15-16) that the directives "have independent legal significance" because they are binding on Capitol Police employees. But this Court has previously held that documents concerning "administrative matters internal to the [government entity]"

are not public records. *Washington Legal Found. II*, 89 F.3d at 900.[7]

The directives do not apply to any member of the public and can only

affect third party rights on the contingency of future action. *See id.* at

905 (documents are not public records if, "for one reason or another,

[they] do not eventuate in any official action or decision being taken").

This stands in sharp contrast to, for example, a subpoena (*see* Br. 14-

15), which is a "formal legal comman[d] issued to third parties."

*Judicial Watch, Inc. v. Schiff*, 988 F.3d 989, 995 (D.C. Cir. 2021)

(Henderson, J., concurring in the judgment) (quotation marks omitted);

*see also Subpoena*, Black's Law Dictionary (11th ed. 2019) (defining

subpoena as "[a] writ or order commanding a person to appear before a

court or other tribunal, subject to a penalty for failing to comply").

For the same reason, Leopold misses the mark when he argues

(Br. 21) that the directives are public records because they

"memorializ[e]" the "policies and procedures" contained therein and

"recor[d]" the "decision to adopt those policies and procedures." This

---

[7] Leopold initially contends (Br. 20) that only *letters or memoranda* on internal administrative matters" fall outside the definition of public records. But he fails to explain why the format of a record matters more than its content or operative effect and later acknowledges (Br. 21 n.5) that it should not.

argument would make every written document a public record.  *See Washington Legal Found.* II, 89 F.3d at 905 ("Not every writing is a 'written memorial,' of course.").  The relevant question is whether the creation of the document, as opposed to some subsequent action, constitutes "the business of that unit of government."  *Id.* (quoting *City of St. Matthews v. Voice of St. Matthews*, 519 S.W.2d 811, 816 (Ky. 1974)); *see also id.* at 906 (considering the "mission" of the Sentencing Commission).  Here, the official action or decision occurs when Capitol Police personnel carries out part of the agency mission, for example, by making an arrest, referring a subject for potential prosecution, or hiring or firing an employee.  The directive's guidance is preliminary to any such action.

Finally, Leopold cites cases applying FOIA's Exemption 5 to argue (Br. 18-19) that the directives cannot be preliminary because they are not "initial drafts" or otherwise "predecisional."  It is totally unclear, however, why concepts applicable to the deliberative process privilege should govern the common-law definition of a public record.  This Court certainly did not apply any such analysis in *Washington Legal Foundation II*, nor did all of the documents it considered meet the

standard Leopold now advances.  *See* 89 F.3d at 900, 906 (listing "copyrighted scholarly research" and "materials from other organizations" as among the types of non-public records and finding that not all of the documents were "predecisional").

### b.    The Balance of Interests Weighs Against Disclosure

Even though it correctly recognized that the written directives are not public records subject to a common-law right of access, the district court balanced the interests "[f]or good measure" and concluded that disclosure of the directives would "fail the second part of the test for public access."  JA-89.  "[T]he decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case."  *Nixon*, 435 U.S. at 599; *In re National Broad. Co.*, 653 F.2d 609, 613 (D.C. Cir. 1981).

As the district court recognized, all written directives (whether or not they are security information under 2 U.S.C. § 1979) have been designated as "Law Enforcement Sensitive" information.  JA-89.  Within the Capitol Police, "that designation indicates that such information should only be accessed by those with a need to know and

47

should be reasonably protected from unauthorized disclosure." JA-24.

The designation is applied here because, as noted above, the directives

reflect "internal policies, rules, protocols, and guidance for [Capitol

Police] on a variety of subjects." *Id.* They guide personnel on "how . . .

to respond to particular threats or incidents"; "weapons policies;

uniform and equipment policies; traffic control policies; and a variety of

personnel policies and programs." *Id.* As such, the directives "contain

operational information that would reveal confidential sources and

methods, [or] investigative activities and techniques." *Id.*

This judgment by the Capitol Police—the agency responsible for

safeguarding Congress, its grounds, and its personnel—that the

directives should be kept confidential weighs heavily against disclosure.

*Cf. Cable News Network*, 984 F.3d at 119 (explaining that the FBI's

objection to disclosure to judicial records weighed against disclosure

before of its statutory responsibilities in the national security context).

Further, because the Capitol Police keeps these directives confidential,

the public has never had access to them. *Cf. id.* (discussing, as a

relevant consideration for judicial records, "the public's previous access

to the sealed information"). Those directives that were previously

released to the public have also been disclosed to Leopold. JA-22, 25. A judicial decision requiring disclosure of other directives for the first time would necessarily override the consistent judgment of a coordinate branch of government.

Leopold offers no persuasive reason to disturb the district court's exercise of its discretion. He claims generally that "matters of substantive law enforcement policy . . . are properly the subject of personal concern," Br. 22 (alteration in original) (quoting *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 766 n.18 (1989)), but repeatedly acknowledges that not all of the directives involve such substantive matters, *see* Br. 22, 23, 26 (citing directives for "Rayburn House Office Building Range," "Budget Office Classification Codes" and "Grievance Procedure"). Further, the directives that relate more immediately to substantive matters of law enforcement policy are also more likely to involve weightier government interests against disclosure. *See* Br. 23-24 (conceding that the "degree of sensitivity" for the "Protective Body Armor" directive is "potentially significant").

Leopold next criticizes (Br. 23) the "law enforcement sensitive" designation as being "vague" and without "consistent meaning across

agencies."  But even if that might be true across agencies, there is uncontradicted record evidence about what it means to the Capitol Police and why that label is used here.  *See* JA-24.

Leopold also misses the mark when he criticizes (Br. 26) the district court's observation that "certain of these '[written] directives describe "information related solely to the internal personnel rules and practices of an agency" and would fall under Exemption 2 of the Freedom of Information Act, if the [Capitol Police] were subject to [that statute].'"  JA-90 (quoting JA-24).  Given the mission of the Capitol Police, the directives that do not relate solely to personnel rules and practices are more likely to "disclose technique and procedures for law enforcement investigations" or "guidelines for law enforcement investigations" whose disclosure "could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E); *see also* JA-24 (discussing directives that contain "operational information" about "investigative activities and techniques").  Such materials are also exempt from disclosure under FOIA.  And "congressional judgment about the importance of maintaining the confidentiality of nonpublic

information" must "weigh heavily" in any balancing of interests. *Metlife*, 865 F.3d at 675.[8]

Finally, Leopold argues (Br. 24-25) that the Capitol Police should be required to submit a *Vaughn* index with more information about the withheld directives or produce redacted versions of directives. Again, Leopold's invitation to use common law to apply FOIA concepts to the Legislative Branch should be declined. *See Washington Legal Found. I*, 17 F.3d at 1452 (acknowledging that creation of a *Vaughn* index "requires a significant expenditure" of agency resources). This is not a case where the court lacks information about what the documents are. *See id.* Here, it is clear that the documents at issue are written directives reflecting internal policies and procedures of the Capitol

---

[8] While recognizing that the Capitol Police is not subject to FOIA, the House Appropriations Committee has instructed the agency to "develop a policy and procedure for the sharing of information that follows the spirit of" that statute. H.R. Rep. No. 117-80, at 26 (2021). FOIA's spirit necessarily includes the careful protection of sensitive information. *See, e.g.*, *Food Mktg. Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019) (explaining that the exemptions are "as much a part of FOIA's purposes and policies as the statute's disclosure requirement" (alterations omitted)); *see also* H.R. Rep. No. 117-80, at 26 ("This policy should be consistent with, and not interfere with, [the Capitol Police's] primary function of protecting the Congress."). That process is currently underway.

Police.  And while courts may be able to rely on their inherent supervisory authority to require the production of redacted judicial records, *see, e.g.*, *In re Leopold*, 964 F.3d at 1133, Leopold cites no authority for the proposition that courts can fashion common law to decide which parts of sensitive records belonging to another Branch can be safely released to the public.

**C.    The Inspector General Has No Clear and Indisputable Statutory Duty To Publish Reports**

Leopold's complaint seeks mandamus-style relief on the claim that § 4 of the Inspector General Act requires the Inspector General to publish electronically certain reports for public access.  Leopold cannot demonstrate entitlement to such relief on this claim.  Accordingly, whether viewed through the lens of sovereign immunity or statutory jurisdiction, the district court lacked jurisdiction.

**1.**  "Mandamus is 'one of the most potent weapons in the judicial arsenal,' a 'drastic and extraordinary remedy reserved for really extraordinary causes.'"  *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 944 F.3d 945, 949 (D.C. Cir. 2019) (per curiam) (quoting *Cheney v. U.S. Dist. Court for the Dist. of Columbia*, 542 U.S. 367, 380 (2004)).  In order to obtain mandamus-style relief, "a plaintiff

must demonstrate (1) a clear and indisputable right to relief, (2) that the government official has a clear duty to act, and (3) that no adequate alternative remedy exists." *Citizens for Responsibility & Ethics in Washington v. Trump*, 924 F.3d 602, 606 (D.C. Cir. 2019) (quotation marks omitted); *see also Illinois v. Ferriero*, 60 F.4th 704, 714 (D.C. Cir. 2023) (explaining that "[f]ew legal standards are more exacting"). "These three threshold requirements are jurisdictional" as well. *Lovitky v. Trump*, 949 F.3d 753, 759 (D.C. Cir. 2020); *supra* n.5.[9]

"To meet the 'clear and indisputable' requirement, the plaintiff must show that the challenged action is 'plainly and palpably wrong as [a] matter of law.'" *Illinois*, 60 F.4th at 714 (alteration in original) (quoting *United States ex rel. Chicago Great W. R.R. Co. v. Interstate*

_____

[9] A separate question under 28 U.S.C. § 1361 is whether this statute provides jurisdiction to seek mandamus-style relief against officials in the Legislative Branch. *See Liberation News Serv. v. Eastland*, 426 F.2d 1379, 1384 (2d Cir.1970) (Friendly, J.) (explaining that "Congress was thinking solely in terms of the executive branch" when it enacted § 1361) (Friendly, J.); *United States v. Choi*, 818 F. Supp. 2d 79, 84 (D.D.C. 2011) ("[Section] 1361 is only a source of jurisdiction for district courts to exercise writs of mandamus to employees of the Executive branch.") (citing *Trackwell v. U.S. Gov't*, 472 F.3d 1242, 1247 (10th Cir. 2007))). But the Court need not reach this issue because Leopold fails to demonstrate that he would be entitled to mandamus-style relief even if the statute did reach the defendants in this case.

*Commerce Comm'n*, 294 U.S. 50, 61 (1935)).  The "clear duty to act" requirement is "equally stringent."  *Id.*  Thus, the duty must also be "'*clear and indisputable.*'"  *Id.* at 715 (quoting *United States ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931)).  A court cannot grant mandamus-style relief "to compel an official to perform an act unless the official's interpretation of her statutory duties is 'clearly wrong'" and  there is no "'room for an honest difference of opinion.'"  *Id.* at 715-16 (first quoting *Association of Am. Med. Colls. v. Califano*, 569 F.2d 101, 110 n.80 (D.C. Cir. 1977); then quoting *Reichelderfer v. Johnson*, 72 F.2d 552, 554 (D.C. Cir. 1934)).  And "where an alleged duty is not . . . plainly prescribed, but depends on a statute or statutes the construction or application of which is not free from doubt, it is regarded as involving the character of judgment or discretion which cannot be controlled by mandamus."  *Power v. Barnhart*, 292 F.3d 781, 786 (D.C. Cir. 2002) (alteration in original) (quotation marks omitted).  Because the standards are similar, the first and second mandamus elements can be considered together.  *Illinois*, 60 F.4th at 715.

 **2.**  Section 4(e)(1)(C) of the Inspector General Act provides that "whenever an Inspector General issues a recommendation for corrective

action to the agency, the Inspector General . . . not later than 3 days after the recommendation for corrective action is submitted in final form to the head of the establishment, post the document" online. 5 U.S.C. app. 3 § 4(e)(1)(C).[10]  This provision does not apply of its own force to the Inspector General of the Capitol Police.  *See id.* § 12(2) (defining "establishments" subject to that Act).  Rather, it could only apply if it were incorporated by reference in the law creating the Inspector General's office.  That law, in turn, provides that

> [t]he Inspector General shall carry out the same duties and responsibilities with respect to the United States Capitol Police as an Inspector General of an establishment carries out with respect to an establishment under section 4 of the Inspector General Act of 1978, (5 U.S.C. App. 4), under the same terms and conditions which apply under such section.

2 U.S.C. § 1909(c)(1).  When Congress enacted this provision, § 4 of the Inspector General Act did not include a public posting requirement.

---

[10] As the district court observed, it is unclear "whether the operative modal verb in section 4(e)(1)(C) is 'shall' (from section 4(e)(1)(A) or 'may' (from section 4(e)(1)(B))."  JA-92 n.7.  The disclaimer that "[n]othing in this subsection shall be construed as authorizing" particular disclosures, 5 U.S.C. app. 3 § 4(e)(2), suggests that § 4(e)(1)(C) is intended to be permissive, rather than mandatory.  But because § 4(e) does not apply at all to the Inspector General of the Capitol Police, it is not necessary to resolve this particular ambiguity. JA-92 n.7.

That requirement was not added until 11 years later. *See* Inspector General Empowerment Act of 2016, Pub. L. No. 114-317, § 4(d), 130 Stat. 1595, 1602 (adding subsection (e)(1) to § 4 of the Inspector General Act). The question therefore arises whether § 1909(c)(1) incorporates § 4 as it existed at the time Congress created OIG or whether it incorporates the current version that exists now.

The Supreme Court's opinion in *Jam v. International Finance Corp.*, 139 S. Ct. 759 (2019), answers that question. The Court explains that, "[a]ccording to the 'reference' canon, when a statute refers to a general subject, the statute adopts the law on that subject as it exists whenever a question under the statute arises." *Id.* at 769. Thus, for example, if § 1909(c)(1) has said solely that the Inspector General "shall carry out the same duties and responsibilities with respect to the United States Capitol Police as an Inspector General of an executive branch establishment," then the public posting requirement of § 4(e)(1)(C) would apply. But "a statute that refers to another statute by specific title or section number" works differently. *Jam*, 139 S. Ct. at 769. In that case, the new statute "in effect cuts and pastes the referenced statute as it existed when the referring statute was enacted,

without any subsequent amendments." *Id.* As the district court explained, "§ 1909(c)(1) does precisely that"—it refers expressly to § 4 of the Inspector General Act by specific section number, and therefore incorporates that provision as it existed at that time, without "the subsequently added duty of public disclosure." JA-93.

Congress shares the district court's understanding that Inspector General reports are not subject to any public disclosure requirement. In a series of reports on Legislative Branch appropriation bills, the House Committee on Appropriations has repeatedly stated that it "is aware that the public does not have access to reports issued by the Capitol Police Office of Inspector General." H.R. Rep. No. 117-389, at 25 (2022); *see also* H.R. Rep. No. 117-80, at 26; H.R. Rep. No. 116-447, at 22 (2020). The Committee recognized the sensitivity of these reports but expressed a "belie[f] that the Inspector General should try to make appropriate reports public if they do not compromise law enforcement activities, national security, or Congressional security and processes without redaction." H.R. Rep. No. 117-389, at 25. To that end, the Committee "instruct[ed] the Inspector General to institute procedures to make reports publicly available whenever practicable and to begin

publishing reports on its website." *Id.*; *see also* H.R. Rep. 117-80, at 26.

None of this would make any sense if Leopold's interpretation of

§ 1909(c)(1) were correct because the Inspector General would already

be required to post his reports online.[11]

Leopold nevertheless argues (Br. 52) that the "same duties and

responsibilities" and "same terms and conditions" language in

§ 1909(c)(1) "is indistinguishable from the language in the statute at

issue in *Jam*, which the Supreme Court found to . . . incorporate future

changes in the law." But Leopold ignores the fact that the International

Organizations Immunities Act of 1945 at issue in *Jam* did not refer to

"a specific provision of another statute." *Jam*, 139 S. Ct. at 769.

Rather, that Act involved "a general rather than specific reference," and

therefore incorporated "an external body of potentially evolving law."

*Id.*

Leopold also claims (Br. 50-51) that the reference canon should

not apply here because § 1909(c)(1) is unambiguous. But the entire

---

[11] In response to Congress's instruction, OIG and the Capitol Police Board have instituted procedures for redacting and releasing new reports to the public. The results are posted on the OIG website. *See* https://www.uscp.gov/oig-reports.

reason that the canon exists is that a reference to another statutory provision becomes ambiguous whenever the referent is subsequently amended and two different versions exist—the one Congress knew about when it created the reference and the new one that came into being later.  None of the cases Leopold cites where courts have declined to apply the canon support his argument.  *United States v. Ho*, 984 F.3d 191 (2d Cir. 2020), involved a statute that used the "expansive" word "any" "paired with the broad descriptor 'felony violation of the Foreign Corrupt Practices Act,'" to create a more general reference to "a *concept* described in another provision."  *Id.* at 202 (emphasis added) (quotation marks omitted).  Section 1909(c)(1), by contrast, involves a specific reference to a particular section of another statute and uses the more restrictive definite article "the" when referring to the relevant duties and responsibilities.  *New York ex rel. New York State Office of Children & Family Servs. v. U.S. Dep't of Health & Human Servs.' Admin. for Children & Families*, 556 F.3d 90, 99 (2d Cir. 2009), involved a situation where both the referring statute and the referent were amended at the same time, reflecting Congress's intent to keep them updated together.  *See, e.g.*, 2B Sutherland Statutory Construction

§ 51:8 (7th ed.), Westlaw (database updated Nov. 2022) (explaining that a legislature may "expressly or by strong implication sho[w] its intention to incorporate subsequent amendments"). And as for *United States v. Head*, 552 F.3d 640, 644 (7th Cir. 2009), the statutory interpretation adopted in that case (ten years before *Jam*) created a 7-1 circuit split and was "restrict[ed] . . . significantly" by the same court less than a year later, *see United States v. Anderson*, 583 F.3d 504, 510 (7th Cir. 2009), making it a particularly unpersuasive authority.

Finally, Leopold is incorrect to suggest (Br. 53) that "[r]ecent statutory changes confirm" his interpretation of § 1909. Congress codified the Inspector General Act after the district court entered judgment. *See* Act of Dec. 27, 2022, Pub. L. No. 117-286, § 3(b), 123 Stat. 4196, 4206. As part of this codification, Congress also updated various references to the Inspector General Act, including the reference in § 1909(c)(1), which now says that the Inspector General shall have the same duties and responsibilities as other inspectors general "under section 404 of Title 5"—the new location of § 4. 2 U.S.C. § 1909 (as amended Dec. 27, 2022); *see* Pub. L. No. 117-286, § 4(b)(4)(A), 123 Stat. at 4342. Congress made clear, however, that this codification "does not

change the meaning or effect of the existing law." Pub. L. No. 117-286, §2(b)(1), 123 Stat. at 4196; *see also Port Auth. of New York & New Jersey v. Department of Transp.*, 479 F.3d 21, 41 (D.C. Cir. 2007) (noting that this principle is "well established"). Thus, if Leopold was not correct before the codification, he is no more correct now.

As the district court concluded, "no statutory duty of disclosure" for the requested reports "is imposed by 2 U.S.C. § 1909(c)(1)." JA-93. It necessarily follows that Leopold fails to demonstrate "a clear and indisputable right to relief based on a clear and compelling duty to act." *Illinois*, 60 F.4th at 715 (quotation marks omitted).

But his claim to mandamus-style relief fails for the additional reason that § 1979 specifically forbids distribution of security information without the approval of the Capitol Police Board (and the Board has specifically ordered the Inspector General not to distribute any reports). Immediately following the public posting provision that Leopold relies on, § 4(e) of the Inspector General Act goes on to say that "[n]othing in this subsection shall be construed as authorizing an Inspector General to publicly disclose information otherwise prohibited from disclosure by law." 5 U.S.C. app. 3 § 4(e)(2). If, as Leopold

contends, § 1909(c)(1) incorporates the duty of public posting subsequently imposed on other inspectors general, then it must also incorporate the limitation on that duty that prevents the disclosure of information otherwise protected by law. Quite apart from § 4(e)(2), moreover, the specific prohibition in § 1979 would control as a matter of general statutory interpretation. *See also Edmond v. United States*, 520 U.S. 651, 657 (1997) ("Ordinarily, where a specific provision conflicts with a general one, the specific governs."). Even if this Court might be inclined to take a different view of either the scope of § 1979 or the Capitol Police Board's order, there is, at absolute minimum, "room for an honest difference of opinion" on how they should interact with § 1909 and § 4(e). *Reichelderfer*, 72 F.2d at 554. In that case, the application of the statutes together would be "sufficiently uncertain" as to preclude mandamus. *Wilbur v. United States ex rel. Kadrie*, 281 U.S. 206, 219, 221 (1930); *see also Power*, 292 F.3d at 786.

If the Inspector General were not legally required to deny Leopold's request, he certainly was not clearly and palpably wrong to do so. Leopold therefore fails to demonstrate entitlement to mandamus-style relief.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant*
*Attorney General*

MICHAEL S. RAAB

*/s/ Thomas Pulham*
THOMAS PULHAM
*Attorneys, Appellate Staff*
*Civil Division, Room 7323*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4332*
*thomas.pulham@usdoj.gov*

July 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,558 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*/s/ Thomas Pulham*
Thomas Pulham

## CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system.

*/s/ Thomas Pulham*
Thomas Pulham

# ADDENDUM

# TABLE OF CONTENTS

2 U.S.C. 1909 (effective until Dec. 26, 2022)............................................ A1

2 U.S.C. 1909 (as amended Dec. 27, 2022) (excerpts)............................ A6

2 U.S.C. § 1979 ...................................................................................... A7

5 U.S.C. app. 3 § 4 (effective until Dec. 26, 2022) (excerpts)................. A9

5 U.S.C. § 404 (enacted Dec. 27, 2022) (excerpts)................................. A10

**2 U.S.C. § 1909 (effective until December 26, 2022)**

**§ 1909. Inspector General for the United States Capitol Police**

(a) Establishment of Office

There is established in the United States Capitol Police the Office of the Inspector General (hereafter in this section referred to as the "Office"), headed by the Inspector General of the United States Capitol Police (hereafter in this section referred to as the "Inspector General").

(b) Inspector General

(1) Appointment

The Inspector General shall be appointed by, and under the general supervision of, the Capitol Police Board. The appointment shall be made in consultation with the Inspectors General of the Library of Congress, Government Publishing Office, and the Government Accountability Office. The Capitol Police Board shall appoint the Inspector General without regard to political affiliation and solely on the basis of integrity and demonstrated ability in accounting, auditing, financial analysis, law, management analysis, public administration, or investigations.

(2) Term of service

The Inspector General shall serve for a term of 5 years, and an individual serving as Inspector General may be reappointed for not more than 2 additional terms.

(3) Removal

The Inspector General may be removed from office prior to the expiration of his term only by the unanimous vote of all of the voting members of the Capitol Police Board, and the Board shall communicate the reasons for any such removal to the Committee on House Administration, the Senate Committee on Rules and Administration and the Committees on Appropriations of the House of Representatives and of the Senate.

(4) Salary

The Inspector General shall be paid at an annual rate equal to $1,000 less than the annual rate of pay in effect for the Chief of the Capitol Police.

(5) Deadline

The Capitol Police Board shall appoint the first Inspector General under this section not later than 180 days after August 2, 2005.

(c) Duties

(1) Applicability of duties of Inspector General of executive branch establishment

The Inspector General shall carry out the same duties and responsibilities with respect to the United States Capitol Police as an Inspector General of an establishment carries out with respect to an establishment under section 4 of the Inspector General Act of 1978, (5 U.S.C. App. 4), under the same terms and conditions which apply under such section.

(2) Semiannual reports

The Inspector General shall prepare and submit semiannual reports summarizing the activities of the Office in the same manner, and in accordance with the same deadlines, terms, and conditions, as an Inspector General of an establishment under section 5 (other than subsection (a)(13) thereof) of the Inspector General Act of 1978, (5 U.S.C. App. 5). For purposes of applying section 5 of such Act to the Inspector General, the Chief of the Capitol Police shall be considered the head of the establishment. The Chief shall, within 30 days of receipt of a report, report to the Capitol Police Board, the Committee on House Administration, the Senate Committee on Rules and Administration, and the Committees on Appropriations of the House of Representatives and of the Senate consistent with section 5(b) of such Act.

(3) Investigations of complaints of employees and members

(A) Authority

The Inspector General may receive and investigate complaints or information from an employee or member of the Capitol Police concerning the possible existence of an activity constituting a violation of law, rules, or regulations, or mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to the public health and safety, including complaints or information the investigation of which is under the jurisdiction of the Internal Affairs Division of the Capitol Police as of August 2, 2005.

(B) Nondisclosure

The Inspector General shall not, after receipt of a complaint or information from an employee or member, disclose the identity of the employee or member without the consent of the employee or member, unless required by law or the Inspector General determines such disclosure is otherwise unavoidable during the course of the investigation.

(C) Prohibiting retaliation

An employee or member of the Capitol Police who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority, take or threaten to take any action against any employee or member as a reprisal for making a complaint or disclosing information to the Inspector General, unless the complaint was made or the information disclosed with the knowledge that it was false or with willful disregard for its truth or falsity.

(4) Independence in carrying out duties

Neither the Capitol Police Board, the Chief of the Capitol Police, nor any other member or employee of the Capitol Police may prevent or prohibit the Inspector General from carrying out any of the duties or responsibilities assigned to the Inspector General under this section.

(d) Powers

(1) In general

The Inspector General may exercise the same authorities with respect to the United States Capitol Police as an Inspector General of an establishment may exercise with respect to an establishment under section 6(a) of the Inspector General Act of 1978, (5 U.S.C. App. 6(a)), other than paragraphs (7) and (8) of such section.

(2) Staff

(A) In general

The Inspector General may appoint and fix the pay of such personnel as the Inspector General considers appropriate. Such personnel may be appointed without regard to the provisions of Title 5 regarding appointments in the competitive service, and may be paid without regard to the provisions of chapter 51 and subchapter III of chapter 53 of such title relating to classification and General Schedule pay rates, except that no personnel of the Office (other than the Inspector General) may be paid at an annual rate greater than $500 less than the annual rate of pay of the Inspector General under subsection (b)(4).

(B) Experts and consultants

The Inspector General may procure temporary and intermittent services under section 3109 of Title 5 at rates not to exceed the daily equivalent of the annual rate of basic pay for level IV of the Executive Schedule under section 5315 of such title.

(C) Independence in appointing staff

No individual may carry out any of the duties or responsibilities of the Office unless the individual is appointed by the Inspector General, or provides services procured by the Inspector General, pursuant to this paragraph. Nothing in this subparagraph may be construed to prohibit the Inspector General from entering into a contract or other arrangement for the provision of services under this section.

(D) Applicability of Capitol Police personnel rules

None of the regulations governing the appointment and pay of employees of the Capitol Police shall apply with respect to the appointment and compensation of the personnel of the Office, except to the extent agreed to by the Inspector General. Nothing in the previous sentence may be construed to affect subparagraphs (A) through (C).

(3) Equipment and supplies

The Chief of the Capitol Police shall provide the Office with appropriate and adequate office space, together with such equipment, supplies, and communications facilities and services as determined by the Inspector General to be necessary for the operation of the Office, and shall provide necessary maintenance services for such office space and the equipment and facilities located therein.

(e) Transfer of functions

(1) Transfer

To the extent that any office or entity in the Capitol Police prior to the appointment of the first Inspector General under this section carried out any of the duties and responsibilities assigned to the Inspector General under this section, the functions of such office or entity shall be transferred to the Office upon the appointment of the first Inspector General under this section.

(2) No reduction in pay or benefits

The transfer of the functions of an office or entity to the Office under paragraph (1) may not result in a reduction in the pay or benefits of any employee of the office or entity, except to the extent required under subsection (d)(2)(A).

(f) Effective date

This section shall be effective on August 2, 2005.

**2 U.S.C. § 1909 (as amended Dec. 27, 2022) (excerpts)**

**§ 1909. Inspector General for the United States Capitol Police**

...

(c) Duties

(1) Applicability of duties of Inspector General of executive branch establishment

The Inspector General shall carry out the same duties and responsibilities with respect to the United States Capitol Police as an Inspector General of an establishment carries out with respect to an establishment under section 404 of Title 5, under the same terms and conditions which apply under such section.

...

(d) Powers

(1) In general

The Inspector General may exercise the same authorities with respect to the United States Capitol Police as an Inspector General of an establishment may exercise with respect to an establishment under section 406(a) of Title 5, other than paragraphs (7) and (8) of such section.

...

....

**2 U.S.C. § 1979**

## § 1979. Release of Security Information

(a) Definition

In this section, the term "security information" means information that—

> (1) is sensitive with respect to the policing, protection, physical security, intelligence, counterterrorism actions, or emergency preparedness and response relating to Congress, any statutory protectee of the Capitol Police, and the Capitol buildings and grounds; and

> (2) is obtained by, on behalf of, or concerning the Capitol Police Board, the Capitol Police, or any incident command relating to emergency response.

(b) Authority of Board to determine conditions of release

Notwithstanding any other provision of law, any security information in the possession of the Capitol Police may be released by the Capitol Police to another entity, including an individual, only if the Capitol Police Board determines in consultation with other appropriate law enforcement officials, experts in security preparedness, and appropriate committees of Congress, that the release of the security information will not compromise the security and safety of the Capitol buildings and grounds or any individual whose protection and safety is under the jurisdiction of the Capitol Police.

(c) Rule of construction

Nothing in this section may be construed to affect the ability of the Senate and the House of Representatives (including any Member, officer, or committee of either House of Congress) to obtain information from the Capitol Police regarding the operations and activities of the Capitol Police that affect the Senate and House of Representatives.

(d) Regulations

The Capitol Police Board may promulgate regulations to carry out this section, with the approval of the Committee on Rules and

Administration of the Senate and the Committee on House Administration of the House of Representatives.

(e) Effective date

This section shall take effect on December 8, 2004, and apply with respect to—

　(1) any remaining portion of fiscal year 2004, if this Act is enacted before October 1, 2004; and

　(2) fiscal year 2005 and each fiscal year thereafter.

**5 U.S.C. app. 3 § 4 (effective until Dec. 26, 2022) (excerpts)**

**§ 4. Duties and responsibilities; report of criminal violations to Attorney General**

...

(e)(1) In carrying out the duties and responsibilities established under this Act, whenever an Inspector General issues a recommendation for corrective action to the agency, the Inspector General—

> (A) shall submit the document making a recommendation for corrective action to—
>
>> (i) the head of the establishment;
>>
>> (ii) the congressional committees of jurisdiction; and
>>
>> (iii) if the recommendation for corrective action was initiated upon request by an individual or entity other than the Inspector General, that individual or entity;
>
> (B) may submit the document making a recommendation for corrective action to any Member of Congress upon request; and
>
> (C) not later than 3 days after the recommendation for corrective action is submitted in final form to the head of the establishment, post the document making a recommendation for corrective action on the website of the Office of Inspector General.

(2) Nothing in this subsection shall be construed as authorizing an Inspector General to publicly disclose information otherwise prohibited from disclosure by law.

**5 U.S.C. § 404 (enacted Dec. 27, 2022) (excerpts)**

**§ 404. Duties and Responsibilities**

...

(e) Recommendations for corrective actions.—

(1) Submission of documents.—In carrying out the duties and responsibilities established under this chapter, whenever an Inspector General issues a recommendation for corrective action to the agency, the Inspector General—

    (A) shall submit the document making a recommendation for corrective action to—

        (i) the head of the establishment;

        (ii) the congressional committees of jurisdiction; and

        (iii) if the recommendation for corrective action was initiated upon request by an individual or entity other than the Inspector General, that individual or entity;

    (B) may submit the document making a recommendation for corrective action to any Member of Congress upon request; and

    (C) not later than 3 days after the recommendation for corrective action is submitted in final form to the head of the establishment, post the document making a recommendation for corrective action on the website of the Office of Inspector General.

(2) Public disclosure otherwise prohibited by law.—Nothing in this subsection shall be construed as authorizing an Inspector General to publicly disclose information otherwise prohibited from disclosure by law.